Reynolds Am. Inc. v. Third Motion Equities Master Fund Ltd., 2020 NCBC 35.

STATE OF NORTH CAROLINA
FORSYTH COUNTY

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
17 CVS 7086

REYNOLDS AMERICAN INC.,

Plaintiff,

v.

THIRD MOTION EQUITIES MASTER
FUND LTD., MAGNETAR CAPITAL
MASTER FUND, LTD., SPECTRUM
OPPORTUNITIES MASTER FUND LTD.,
MAGNETAR FUNDAMENTAL
STRATEGIES MASTER FUNDS LTD.,
MAGNETAR MSW MASTER FUND LTD.,
MASON CAPITAL MASTER FUND, L.P.,
ANTON S. KAWALSKY, trustee for the
benefit of Anton S. Kawalsky Trust UA
9/17/2015, CANYON BLUE CREDIT
INVESTMENT FUND L.P., THE
CANYON VALUE REALIZATION
MASTER FUND, L.P., CANYON VALUE
REALIZATION FUND, L.P., BLUE
MOUNTAIN CREDIT ALTERNATIVES
MASTER FUND L.P., BLUEMOUNTAIN
FOINAVEN MASTER FUND L.P.,
BLUEMOUNTAIN GUADALUPE PEAK
FUND L.P., BLUEMOUNTAIN SUMMIT
TRADING L.P., BLUEMOUNTAIN
MONTENVERS MASTER FUND SCA
SICAV-SIF, AMUNDI ABSOLUTE
RETURN CANYON FUND P.L.C.,
CANYON-SL VALUE FUND, L.P.,
PERMAL CANYON IO LTD., CANYON
VALUE REALIZATION MAC 18 LTD.,
and BARRY W. BLANK TRUST,

Defendants.

**FINDINGS OF FACT,
CONCLUSIONS OF LAW, AND
FINAL JUDGMENT**

1. **THIS MATTER** arises out of the assertion of appraisal rights by Defendants, who are former shareholders of Plaintiff Reynolds American Inc. ("RAI" or the "Company"), in connection with the merger of RAI with and into a wholly-owned subsidiary of British American Tobacco plc ("BAT") (the "Merger"). By statute, the Court is charged with determining the fair value of Defendants' shares at the time of the transaction. N.C.G.S. § 55-13-30(a).

2. The Court has considered all relevant and admissible evidence of value presented by the parties at trial, including the pre-Merger trading price of RAI stock; the robustness of the negotiations between RAI and BAT and the resulting deal price; the valuation work performed by Goldman Sachs Group, Inc. ("Goldman"), Lazard (formerly known as Lazard Frères & Co.), and JPMorgan Chase and Co. ("JPMorgan") (collectively, the "Financial Advisors") in connection with the Merger; the pre-litigation valuations prepared by the parties; and other evidence from the testimony of the fact witnesses, the testimony of the parties' retained experts, and the documents introduced by the parties as set forth herein.

3. After full consideration of the evidence presented at trial and the parties' well-presented arguments in voluminous pre- and post-trial submissions and at an all-day post-trial hearing, the Court, for the reasons set forth below, concludes that the $59.64 per share that RAI has already paid Defendants equals or exceeds the fair value of RAI shares as of the date of the Merger and that RAI is therefore entitled to a judgment that no further payments to Defendants are required.

*Cravath, Swaine & Moore LLP, by Gary A. Bornstein, Thomas G. Rafferty, Samira Shah, Nicole D. Valente, and Brook E. Tay, and Smith,*

*Anderson, Blount, Dorsett, Mitchell & Jernigan, LLP, by Donald H. Tucker, Jr., Christopher B. Capel, and Clifton L. Brinson, for Plaintiff Reynolds American Inc.*

*Lowenstein Sandler LLP, by Lawrence M. Rolnick, Sheila A. Sadighi, Thomas E. Redburn, Jr., Jennifer A. Randolph, and Jarrett Sena, and Brooks, Pierce, McLendon, Humphrey & Leonard, LLP, by Jennifer K. Van Zant and Jessica Thaller-Moran, for Defendants Mason Capital Master Fund, L.P., The Canyon Value Realization Master Fund, L.P., Canyon Value Realization Fund, L.P., Canyon Blue Credit Investment Fund L.P., Canyon-SL Value Fund, L.P., Permal Canyon IO Ltd., Canyon Value Realization MAC 18 Ltd., Amundi Absolute Return Canyon Fund P.L.C., Anton Kawalsky, Blue Mountain Credit Alternatives Master Fund L.P., BlueMountain Summit Trading L.P., BlueMountain Montenvers Master Fund SCA SICAV-SIF, BlueMountain Foinaven Master Fund L.P., BlueMountain Guadalupe Peak Fund L.P.*

*Abrams & Bayliss LLP, by J. Peter Shindel, Jr., Kevin G. Abrams, and Matthew L. Miller, and the Sanderson Law Firm, PLLC, by George F. Sanderson, III, for Defendants Magnetar Capital Master Fund, Ltd., Magnetar Fundamental Strategies Master Fund Ltd., Magnetar MSW Master Fund Ltd., Third Motion Equities Master Fund Ltd., and Spectrum Opportunities Master Fund Ltd.*

*Shanahan Law Group, PLLC, by Kieran J. Shanahan, Brandon S. Neuman, and Christopher S. Battles, for Defendant Barry W. Blank Trust.*

Bledsoe, Chief Judge.

## I.

## PROCEDURAL BACKGROUND

4. RAI filed this judicial appraisal action on November 29, 2017, pursuant to N.C.G.S. § 55-13-30. (ECF No. 4.) The case was designated as a mandatory complex business case by Order of the Chief Justice of the Supreme Court of North Carolina

on November 30, 2017, (ECF No. 3), and assigned to the undersigned on December 1, 2017, (ECF No. 2).

5. This matter came on for trial before the undersigned and was tried to the Court, sitting without a jury, on June 10–25, 2019. By consent of all parties, the trial was held in Mecklenburg County. The trial was conducted by very experienced and accomplished counsel and generated an extensive record. The Court admitted into evidence 177 exhibits and received testimony both from witnesses appearing at trial and from witnesses appearing by written deposition transcript and/or by videotape.[1] The parties have submitted post-trial briefs and proposed findings of fact and conclusions of law, and the Court heard post-trial oral argument on October 2, 2019. All issues and claims are now ripe for determination.

6. Having considered the relevant and admissible evidence[2] and the submissions and arguments of the parties, the Court now makes the following

---

[1] Four experts appeared and testified at trial. Plaintiff's expert was Dr. Paul Gompers ("Gompers"), the Eugene Holman Professor of Business Administration at Harvard Business School. (Gompers Tr. 721:5–18; Parties' Witness Summaries 3, ECF No. 189.) Defendants introduced expert testimony from three experts: Dr. Fredrick Flyer ("Flyer"), the Executive Vice President of Compass Lexecon, an economic consulting firm, (Flyer Tr. 1065:18–1066:11; Parties' Witness Summaries 2); Dr. Mark Zmijewski ("Zmijewski"), a Professor Emeritus of financial accounting and corporate finance at The University of Chicago Booth School of Business, (Zmijewski Tr. 1237:23–1238:5; Parties' Witness Summaries 6); and Dr. Bilge Yilmaz ("Yilmaz"), the Wharton Private Equity Professor and a Professor of Finance at the Wharton School of the University of Pennsylvania, (Yilmaz Tr. 1863:23–1864:21; Parties' Witness Summaries 6). Nine fact witnesses appeared and testified at trial. Deposition testimony was introduced from an additional seven fact witnesses.

[2] The parties lodged numerous objections to proffered exhibits and testimony during the trial. The Court ruled on many of these objections at the time they were made. As to others, however, the Court received the proffered exhibits and testimony subject to objection and permitted post-trial briefing and argument on the objections. The Court's rulings on the parties' remaining evidentiary objections are set forth in Appendix B attached hereto and those rulings are incorporated herein.

findings of fact and conclusions of law pursuant to Rule 52(a) of the North Carolina Rules of Civil Procedure ("Rule(s)").

II.

FINDINGS OF FACT[3]

7. Plaintiff RAI is a corporation incorporated under the laws of North Carolina, with its principal place of business located in Winston-Salem, Forsyth County, North Carolina. (JX0017.0003.)

8. Prior to July 25, 2017, RAI was a public company traded on the New York Stock Exchange ("NYSE"), with over 1.4 billion shares of common stock outstanding. (JX0017.0001, .0003.) Pursuant to an Agreement and Plan of Merger dated January 16, 2017 (the "Merger Agreement"), (JX0023.0572–.0647), a wholly-owned subsidiary of BAT was merged with and into RAI on July 25, 2017 (the "Transaction Date"), with RAI continuing as the surviving corporation and as an indirect and wholly-owned subsidiary of BAT, (Corr. Stip'd Facts ¶¶ 17, 19; JX0017.0003).

9. Plaintiff seeks a judgment establishing the fair value of RAI common stock at no more than $59.64 per share. (Bornstein Tr. 13:16–18.)

---

[3] Any determination later stated as a Conclusion of Law that should have been stated as a finding of fact is incorporated in these Findings of Fact. The Court incorporates herein and adopts as findings of fact the Corrected Joint Statement of Stipulated Facts filed by the parties on September 27, 2019. (Corrected Joint Statement Stipulated Facts [hereinafter "Corr. Stip'd Facts"], ECF No. 233.) Citations to the record herein are not exhaustive and do not necessarily reflect all evidence upon which corresponding findings of fact are based.

10.     Defendants (or "Dissenters")[4] are former shareholders of RAI who asserted appraisal rights in connection with the Merger.  Dissenters seek appraisal for 9,641,911 shares held on the date of the Merger.  (Compl. Judicial Appraisal ¶¶ 3–25, ECF No. 4; Appendix A.)

11.     Dissenters contend that the $59.64 per share they received for their shares does not reflect the shares' fair value and instead seek a judgment establishing the fair value of RAI common stock at $92.17 per share, plus interest, pursuant to N.C.G.S. 55-13-30(e)(i).  (Sadighi Tr. 30:5–8.)  Dissenters also seek to recover their costs and expenses, including their attorneys' fees.

A.     RAI'S Business

12.     At the time of the Merger, RAI was a holding company whose wholly-owned subsidiaries collectively had three major business lines:  cigarettes, moist snuff, and vapor and other "next generation products."  (Corr. Stip'd Facts ¶ 7.)  RAI's subsidiaries operated predominantly in the United States, with domestic sales accounting for over 97% of their collective revenue in 2016.  (JX0017.0032, .0075, .0154.)  RAI's wholly-owned subsidiary, R.J. Reynolds Tobacco Company ("RJRT"), was the second largest tobacco company in the United States.  At the time of the Merger, RAI had a market capitalization of over $67 billion.  (PX0115.0181; Gompers Tr. 777:25–778:10.)

---

[4] Each individual Dissenter, with the number of shares the Dissenter owned and the amount RAI paid to the Dissenters for the Dissenters' shares, is set forth in the chart attached hereto as Appendix A.  As shown on the chart, there are three groups of dissenters: the "Magnetar Defendants," the "Canyon, Mason, and BlueMountain Defendants," and the "Barry Blank Trust."

13. RAI's primary product was cigarettes, which it sold through its subsidiaries RJRT and Santa Fe Natural Tobacco Company, Inc. ("SFNTC"). Cigarettes accounted for approximately 90% of RAI's revenue in mid-2017. (JX0017.0005, .0018; Wajnert[5] Tr. 35:5–7; Fragnito[6] Tr. 1670:3–5.) RAI's primary cigarette brands were Newport, the best-selling menthol cigarette in the United States; Camel; Pall Mall; and Natural American Spirit. (Corr. Stip'd Facts ¶ 10; JX0017.0017.) These brands accounted for approximately 93% of RAI's cigarette units sold in 2016. (JX0017.0038–.0041; PX0063.0044–.0045; Fragnito Tr. 1670:3–12.) RAI referred to these brands as its "drive brands" and provided greater marketing and discounting support behind them. (JX0017.0038; PX0063.0051–.0052; Gilchrist[7] Tr. 406:7–12.)

14. In addition to cigarettes, RAI sold moist snuff through its operating company, American Snuff Company, LLC ("American Snuff"), which accounted for roughly 7% of RAI's revenue in 2016. (PX0009.0003.) At the time of the Merger, American Snuff was the second largest smokeless tobacco products manufacturer in the United States, (DX0321.0008), and its primary brands included Grizzly and Kodiak, (Corr. Stip'd Facts ¶ 11; JX0017.0032). U.S. moist snuff retail volumes grew 2% to 3% annually from 2011 to 2016. (Flyer Tr. 1113:4–9; DX0321.0008.)

---

[5] Thomas Wajnert ("Wajnert"), the former Chair and Chief Executive Officer ("CEO") of AT&T Capital Corporation, was Chair of the RAI Board of Directors from 2010 until December 31, 2016. (Wajnert Tr. 31:17–32:16, 34:11–12; Parties' Witness Summaries 5.)

[6] Joseph Fragnito ("Fragnito") was President and Chief Commercial Officer of RJRT at the time of the Merger. (Fragnito Tr. 1666:9–13; Parties' Witness Summaries 3.)

[7] Andrew Gilchrist ("Gilchrist") was Chief Financial Officer ("CFO") of RAI at the time of the Merger. (Gilchrist Tr. 370:20–371:6; Parties' Witness Summaries 3.)

15. RAI had another operating company, RAI Innovations Company ("RAI Innovations"), that was responsible for its next generation products, including its vapor products. RAI's primary vapor product at the time of the Merger was Vuse. (Corr. Stip'd Facts ¶ 12.) Prior to the Merger, RAI Innovations' revenues were never material enough to warrant separate public reporting. RAI Innovations accounted for roughly $150 million in revenue in 2016, which was roughly 1.2% of RAI's total revenue that year. (Hanigan[8] Tr. 1623:11–13, 1648:9–17; DX0061.0007–.0008; DX0233.0016; JX0017.0069.) As of the Transaction Date, RAI Innovations had not yet posted a profit on its vaping and other next generation products. (Hanigan Tr. 1651:13–17; Crew[9] Tr. 642:25–643:22; Flyer Tr. 1205:17–21; Fragnito Tr. 1683:21–25.)

B. The Challenges Facing RAI and the U.S. Tobacco Industry

16. Although the parties agree that the tobacco industry is in decline, the severity and rapidity of that decline and its impact on RAI's future growth were hotly contested issues at trial. Stated broadly, RAI tended to introduce evidence suggesting that RAI's future growth is imperiled by real and substantial risks that were not quantified or measured through its ordinary course financial modeling and are significant downward determinants in assessing RAI's fair value. In contrast, Dissenters tended to introduce evidence suggesting that RAI had enjoyed strong

[8] Carolyn Hanigan ("Hanigan") was the President of RAI Innovations at the time of the Merger. (Hanigan Tr. 1612:3–7; Parties' Witness Summaries 3.)

[9] Debra Crew ("Crew") was President and Chief Operating Officer of RJRT before she became RAI's CEO and joined the RAI Board on January 1, 2017. She served as RAI's CEO through the Transaction Date. (Crew Tr. 631:17–22; Parties' Witness Summaries 2.)

revenue and earnings growth in the years leading up to the Merger, its ordinary course modeling forecasted continued strong growth for at least the next decade, and RAI's concerns over the future risks to its business were exaggerated.

17. Prior to the Merger, RAI had reasons for both optimism and serious concern about its future. Through acquisitions and divestitures, cost-cutting, and sound financial management, RAI had weathered the decline of the U.S. tobacco industry reasonably well, and it had built a portfolio of strong brands. Indeed, RAI's drive brands accounted for well over 90% of RAI's cigarette sales by mid-2017, (Fragnito Tr. 1670:3–13), and three of those brands—Newport, Camel, and Pall Mall—experienced volume growth during the ten years prior to the Merger, (Flyer Tr. 1110:4–11).

18. Nevertheless, RAI management and its Board of Directors appropriately recognized that the Company was subject to certain key negative trends affecting the U.S. tobacco industry at large. They also understood that the Company was limited in its ability to grow in the ways it had in the recent past and was exposed to key risks that, if they came to pass, would cause material harm to RAI's business and profitability and substantially limit the Company's growth or even cause its business to decline. (Wajnert Tr. 43:17–49:11; Gompers Tr. 730:10–731:5.)

a. Cigarette Volume Declines

19. The U.S. cigarette market at the time of the Merger was "[c]learly an industry in structural decline." (Crew Tr. 640:21–641:7; Wajnert Tr. 35:13–36:2; Fragnito Tr. 1669:14–1697:8.) Overall demand for cigarettes had been declining

steadily at an average of 3% to 4% per year since 1981, and that trend was expected to continue for the foreseeable future. (de Gennaro[10] Tr. 204:5–25; Wajnert Tr. 35:13–36:2; Crew Tr. 640:21–641:10; Flyer Tr. 1092:20–1093:6; JX0017.0005.) As a point of reference, the U.S. cigarette industry sold 624 billion cigarettes ("sticks") in 1981. In 2016, the number was 258 billion, an amount roughly in line with sales during the 1940s when the U.S. population was less than half its total in July 2017:



(PX0009.0006.)

20. In addition to the total number of cigarettes sold, the number of consumers and the individual levels of tobacco consumption by each consumer was also in long term decline as of the Transaction Date. (JX0017.0018; Flyer Tr. 1188:17–1189:17.)

---

[10] Maxence de Gennaro ("de Gennaro") was a Managing Director at Lazard who provided financial advice to RAI concerning the Merger as well as in connection with RAI's purchase of Lorillard Tobacco Company ("Lorillard") in 2015. (de Gennaro Tr. 184:13–185:18, 186:21–187:9; Parties' Witness Summaries 2.)

The number of new smokers also was steadily decreasing, (Flyer Tr. 1189:8–17), dropping from 20% of 20-year-olds to 10% over the prior 20-year period, (Flyer Tr. 1189:12–17, 1204:20–1205:13). The age at which smokers reached their peak smoking consumption was also accelerating. (Flyer Tr. 1188:17–1189:7.)

21. The evidence showed that there are several factors contributing to the tobacco industry's decline, many of which are familiar: health concerns; price increases; restrictions on advertising and promotions; governmental and private restrictions on the locations where tobacco may be used; increases in federal, state, and local regulation and excise taxes that have made tobacco more expensive for consumers; a general decline in the social acceptability of smoking; and a migration to smoke-free products. (JX0017.0018; de Gennaro Tr. 204:3–25.)

22. RAI was not immune to the industry-wide decline. Testimony from RAI's Fragnito confirmed that RAI's sales volumes have declined at rates approaching the rates of decline in the industry overall. (Fragnito Tr. 1669:10–1670:2.) Indeed, Dissenters' expert Flyer testified that it is possible RAI's cigarette business will decline such that by 2026, cigarettes "may be 15, 20 percent of the business[,]" as opposed to nearly 90% of RAI's business in 2017. (Flyer Tr. 1207:4–23.)

23. RAI had been able to partially offset declining volumes by growing its market share for certain of its brands. (Fragnito Tr. 1678:4–9.) Increased market share, however, does not directly correlate with increased profitability. As Fragnito put it, gaining market share in cigarettes "essentially just means you're gaining a larger slice in a much smaller pie." (Fragnito Tr. 1678:10–15.) There was no evidence

that RAI's modest share gains would materially offset annual volume declines of 3% to 4% in the future. In fact, RAI's internal documents state otherwise. In materials prepared for a February 2, 2017 meeting of RAI's Board of Directors, in which RAI management described 2016 as a "BIG year" with "Outstanding results[,]" RAI saw an overall increase of 0.3% in its share of cigarette sales, but nonetheless experienced a 2% decline in cigarette shipments and expected that "[l]ong term, [RAI would] resume a 3% - 4% industry decline[.]" (DX0291.0121–.0124.)

### b. Limited Sources of Potential Growth

24. Given the substantial declines in sales of cigarettes, which accounted for a substantial majority of RAI's profits, RAI historically employed a variety of operating and non-operating mechanisms in order to meet its goal of annual earnings per share ("EPS") growth in the "high single-digit[s.]"[11] (Wajnert Tr. 110:14–18; Gilchrist Tr. 373:20–374:13.) RAI was able to achieve its EPS targets through a combination of engaging in mergers and acquisitions, aggressively cutting costs, taking advantage of low interest rates to refinance its debt, repurchasing its own stock, and—most importantly—raising prices for its products. (Crew Tr. 642:7–24, 644:17–645:15, 646:4–25, 647:16–648:18; Peters[12] Dep. Tr. 93:05–94:01.) The evidence showed,

---

[11] RAI's EPS growth goal was in response to shareholder demands and expectations. (Gilchrist Tr. 373:20–374:13 ("Q. And is there a reason that the company tracked EPS as its primary metric? A. That was what the shareholders were primarily focused on. That's what our board had structured, you know, a lot of our goals and objectives around. So that was our primary focus and that's where our goals and objectives had been – you know, had been focused from the board perspective.").)

[12] Mark Peters ("Peters") was RJRT's CFO at the time of the Merger. (Peters Dep. Tr. 17:14–18:7.) Portions of Peters's deposition were admitted into the trial record. (ECF No. 207.)

however, that, at the time of the Merger, the mechanisms RAI had previously employed to increase profitability and meet its EPS targets were less likely to be available in the future.

### i. Fewer M&A Opportunities

25. Historically, consolidation had been a way for the tobacco industry to lower costs and address declining consumer demand. While there had originally been a group of seven leading U.S. tobacco companies, commonly referred to as the "Big Seven," over time consolidation in the industry had shrunk the number of competitors from the Big Seven to the "Big Three." (Crew Tr. 646:17–25; Fragnito Tr. 1674:13–16.) The Big Three included (i) Altria Group, Inc. ("Altria"), the maker, through its subsidiary Philip Morris USA Inc. ("Philip Morris"), of the leading Marlboro brand cigarette and the market leader with a nearly 50% share of sales; (ii) RAI, with a 32.3% share of sales; and (iii) Imperial Tobacco Group, PLC ("ITG"), with a 9% share of sales. Several smaller manufacturers of deep-discount brands competed for market share against the Big Three. (Corr. Stip'd Facts ¶ 8; JX0017.0005–.0006; JX0004.0024; PX0063.0047; Fragnito Tr. 1674:9–18.)

26. RAI had played a leading role in this consolidation trend. As Crew testified, RAI had long served as a "consolidator in the industry[,]" with that history of consolidation helping Reynolds "stay[ ] in business." Crew testified that most of the Big Seven U.S. tobacco companies "are now part of Reynolds American[,]" and described how RAI had engaged in a series of acquisitions, culminating in the acquisition of a large competitor, Lorillard, in 2015. (Crew Tr. 646:11–647:6;

JX0014.0001 ("Our 900% +return over the last 10 years ha[s] been largely driven by deals[.]").)

27. By the time of the Merger negotiations in October 2016, however, it appeared that RAI would no longer be able to rely on meaningful future mergers and acquisitions to overcome the effect of declining cigarette sales volumes and to increase its profitability and EPS. As RAI's CFO at that time, Gilchrist testified that "consolidation had sort of run its course in terms of really material impact consolidation." (Gilchrist Tr. 433:13–20.) Wajnert similarly testified that, due to antitrust concerns, there "were not major revenue [M&A] opportunities at all" because "the industry had consolidated so much over the years[,]" leaving only three major competitors. (Wajnert Tr. 40:18–41:2.) In addition, de Gennaro testified that, after RAI acquired Lorillard, "it was inconceivable that the regulators" would have allowed further consolidation in the tobacco industry to make it effectively a duopoly. (de Gennaro Tr. 190:10–21.) In short, "there [were] no big deals remaining." (JX0014.0001; Crew Tr. 647:3–15; Flyer Tr. 1156:14–24; Peters Dep. Tr. 93:05–94:01.) Thus, future consolidation was not a likely strategy for RAI to increase profitability and EPS.

ii.    Reduced Cost-Cutting Opportunities

28. Another important tool RAI had used to increase its profitability had been cost-cutting. RAI historically had successfully implemented numerous cost-cutting initiatives to improve productivity and efficiency. (Wajnert Tr. 39:8–23; Crew Tr. 642:16–19.) By the time of the Merger, however, RAI's ability to further cut costs as

a standalone company had been nearly exhausted, particularly as synergies[13] had gotten "thin." (Crew Tr. 648:19–649:5; Peters Dep. Tr. 93:05–94:01.) For example, RAI identified $800 million in synergies attributable to the acquisition of Lorillard in 2015, but by July 2016, the vast majority of those synergies had been achieved. (Crew Tr. 649:5–649:15; Wajnert Tr. 52:15–17; Gilchrist Tr. 490:1–10 ("I believe the majority had been captured and we were just – the last piece of synergies had to do with machinery and the move from the old Lorillard facility to Winston-Salem.").)

### iii. Debt Refinancing Completed

29. RAI also employed non-operating financial strategies affecting its finances "below the line" to meet EPS targets, including liabilities management. (Crew Tr. 647:16–25.) Given RAI's extensive mergers and acquisitions activity, RAI often had substantial levels of debt. Accordingly, in 2016, one of the financial steps RAI took to help meet its EPS goals was to capitalize on historically low interest rates to refinance much of its debt. But this was a one-time event. Because there were few opportunities for further debt refinancing, that once-effective strategy no longer

---

[13] Synergies are gains that a buyer expects to achieve through the combination of its existing business and the acquired one. *See, e.g.*, Adam Barone, *Synergy*, Investopedia (March 10, 2020), https://www.investopedia.com/terms/s/synergy.asp ("Synergy is the concept that the combined value and performance of two companies will be greater than the sum of the separate individual parts."); *Synergy*, Merriam-Webster's Online Dictionary, https://www.merriam-webster.com/dictionary/synergy (defining "synergy" as "a mutually advantageous conjunction or compatibility of distinct business participants or elements (such as resources or efforts)").

presented RAI a significant path to increase its profitability moving forward. (Crew Tr. 648:9–18; Price[14] Tr. 1044:20–25.)

### iv. Limited Share Buyback Opportunities

30. RAI also sought to increase its EPS by repurchasing shares of its stock on the open market in share buybacks. (Crew Tr. 647:16–25; Price Tr. 1022:16–22 ("So the share repurchases are something that we had been doing for a number of years. Something that the analysts liked seeing. And it was an efficient way to utilize the cash when we didn't have other uses for it.").) Although RAI's Board of Directors approved a $2 billion share repurchase program in June 2016 due to certain unique circumstances relating to RAI's 1998 Master Settlement Agreement (the "MSA") payment obligations in 2017, (Gilchrist Tr. 412:4–413:11; Wajnert Tr. 146:2–5), as with debt refinancing, share buybacks were not a viable, long-term solution to overcome declining annual cigarette sales volumes to maintain or increase profits, (Gilchrist Tr. 413:12–14).

### v. Constrained Net Price Realization

31. Through the date of the Merger, the primary driver of profit growth for RAI and its competitors in the U.S. tobacco industry had been the ability to increase cigarette pricing above the rate of volume decline over many years due in no small part to the largely inelastic demand for cigarettes resulting from nicotine addiction. (JX0004.0006, .0028; Flyer Tr. 1095:17–21, 1096:12–21; Crew Tr. 642:7–15; de

---

[14] Ronald Price ("Price") was Vice President of Business Development of RJRT at the time of the Merger. (Price Tr. 940:12–941:7; Parties' Witness Summaries 5.)

Gennaro Tr. 204:3–16; Cameron[15] Dep. Tr. 25:08–16; Wajnert Tr. 37:18–38:4.) RAI referred to this pricing power as "net price realization." (DX0003.0094.) As Fragnito explained, "[I]f volume is declining at 3 percent, we would have [to] price above the 3 percent in order to drive profit." (Fragnito Tr. 1672:5–11.)

32.   RAI recognized that its reliance on net price realization would increase as volumes continued to decline and thus that achieving sufficient net price realization was "a critical imperative" to meet its EPS goals.   (Fragnito Tr. 1726:3–17; PX0063.0044; JX0004.0006.) RAI anticipated that its future growth "would continue through increased pricing on cigarettes as the volumes declined[,]" but RAI also believed that the assumption that RAI could continue to raise prices indefinitely was "tenuous at best[,]" (Wajnert Tr. 41:14–19), because "you get to a point where the volume declines were so substantial that you would end up having to raise prices to 30, 40, $50 a pack of cigarettes, which obviously wouldn't make sense[,]" (Wajnert Tr. 39:2–7). RAI's Financial Advisors and RAI management, including Cameron, shared these views, recognizing that pricing strategies cannot offset volume decline "[i]n perpetuity" because to assume such would require "selling the last cigarette for 20 billion" dollars. (Cameron Dep. Tr. 93:13–25; de Gennaro Tr. 204:10–25; Crew Tr. 644:17–645:15; Fragnito Tr. 1672:20–1673:5; Gompers Tr. 746:11–17.)

---

[15] Susan Cameron ("Cameron") was RAI's CEO from 2005 to 2010 and again from May 1, 2014 until December 31, 2016.   She became the Chairman of the RAI Board on January 1, 2017 and held that position at the time of the Merger. (Cameron Dep. Tr. 10:18–11:8; Fragnito Tr. 1669:5–9; Parties' Witness Summaries 1.)   Portions of Cameron's deposition were admitted into the trial record. (ECF No. 201.)

33. Additionally, Altria's *de facto* control over pricing dynamics in the cigarette industry was a significant source of uncertainty impacting RAI's ability to continue to increase prices to offset volume declines. For the two decades prior to the Merger, cigarette pricing was led by Altria, which would raise prices for cigarettes twice per year, amounting to about a 5% to 6% total price increase annually. The rest of the U.S. tobacco industry, including RAI, tended to follow Altria's pricing. (JX0004.0008–.0013; PX0063.0100, .0107; Wajnert Tr. 37:1–8; Fragnito Tr. 1673:21–25.) Altria's subsidiary Philip Morris and its pricing practices are "the number one reason the industry can or cannot take pricing." (Jennette[16] Dep. Tr. 87:08–88:25.)

34. RAI could not raise its prices before Altria because "Altria had a substantial market leverage, had much more volume. They had more control over the marketplace." (Wajnert Tr. 38:7–12.) For this reason, RAI believed that if Altria did not raise prices, RAI could not profitably raise prices either, without accelerating switching or "downtrading" from its consumers, (Crew Tr. 644:17–645:15; Fragnito Tr. 1675:19–1676:21; PX0063.0107; JX0009.0001), which occurs "when a consumer will choose a lower priced offering versus their usual brand that they would buy[,]" (Fragnito Tr. 1680:5–22). In particular, RAI feared losing volume to Altria's already popular Marlboro cigarettes, "which would be a preferred brand" if priced lower. (Wajnert Tr. 38:17–23.)

---

[16] Winton Jennette ("Jennette") was RJRT's Senior Vice President of Strategy and Planning at the time of the Merger. (Jennette Dep. Tr. 12:21–24; Parties' Witness Summaries 4.) Portions of Jennette's deposition were admitted into the trial record. (ECF No. 205.)

35.    RAI's perception of the pricing environment is grounded in historical fact. In 1993, Altria's predecessor decided to dramatically drop the price of Marlboro cigarettes on what is referred to in the industry as "Marlboro Friday." As a result of Marlboro Friday, "pricing in the U.S. came down significantly[.]" (Flyer Tr. 1090:8–14; Peters Dep. Tr. 92:8–17 ("Marlboro Friday . . . reduced industry profits dramatically.").)

36.    Further, Altria was a diversified company with sizeable interests in sectors besides tobacco, including beer, wine, and cigars, among others. RAI was less diversified and more reliant on cigarette pricing than Altria to grow its earnings. (JX0004.0008–.0013; PX0063.0044, .0048–.0049; Fragnito Tr. 1677:1–17.) In 2016, in connection with the merger of beer companies AB InBev and SABMiller, of which Altria owned over 25%, Altria received a large cash payment and a roughly 10% equity stake in the newly-formed company. There was significant concern within RAI that Altria would have less pressure to raise cigarette prices as it had done in the past because of the additional financial flexibility brought by the SABMiller deal. (PX0063.0044, .0048–.0049, .0107; JX0004.0008–.0009; JX0009; Fragnito Tr. 1673:17–1674:8, 1677:18–1678:3 ("So [Altria has] other revenue and profit streams that we don't have at Reynolds that could potentially alleviate – if one of those other profit streams did exceptionally well, it would reduce their need to drive a significant amount of profit on their combustibles business via pricing.").) As Wajnert explained,

> If Altria had more alternatives to deliver earnings growth to their share owners that wasn't dependent on raising prices for their cigarette portfolio, that would be a threat to Reynolds. Because if Altria didn't raise prices, Reynolds would not raise prices. In which case, the

reduction in cigarette volumes would have a significant impact on Reynolds.

(Wajnert Tr. 44:25–45:6.)

37. RAI also perceived a risk that Altria and Philip Morris International, an international tobacco company with no presence in the United States, would recombine and become a stronger, even more diversified company, again reducing Altria's need to raise prices and putting RAI's ability to compete with the combined company at risk. (JX0014.0001; Cameron Dep. Tr. 25:8–26:9; Wajnert Tr. 83:15–84:6 ("[T]hey had been together previously and had been separated – put those two companies back together, the economic power and the brand power would be tremendous. And, in fact, they were working together in terms of innovation products as well, which was very threatening to Reynolds.").)

38. RAI also had reason to believe that it would face increased pricing pressure from deep-discount cigarette brand manufacturers. As pricing by the Big Three continued to increase, these smaller manufacturers could become more competitive by maintaining pricing levels, or increasing them only slightly, and creating greater relative discounts to the brands of the Big Three. (Fragnito Tr. 1678:16–1679:15.) In other words, the more the Big Three raised prices, the more attractive the deep-discount brands would become to consumers and the more those brands could raise their prices and increase their profits while still remaining lower-priced alternatives. (Fragnito Tr. 1679:16–1680:4.)

39. RAI was particularly vulnerable to this threat due to its product mix. RAI's sales were concentrated in premium and super-premium brands, which accounted for

approximately 73% of RAI's cigarette volume in 2016. (JX0017.0018; Flyer Tr. 1113:13–17.) This concentration made RAI more susceptible to downtrading: "as consumers look for less expensive alternatives [to RAI products], there's less products within our portfolio that would meet that need from a price perspective. So they ultimately move to products outside of our portfolio." (Fragnito Tr. 1680:5–22; JX0017.0018 ("RAI's subsidiaries are more susceptible to consumer price sensitivities[.]").) In addition, smokers in the 50+ age category, who are the heaviest smokers and account for approximately 50% of RAI's revenue, are more sensitive to increases in cigarette prices and are more likely to downtrade in the face of increasing prices.[17] (Fragnito Tr. 1682:13–1683:8.)

40. Despite these serious long-term risks, RAI anticipated that, in the near term (and barring a change in behavior by Altria or increased excise taxation), it would be able to increase cigarette prices at historical levels and continue to profit. (Fragnito Tr. 1672:2–1673:16.) Over time, however, RAI's ability to maintain growth through increased pricing would become more and more doubtful. (Fragnito Tr. 1672:20–1673:3 ("[T]here would ultimately be a time where . . . the price of cigarettes would have to be at a point where it would just accelerate the rate of decline.").)

vi. Uncertain Growth and Profitability of Next Generation Products

41. RAI expressed hope that its "next generation products," including vapor products, could someday be potentially "transformative" for RAI's business and

---

[17] This risk was somewhat mitigated by Newport's appeal to younger smokers. (Flyer Tr. 1115:19–25.)

present "big opportunit[ies]" that could provide a possible avenue for overcoming declining cigarette sales. (Crew Tr. 642:20–24; Hanigan Tr. 1613:14–17.) The evidence shows, however, that RAI's vapor products were not profitable at the time of the Merger. (Flyer Tr. 1205:17–21; Wajnert Tr. 36:3–25; Crew Tr. 642:25–643:22; Hanigan Tr. 1651:13–17.)

42. Indeed, despite RAI's high hopes, it was unclear whether and when RAI's vapor products would achieve profitability or the degree to which those products would impact RAI's future revenues and profits. Prior to the Merger, RAI did not "have a path to profitability based on a specific milestone" for its vapor products. (Fragnito Tr. 1704:20–1705:2.) Vapor had not been profitable because

> the cost of goods associated with an electronic cigarette are exponentially higher than a combustible cigarette as you would imagine. The electronics, the batteries, the fact that they're manufactured in China. And we don't have the scale – the category is still relatively small in the world of total tobacco. So without the econom[ies of] scale to offset those higher costs. And because we're still trying to educate, inform and gain trial on consumers, there's not a lot of pricing power in the industry. . . . So relatively low price despite the high cost of goods, on top of the significant amount of investment required from an R&D[ a]nd then advertising and marketing perspective makes it difficult to make money in that.

(Fragnito Tr. 1687:17–1688:7.)

43. Another challenge facing RAI in the vapor market was that, unlike cigarettes, the vapor market was highly fragmented and rapidly evolving, with more than a thousand competitors marketing their products through different "channels," including through convenience stores and gas stations (the "C-gas" channel, in which RAI competed) and through vape shops and e-commerce (in which RAI did not compete). (Hanigan Tr. 1639:8–1640:21; Fragnito Tr. 1684:18–1685:21.)

44.     As of July 19, 2017, approximately 950,000 vapor products had been registered with the FDA (including 900,000 e-liquids). (JX0019.0011.) RAI's leading vapor brand, Vuse, was sold only through the C-gas channel, in which RAI was able to use its cigarette relationships to optimize shelf space and placement. While Vuse was the industry leader in the C-gas channel with approximately 30% share of sales, Vuse's overall market share in all channels was estimated to be closer to 5%. (PX0009.0025; Hanigan Tr. 1618:14–19, 1643:24–1644:13.)

45.     Sales of vapor products impacted RAI's profitability in other ways. Certain consumers switched from cigarettes to vapor, resulting in greater sales of unprofitable vapor products at the expense of profitable sales of cigarettes. (Crew Tr. 643:23–644:16; Fragnito Tr. 1688:8–1689:21.) Similarly, RAI found that in 2015, 42.7% of adult tobacco users under age 35 consisted of "poly-users"—consumers who used vapor products in addition to other tobacco products. RAI's profitability decreased as vapor sales to those customers replaced cigarette sales. (PX0009.0004; Fragnito Tr. 1688:8–1689:21.)

46.     RAI's efforts prior to the Merger to address its unprofitable vapor business through mergers and acquisitions also failed. RAI Innovations considered acquiring minority positions in three small vapor companies (Vape Forward, Cosmic Fog and Five Pawns) but elected not to pursue transactions with any of them because none passed RAI Innovations' product integrity tests. In any event, none of these companies had revenues that would have materially affected the profitability of RAI Innovations' vapor business. (Hanigan Tr. 1637:20–1639:1, 1650:16–1651:7.)

47. In addition to these hurdles, RAI identified "major obstacles to the consumer adoption of vapor[,]" including, among other things, the "uncertainty and potential difficulty of the vapor innovation approval pathway" and "a tough legislative and regulatory environment." (PX0063.0057.)

48. At the federal level, the U.S. Food and Drug Administration ("FDA") possesses broad authority under the 2009 Family Smoking Prevention and Tobacco Control Act (the "Tobacco Control Act"), 21 U.S.C. § 387 *et seq.*, over the manufacture, sale, marketing, and packaging of tobacco products. In May 2016, the FDA issued a regulation expanding the purview of the Tobacco Control Act to include vapor products. Prior to this announcement, there had been no federal regulation, and very little state or local regulation, of the vapor industry. Afterwards, vapor product manufacturers were required to seek approval for existing vapor products on the market by submitting Premarket Tobacco Product Applications ("PMTAs"). FDA approval of a PMTA was also required before a manufacturer could lawfully release a new tobacco product. (JX0017.0011; Hanigan Tr. 1620:9–17; Crew Tr. 642:25–643:22; DX0230.0005.)

49. While RAI was better-positioned to comply with the FDA's regulations than some of its vapor competitors, RAI was not able to capitalize on that advantage because the FDA delayed the deadline by which manufacturers were required to submit a PMTA, allowing RAI's competitors to sell vapor products in the market longer without FDA approval. (Hanigan Tr. 1639:8–1640:9.) From 2009 until the Transaction Date, the FDA authorized the introduction onto the market of only eight

new tobacco products, all of which were noncombustible cigarettes. (Flyer Tr. 1087:4–1088:6.)

### c. Substantial Regulatory, Taxation, and Litigation Risk

50. In addition to industry-wide cigarette volume declines and limited opportunities for growth, extensive evidence was introduced showing that RAI faced a number of other serious risks that had the potential to undermine the Company's future profitability or, depending on their nature and magnitude, have devastating effects on RAI's future business prospects. (Gompers Tr. 730:10–731:5; Gilchrist 387:25–391:9.)

### i. Regulatory Risk

51. At the time of the Merger, the tobacco industry was highly regulated; tobacco products were subject to a variety of federal, state, and local laws and regulations, and regulation had an extensive impact on how the industry operated.[18] (JX0017.0011.) The evidence shows that the existing and future regulation of tobacco products had the potential to substantially affect RAI's ability to increase future profits.

52. At the federal level, the Tobacco Control Act was a concern for the tobacco industry. As Wajnert explained,

> [H]aving the Tobacco Control Act put in place with the FDA having supervision created perceived risks and I think have manifested themselves in that the FDA has been working to reduce the harm within

---

[18] At the same time, extensive regulation, including restrictions on marketing, distribution, points of sales, and taxation, made it very difficult, expensive, and time-consuming to bring new products from other countries into the United States, if at all. (Flyer Tr. 1086:6–1086:17, 1089:1–25.)

> cigarettes, which could include changing formulations, could include attractiveness of the product, and it could include banning certain flavors, for example, as in menthol. All those were uncertain at the time and I think still uncertain.

(Wajnert Tr. 46:7–20.)

53. In addition to federal regulations, many state, local, and municipal governments and agencies had adopted laws or regulations restricting or prohibiting the public use of tobacco products, including but not limited to age and location restrictions, and bans or restrictions on the sale or use of e-cigarettes and other tobacco products, including menthol cigarettes. (JX0017.0011; Crew Tr. 691:23–692:9; Fragnito Tr. 1692:7–21, 1694:9–1695:6.) Indeed, regulation and legislation at the local level were "becom[ing] the new frontier of tobacco control" and such efforts were viewed by RAI as a significant threat, as there were "close to 700 pieces of anti-tobacco legislation at the local level" that had the potential to impact RAI's and the industry's growth prospects.[19] (Fragnito Tr. 1692:4–21.)

54. The parties presented conflicting evidence concerning the likelihood of future regulation and its effects on RAI's business. Much of this evidence related to regulation of menthol cigarettes.

55. Menthol regulation was a primary concern for RAI because of the extent to which RAI relied on menthol products for its revenue and profit, particularly in comparison to other tobacco companies. At the time of the Merger, 60% of RJRT's

---

[19] Flyer testified that the purpose of much of this legislation was to reduce "second-hand smoke essentially. And the health effects of . . . [e]nvironmental smoke levels . . . . So that's really my understanding is the impetus for – behind most of these laws in public places, you don't want to expose nonsmokers to smoke." (Flyer Tr. 1183:6–16.)

revenue, and 50% of RAI's overall revenue, was attributable to sales of menthol cigarettes. RAI's Newport brand was the number one menthol cigarette on the market and was RAI's best-selling product. (JX0017.0016; Fragnito Tr. 1670:17–1671:5, 1671:20–1672:1; Flyer Tr. 1212:16–19.)

56. The RAI Board attributed "growing . . . importance" to sales of menthol cigarettes to RAI's adult smokers under 35 because RAI was realizing market share growth to that demographic group, which implied that as "this segment aged, there would be continued usage of the [menthol] product" due to nicotine addiction and brand loyalty. (Wajnert Tr. 55:18–56:4; PX0009.0008.) As a result, heightened regulation of menthol, such as a federal ban on sales of menthol cigarettes, was viewed as "disastrous" and "devastating" for RAI, (Wajnert Tr. 119:21–120:5; Fragnito Tr. 1690:14–20), and presented a credible, significant threat to RAI's ability to maintain or increase its profitability into the future.

57. Evidence was introduced that the FDA viewed a ban on menthol as a potentially viable regulatory strategy. In 2013, the FDA announced its intention to review the possible increased regulation of menthol cigarettes, including a potential ban on menthol-flavored products. This announcement acted as an "overhang on the [C]ompany and in the industry." (Fragnito Tr. 1671:20–1672:1; JX0017.0016.) Crew explained that after the FDA's 2013 review of menthol, RAI believed that the FDA

> had never stopped looking at it, despite the fact they couldn't find any increased toxicity or disease caused by menthol cigarettes, it was very clear that the government was still intending to do something about menthol. We weren't sure what they were going to do, whether it was just reduce the amount of menthol allowed or they could go all the way to a ban. We weren't sure exactly whether – but they – we knew they

felt like they could do that. So we were very concerned about that. It was one of our largest profit contributors to the business.

(Crew Tr. 662:5–16.) That the FDA had, prior to the Merger, expressly considered increasing regulation of menthol demonstrates that RAI's fears of future regulation were well-founded.

58. Flyer did not believe a federal menthol ban would have a meaningful impact on the value of RAI. The Court finds this testimony unpersuasive. Flyer testified that a menthol ban would simply push smokers to non-menthol products, but his own research indicated that when adult smokers switched from Newport to another brand, those smokers were much more likely to switch to Marlboro or another non-RAI brand, thus reducing RAI revenues. (Flyer Tr. 1081:13–1082:20, 1215:1–1216:2 ("It makes sense it would be Marlboro because Marlboro's four times the size or maybe five times the size of Camel. So it would have to almost certainly be Marlboro as being the closest substitute.").)

59. Dissenters also offered statements by RAI reflecting RAI's expectation that it would be able to successfully manage regulatory risks associated with menthol. (DX0009.0007 ("With new FDA chief, see potential for some easing of the more onerous regulations."); Price Tr. 1049:6–19.) The Court is again unpersuaded. While RAI no doubt had plans to address any future menthol regulation and seek to mitigate its impact, the record is clear that at the time of the Merger the threat of future menthol regulation was a significant risk to RAI's future profit growth and therefore its fair value.

60. The Tobacco Control Act also established onerous requirements for a manufacturer to launch a new tobacco product or modify an existing product, which are known as "product standards" regulations. (JX0017.0016; JX0009.0001–.0002; Flyer Tr. 1087:4–1088:6.) These regulations imposed restrictions on the composition and use of RAI's products and had the ability to significantly affect RAI's revenues and cash flows. (JX0017.0014–0017; Wajnert Tr. 119:21–120:5.)

61. Pursuant to FDA product standards regulations, manufacturers of tobacco products introduced between February 15, 2007 and March 22, 2011 were required to file a "substantial equivalence report" with the FDA's Center for Tobacco Products (the "CTP"). In the report, the manufacturer had to demonstrate that the new product was "substantially equivalent" to a product already on the market. A product subject to such a report is referred to as a "provisional product" because it was subject to the CTP's approval. If the CTP determined that a product was not "substantially equivalent" to a product already in the market, the FDA could force the removal of the provisional product from the market. (JX0017.0016.)

62. In September 2015, the CTP issued orders determining that four RAI products, including RJRT's Camel White and Camel Crush Bold brands, were not substantially equivalent to a product already in the market. The CTP ordered RAI to "stop all distribution, importation, sale, marketing and promotion" of those products. (JX0017.0016; DX0069.0013; DX0291.0112; DX0392.0083.) Nearly all of RAI's products on the market as of the Transaction Date were provisional products

that were subject to a future FDA determination that could require RAI to remove the product from the market. (JX0017.0014–.0017.)

63. In addition to product standards regulations on cigarettes, RAI's moist snuff business faced potentially catastrophic regulation. Prior to the Merger, the FDA proposed regulations limiting the amount of a particular compound—N-nitrosonornicotine, commonly known as "NNN"—that was found in RAI's moist snuff products. If such a regulation were put into effect, it could "basically ban" RAI's entire moist snuff portfolio. (Crew Tr. 663:16–664:7; JX0016.0004.)

64. Product standards regulations were not the only threat to RAI's business imposed by the FDA. In 2015, SFNTC received a "warning letter" from the FDA concerning SFNTC's use of descriptors including "natural" and "additive free" to describe its Natural American Spirit cigarettes. (Crew Tr. 662:15–25.) The FDA letter was cited in over a dozen private lawsuits that pose a threat to the future growth and profits of RAI's fastest-growing brand. (Crew Tr. 658:18–20.)

65. The FDA also publicly announced that it was considering requiring a decrease in nicotine levels in cigarettes to a fraction of current levels. (Flyer Tr. 1199:16–1200:1.) As Fragnito testified, "the goal of the FDA with [lowering nicotine levels] is essentially to terminate the existence of the industry" so that "ultimately smoking would go away." (Fragnito Tr. 1691:3–11.)

66. Restrictions on sales of flavored tobacco products generally, beyond menthol, also represented a significant regulatory headwind for RAI. (DX0009.0007.) At the time of the Merger, the FDA was actively considering proposals to limit the sale of

flavored vapor products. (Fragnito Tr. 1690:11–13, 1691:18–1692:3.) Certain jurisdictions, including San Francisco and Beverly Hills, had already banned flavored products altogether. (DX0009.0007; Fragnito Tr. 1692:13–16, 1695:3–6.)

67. Numerous state and local governments had also passed legislation and ordinances limiting the places in which tobacco may be used. For example, smoking had been prohibited on government property in Charlotte, and all forms of tobacco use had been prohibited in public parks in Mecklenburg County. The express purpose of these regulations is to "deglamorize and denormalize tobacco use helping it become less acceptable." (Flyer Tr. 1181:14–1183:21.)

ii. Taxation Risk

68. In addition to risks associated with heightened regulation, RAI faced the prospect of significant excise tax increases. Cigarettes and other tobacco products are subject to substantial taxation at the federal, state, and local levels. On average, 45–50% of the price of a pack of cigarettes is related to excise taxes. (JX0017.0019; Fragnito Tr. 1695:7–1696:22.) Taxing authorities have increasingly imposed higher excise taxes on tobacco products. As Price explained, "[A]s the governments become more and more in need of money, tobacco is a very easy target for them to increase taxes, whether it be at the state level or the federal level." (Price Tr. 976:12–977:5.)

69. These increases in taxation posed significant risks to RAI's business. While an increase in the federal excise tax was viewed as the "most impactful" because it would be applied on a national basis, (Gilchrist Tr. 384:12–17), state excise taxes also significantly affected RAI's profitability. RAI projected it would face an annual five-

cent-per-pack increase in net state excise taxes, an increase that, standing alone, would cause RAI to lose sales of 300 million sticks and about $30 million in profit every year. Fragnito explained that "at any given time of the 50 states, there were usually a dozen or so proposals to increase" state excise taxes. RAI expected these trends to continue, with each state proposing to increase its excise tax every two to four years. (Fragnito Tr. 1700:10–1701:8, 1770:25–1772:5; JX0009.0001; JX0010.0004; JX0017.0019.)

70. Increased excise taxes have resulted in declines in overall sales volume and shifts by consumers to less expensive brands. Additional increases are likely to result in future sales declines or downtrading to less expensive brands or both. Increased taxes have also reduced RAI's ability to increase pricing in areas with steep increases in excise taxes. (JX0017.0019; Fragnito Tr. 1695:7–14; JX0009.0001.) As Wajnert explained,

> [W]hether federal or state excise taxes, if those were raised, that would be passed through to the consumer which would raise the prices of cigarettes which would have the effect of potentially reducing volumes, because those pricing – the taxes are passed through.

(Wajnert Tr. 45:7–15.)

71. For example, in April 2017, California raised its excise taxes by $2 per pack, which had an immediate effect on demand. Fragnito explained that the increase

> essentially amounted to a 35 percent increase in prices. California's about 6 percent of industry volume. So it's one of the largest states from a volume perspective. And so that increase resulted in volumes declining in the range of 25 to 30 percent in California . . . [, which] drove an additional 80 basis points. So .8 of a percentage point decline in the industry.

(Fragnito Tr. 1696:9–22.) At the time, RAI was also concerned that the California excise tax increase would lead to a "snowball effect" and encourage other West Coast states to increase their excise taxes to match California's taxes. (Gilchrist Tr. 387:25–388:15; JX0010.0006.)

### iii. Litigation Risk

72. The potential for increased litigation and settlement costs posed another meaningful risk to RAI's future profitability. Already accounting for a large portion of the tobacco industry's costs, any increase in litigation and settlement costs would have the potential to substantially affect RAI's ability to increase profits. (JX0017.0011, .0014–.0018.)

73. The risks associated with litigation had the potential to adversely affect RAI's growth potential. In the years leading up to the Merger, RAI had more than 50 active cases going to trial each year. There were thousands of active cases in Florida alone against RAI and other tobacco manufacturers. (Crew Tr. 658:6–17; Gilchrist Tr. 389:8–23.) Continued litigation arising out of the sale, distribution, manufacture, development, advertising, marketing, and health effects of cigarettes and other tobacco products was expected for the foreseeable future. (JX0017.0014–.0018, .0096–.0138; PX0009.0002; Crew Tr. 658:6–17; Wajnert Tr. 46:21–47:2, 54:23–55:3.)

74. In addition to litigation costs, the Big Three manufacturers all have perpetual, multi-billion dollar annual payment obligations under the MSA, which resulted from health-related lawsuits brought against tobacco companies by the

attorneys general of 46 states.  (JX0017.0001, .0017–.0018; Gilchrist Tr. 390:1–12.) Fragnito estimated the MSA payment at approximately $0.72 per pack.  (Fragnito Tr. 1702:13–1703:2, 1703:17–1704:14.)   Because RAI's annual MSA payment is indexed to inflation, RAI's payment obligations increase as inflation rises.  The effect of inflation has "a dramatic impact on [RAI's] cost of goods sold[,]" and any increase in inflation would increase the likelihood of an associated decrease in RAI's profitability.  (Price Tr. 984:19–985:9; Gilchrist Tr. 389:24–390:12; JX0009.0001.)

### C.   RAI's Transaction History

75.   Prior to the Merger, RAI was involved in several significant corporate transactions, several of which had features relevant to its competitive positioning and relationship with BAT in the time leading up to the Merger.

#### a.   Brown & Williamson Transaction

76.   On July 30, 2004, R.J. Reynolds Tobacco Holdings, Inc. ("RJR") and Brown & Williamson Tobacco Corporation ("B&W") completed a series of transactions that resulted in the combination of RJR and the U.S. assets, liabilities, and operations of B&W (the "B&W Transaction").   (Corr. Stip'd Facts ¶ 1; JX0017.0003, .0074; JX0023.0042; Wajnert Tr. 60:5–9; Price Tr. 939:7–9.)   As part of the B&W Transaction, RAI was incorporated as a new publicly traded holding company to hold the now combined businesses.  (Corr. Stip'd Facts ¶ 2; JX0017.0003, .0074.)

77.   Immediately prior to the B&W Transaction, RJR was publicly traded, and B&W was an indirect wholly-owned subsidiary of BAT.  (Corr. Stip'd Facts ¶ 3; JX0017.0003, .0074.) As a result of the B&W Transaction, BAT owned approximately

42% of the stock of RAI. The remaining RAI shares were held by the former stockholders of RJR and publicly traded on the NYSE. (JX0017.0003, .0155; JX0023.0042; Wajnert Tr. 60:13–21.)

### b. Lorillard Transaction

78. In June 2015, RAI acquired Lorillard, a competing tobacco company, for consideration valued at $25.8 billion (the "Lorillard Transaction"). (Corr. Stip'd Facts ¶ 6.) Lorillard had been the third-largest cigarette company in the United States and at the time its largest brand was Newport, which RAI acquired as part of the Lorillard Transaction. (JX0017.0004, .0016.) To achieve antitrust approval for the Lorillard Transaction, RAI divested certain cigarette and vapor products to ITG.[20] (Wajnert Tr. 40:18–41:13; de Gennaro Tr. 243:19–23.)

### c. RAI and BAT Governance Agreement

79. Contemporaneously with the B&W Transaction in 2004, RAI and BAT negotiated a set of contractual restrictions designed, among other things, to maintain RAI's independence and strictly limit the influence BAT and its subsidiaries could exert over RAI. This set of restrictions was known as the "Governance Agreement." (Corr. Stip'd Facts ¶ 5; JX0020; JX0023.0065; Wajnert Tr. 61:9–15; de Gennaro Tr. 185:23–186:20.) The Governance Agreement was put in place because the RJR Board of Directors "did not want BAT to control the [RAI] business in any meaningful way[.]" (Wajnert Tr. 61:2–8.) Nevertheless, RAI disclosed to investors that "BAT's

---

[20] The divested cigarette brands included Winston, Salem, Kool, and Maverick, four of RAI's weaker "tail brands." (Flyer Tr. 1114:6–19.)

significant beneficial equity interest in RAI could be determinative in matters submitted to a vote by RAI's other shareholders, resulting in RAI taking actions that RAI's other shareholders do not support." (DX0321.0024.)

80. Under the Governance Agreement, BAT had the ability to designate for nomination five of RAI's thirteen directors,[21] three of whom were required to be independent of both RAI and BAT under applicable NYSE listing standards. (JX0020.0006, at § 2.01(c)(ii); Wajnert Tr. 62:3–8.) For the remaining eight Board seats, the Governance Agreement required BAT to vote its shares as directed by the Board's Corporate Governance and Nominating Committee. As a result, and as an example, BAT would not have been allowed to vote Thomas Wajnert, an independent director, off the Board. (JX0020.0006, at § 2.01(c)(iii); Wajnert Tr. 62:9–16.) BAT thus contracted away its ability to direct its vote for those eight Board seats, thereby foregoing any right to vote for or otherwise influence the composition of a clear majority of the RAI Board. (JX0020.0006, at § 2.01(c)(iii).)

81. The five BAT-appointed directors had access to confidential, nonpublic information shared at regular RAI Board meetings by virtue of their membership on the RAI Board. (Wajnert Tr. 50:8–19, 146:15–149:15; Gompers Tr. 844:22–845:2; Gilchrist Tr. 395:14–23, 405:2–19, 408:22–25; DX0024.)

82. Under the Governance Agreement, any material contract or transaction between BAT and RAI required the approval of a majority of the seven independent

---

[21] After the Lorillard Transaction in 2015, the Board of Directors was temporarily increased to fourteen directors. BAT was still limited to nominating only five of those fourteen directors. (JX0023.0065; DX0393.0045.)

directors not designated by BAT (known as the "Other Directors"). The Other Directors did not depend on BAT's support for their election.[22] (JX0020.0010, at § 2.07; Wajnert Tr. 62:17–24, 63:2–10.)

83. Under the Governance Agreement, BAT agreed not to increase its ownership in RAI for ten years after the close of the B&W Transaction in July 2004. This standstill provision expired as scheduled in July 2014. (JX0020.0020–.0021, at § 4.01; Wajnert Tr. 66:2–8.)

84. The protections under the Governance Agreement persisted even if BAT became a majority shareholder of RAI. This device ensured that BAT could not circumvent (or threaten to circumvent) these contractual restrictions by buying more stock. Only if BAT acquired 100% of RAI's stock would the Governance Agreement's protections fall away. (JX0020.0026, at § 6.11(a); Wajnert Tr. 63:11–17.)

85. BAT negotiated certain veto and contractual approval rights over certain RAI corporate transactions. For example, subject to certain exceptions, approval of the BAT-appointed directors was required for RAI to issue securities comprising 5% or more of RAI's voting power or to repurchase RAI's common stock. (JX0020.0022, at § 5.01(ii).) BAT's approval as a shareholder was also required for the following RAI activity: (i) the implementation of takeover defense measures, (ii) any transaction that would "impose material limitations on the legal rights of" BAT or its

---

[22] The thirteenth director, who was neither a BAT designee nor an independent Other Director, was RAI's CEO. The fourteenth director, added after the Lorillard Transaction, was the former CEO of Lorillard, who was also not an independent Other Director. (DX0393.0045.)

subsidiaries, and (iii) the sale of intellectual property relating to international tobacco brands that may be able to compete with BAT. (JX0020.0010, at § 2.04(b).)

86. BAT also held contractual protections that ensured its 42% ownership stake would not be diluted. In November 2011, RAI and BAT agreed to amend the Governance Agreement, whereby RAI would not be allowed to repurchase its shares if the repurchase was implemented in such a way "that the number of outstanding shares of RAI common stock would not increase, and the beneficial ownership interest of BAT and its subsidiaries in RAI would not decrease." (DX0323.0061.) BAT took great effort to ensure its high ownership stake. For example, concurrently with the completion of RAI's acquisition of Lorillard, BAT invested approximately $5 billion in order to maintain its approximate 42% beneficial ownership in RAI common stock. (de Gennaro Tr. 192:13–18.)

87. Considering all of the facts, the Supreme Court of North Carolina concluded that "[i]n several ways, the Governance Agreement placed 'contractual handcuffs' on BAT that prevented it from controlling the Reynolds board." *Corwin v. British Am. Tobacco PLC*, 371 N.C. 605, 619, 821 S.E.2d 729, 739 (2018), *reh'g denied*, 822 S.E.2d 648 (N.C. 2019). As the Supreme Court explained, "the fact of BAT's contractual rights did not, on its own, give BAT the kind of coercive power over the Reynolds board that could allow BAT to exercise actual control." *Id.* at 620, 821 S.E.2d at 740. "At best, the allegations that some terms in the transaction agreement were favorable to BAT show only that BAT[ had] . . . the ability to secure some favorable terms from the board. Those allegations do not show that BAT exercised *control* over the board—

that is, to make it take action." *Id.* at 624, 821 S.E.2d at 742. Thus, BAT was not a controlling shareholder of RAI, and notwithstanding BAT's substantial holdings in the Company, RAI had the freedom to make decisions independently from BAT. (JX0023.0080; Wajnert Tr. 63:18–64:18.)

### d. RAI Related Person Policy

88. RAI also instituted a related person transaction approval policy (the "Related Person Policy") to foster transparency and proper governance which required various levels of review before RAI could enter into any transaction with BAT. (PX0002.0001; Gilchrist Tr. 428:7–10.) In addition to the Governance Agreement's prohibition on material transactions between RAI and BAT without approval of the Other Directors, the Related Person Policy established more granular restrictions: any transaction between RAI and BAT involving an amount that would be: (i) less than $1 million required the prior approval of RAI's CEO, CFO or General Counsel, (ii) equal to or greater than $1 million and less than $20 million required the prior approval of RAI's Audit Committee, and (iii) greater than $20 million required the prior approval of the Other Directors. (PX0002.0003.) To implement the Related Person Policy, RAI created a Related Party Transaction Committee, which met monthly to review and approve all interactions between RAI and BAT in the regular course of business. (Gilchrist Tr. 426:15–24.)

### e. RAI's Independence from BAT in Practice

89. RAI's ability to act independently of BAT, and even in a manner contrary to BAT's wishes, was demonstrated in practice. Between July 2004 and the

consummation of the Merger in July 2017, RAI and BAT engaged in negotiations over potential agreements on a variety of matters, some of which were protracted and contentious, some of which did not result in agreement, and one of which led to arbitration between the two companies. (Gilchrist Tr. 431:10–18; Crew Tr. 634:24–635:20.)

90.    As further evidence of RAI's independence, in the fall of 2015, RAI invited BAT to submit a bid to acquire the international rights to RAI's Natural American Spirit brand. (Wajnert Tr. 91:21–92:14; Constantino[23] Tr. 1812:7–20.) RAI wanted to improve its balance sheet after the Lorillard Transaction by de-levering and reducing its overall debt level through this sale. (Constantino Tr. 1804:12–18:06:18; Gilchrist Tr. 412:16–413:11.) After BAT expressed its preference that RAI not sell those international rights, BAT submitted an offer. BAT's competitor, Japan Tobacco, Inc. ("Japan Tobacco") also submitted an offer and won the bid. Although BAT preferred that the international rights not be sold at all, and expressed that preference to RAI's management, RAI proceeded with the sale to Japan Tobacco for $5 billion in January 2016. (Wajnert Tr. 64:4–18, 65:9–16, 91:4–92:14.)

91.    RAI and BAT engaged in other arm's-length transactions in the years preceding the Merger. In December 2015, after protracted negotiations with BAT, the Other Directors ultimately approved a "vapor collaboration agreement" regarding

---

[23] Daniela Constantino ("Constantino") was a Partner and a Senior Member of the research team of Mason Capital Management ("Mason Capital"), one of the Dissenters, at the time of the Merger. (Constantino Tr. 1787:25–1788:6, 1789:17–1790:10; Parties' Witness Summaries 1.)

certain next-generation technologies.  (JX0023.0066; Hanigan Tr. 1617:10–12.)  In May 2016, a few months before the Merger negotiations began in October, RAI and BAT negotiated a termination of the parties' contract manufacturing agreement, which was approved by the Other Directors.  (Crew Tr. 634:24–635:20.)  There is no evidence that these interactions were not fairly negotiated.

D.     Preparing for a Potential BAT Bid

92.    Leading up to and after the expiration of the standstill provision in the Governance Agreement in July 2014, RAI management met periodically with various investment banks to discuss industry trends, RAI's relationship with BAT, and potential transactions involving RAI, including a potential transaction with BAT.  (Gilchrist Tr. 562:20–563:6, 568:21–569:11, 569:19–570:19, 572:8–25.)

93.    Contrary to Dissenters' suggestions, there was nothing sinister nor nefarious concerning these meetings.  Lazard had been advising RAI regarding its relationship with BAT dating back to 2011.   (de Gennaro Tr. 185:11–186:20.) De Gennaro described his meetings with Gilchrist and others within RAI, including Cameron, then the CEO of RAI, as a "banking exercise" and "banker positioning[,]" and explained that "the nature of our business is that we try and stay involved with our clients or potential clients constantly."  (de Gennaro Tr. 246:7–21.)  In addition to advising RAI on a potential offer from BAT, Lazard's meetings with RAI during these pre-Merger years addressed other topics, including the effects that a potential transaction between BAT and ITG would have on RAI.  (de Gennaro Tr. 244:4–23.) Lazard's evaluation of a potential offer from BAT was part of the "comprehensive analysis" Lazard sought to offer its client.  (de Gennaro Tr. 247:5–20.)

94. Goldman also periodically met with RAI management to discuss financial industry trends, RAI's business, and other topics. Around the time of the expiration of the standstill in 2014, Goldman and RAI began discussing BAT's ownership stake and the potential for a future transaction, the terms an offer by BAT to purchase the outstanding shares in RAI might include, and steps RAI could take to prepare for such a potential offer. (Eckler[24] Dep. Tr. 14:8–15:16.)

95. JPMorgan met with RAI "on an ongoing basis in the ordinary course coverage of the client" in the time leading up to the Merger. (Clark[25] Tr. 1462:14–1463:4.) In August and September 2016, Gilchrist and Cameron met with representatives from JPMorgan and discussed issues related to potential transactions involving RAI and BAT, including premiums paid in transactions with large shareholders, potential financing concerns for BAT in a transaction with RAI, a potential mix of the offer between equity and cash, and the effects of Brexit on the shareholder bases of RAI and BAT. (DX0063.0005; Clark Tr. 1462:14–1463:9, 1463:13–1469:18.)

96. There is no evidence anyone at RAI acted to further his or her own personal interest ahead of the Company's in the time period prior to the Merger and, in particular, in RAI's pre-Merger meetings with Lazard, Goldman, and JPMorgan.

---

[24] Zachary Eckler ("Eckler") was a Vice President (and later Managing Director) at Goldman who advised the Transaction Committee concerning the Merger. (Price Tr. 1056:3–5; Eckler Dep. Tr. 19:05–20:01; Parties' Witness Summaries 2.) Portions of Eckler's deposition were admitted into the trial record. (ECF No. 199.)

[25] John Clark ("Clark") was a Managing Director at JPMorgan who advised RAI's Board regarding the Merger. (Clark Tr. 1425:6–21; Parties' Witness Summaries 1.)

97. While Dissenters have tried to suggest that Gilchrist took actions to ensure he would receive his "golden parachute" compensation,[26] (Gilchrist Tr. 555:6–556:18), there is no evidentiary basis from which to draw such a conclusion. Gilchrist's compensation arose from his pre-existing employment contract and consisted of a standard severance package of two years' salary and bonus, vesting of restricted stock options that he already owned, and a payout of his pension. (JX0023.0146, .0153; Gilchrist Tr. 553:16–554:7.) None of his golden parachute compensation arose specifically from the Merger; he would have received his compensation regardless of the reason for his termination (other than firing for cause). (JX0023.0146, .0153; Gilchrist Tr. 573:1–574:3.) In fact, he did not receive over 25% of his golden parachute compensation because the conditions for its payment were not triggered. (Gilchrist Tr. 555:25–556:4.)

98. Dissenters also suggest that Gilchrist sought the investment bankers' perspectives on the amount BAT might be willing to pay in an acquisition of RAI to manipulate a potential future valuation of RAI to a value within BAT's perceived price range. (DX0063.0013; de Gennaro Tr. 244:13–245:25; Gilchrist Tr. 580:18–581:8, 585:22–586:4; Clark Tr. 1466:15–1469:9.) No credible evidence, however, was offered to support this claim.

---

[26] Dissenters appear to have backed away from this contention in their post-trial briefing, asserting that the reason management did not provide the ten-year projections on which the 2016 "Strategy Day" presentation (explained in depth below) was based is "irrelevant." (Defs.' Responsive Post-Trial Br. 12, ECF No. 231.) The Court addresses the contention nonetheless.

99. As an initial matter, more people would have been needed to manipulate the valuation, including Cameron, who received no personal benefit from the Merger, (Cameron Dep. Tr. 223:11–18 ("I didn't qualify for a penny, nothing. I was out, December 31.")), and Crew, who came to RAI with the goal of becoming CEO, (Crew Tr. 634:9–23, 669:20–671:2 ("I literally had just been named sort of CEO elect and then this unsolicited offer came in. So, you know, it's just personally disappointing . . . that I wasn't going to get a chance to . . . lead the company . . . as an independent entity.")). There is no evidence either participated in this alleged scheme.

100. Moreover, the evidence shows that RAI management (including, but not limited to, Gilchrist) made responsible efforts to understand the contours of a potential offer from BAT in order to better understand the negotiating dynamics that might accompany a potential transaction with BAT and to compare it to other strategic alternatives available to the Company. (DX0063.0007–.0010; de Gennaro Tr. 246:22–247:4; Clark Tr. 1468:8–1469:5; Gilchrist Tr. 580:22–581:8.)

101. Given BAT's 42% ownership stake in RAI and BAT's public representations that it periodically considered the possibility of making an offer for RAI, RAI's separate pre-Merger meetings with Lazard, Goldman, and JPMorgan were a prudent step taken by RAI management to be better prepared for a potential offer from BAT and to be better positioned to advocate for a higher price if such an offer materialized. Rather than evidence a conspiracy to facilitate acceptance of an artificially low price, these meetings between the Financial Advisors and a variety of individuals from RAI

reflect prudent scenario planning on the part of RAI's management and routine business development efforts on the part of these investment banks.

E.    The Merger

102.  As set forth in more detail below, the deal price in this case was reached through months of arm's-length negotiations between sophisticated parties. On RAI's side, the deal was negotiated by a fully independent and well-informed transaction committee, which showed a willingness to walk away from a deal entirely and continue operating as an independent company if a fair price could not be obtained. Three highly respected financial advisors separately concluded that the deal price was fair to RAI's shareholders. RAI's non-BAT shareholders voted overwhelmingly in favor of the Merger. For these and the other reasons set forth herein, the Court finds that the deal price is entitled to substantial, if not determinative, weight in determining the fair value of Dissenters' shares of RAI.

a.    BAT's October 20, 2016 Offer

103.  After the market closed on October 20, 2016, BAT made an unsolicited offer to acquire the remaining shares of RAI that it did not already own through a letter sent to Wajnert, as Chair of the RAI Board, and Cameron, as RAI's CEO. BAT's offer letter proposed to purchase all of the outstanding shares of RAI for a mix of stock and cash equal to $56.50 per share of RAI common stock (the "October 20 Offer"), a 19.8% premium over the $47.17 closing price of RAI common stock that day (the "Unaffected Stock Price"). (Corr. Stip'd Facts ¶¶ 13–14; JX0021.0002; JX0023.0068;

PX0115.0254, .0531, .0578; DX0095.0008; Cameron Dep. Tr. 20:9–21:25; Wajnert Tr. 65:17–22.)

104. The October 20 Offer exceeded RAI's six-month average stock price prior to BAT's initial offer, which was $48.97, and its all-time high price of $54.48 per share on July 5, 2016. (PX0115.0290, .0390.) The October 20 Offer implied a total equity value for RAI of $80.56 billion. (PX0115.0128; JX0021.0002; JX0023.0068.)

105. Consistent with BAT's obligations under U.S. securities laws, BAT publicly announced its proposal the next day before the markets opened. In its announcement, BAT stated that it expected to achieve approximately $400 million in synergies from the transaction. (JX0021.0007; JX0023.0068.)

106. BAT's letter acknowledged, consistent with the Governance Agreement, that a proposed transaction between BAT and RAI would require the approval of a majority of the Other Directors, BAT would not pursue the transaction without such approval, and BAT expected that a merger would require the approval by a majority of the votes cast by the non-BAT shareholders. (JX0021.0002; JX0023.0069.)

107. The RAI Board understood BAT's representations to mean that BAT would approach this transaction as a "friendly transaction" and that BAT "didn't want to be threatening in any way." (Wajnert Tr. 68:8–69:17.) The Board found these representations significant because, freed from a hostile takeover threat by BAT, the Board would be able to "control the transaction" and ensure that whatever decision it made about the October 20 Offer was fair to the other shareholders. (Wajnert Tr. 68:21–22.) Importantly, the requirement that the transaction be approved by the

non-BAT shareholders gave "the power to accept or reject the transaction" to the non-BAT shareholders. (Wajnert Tr. 68:8–69:17.)

108. The October 20 Offer also stated that "BAT is interested only in acquiring the shares of [RAI] not already owned by BAT[,] and . . . BAT has no interest in selling any of the [RAI] shares it owns, nor would BAT support any alternative sale, merger or similar transaction involving [RAI]." (JX0021.0003.) The Board did not consider BAT's representation to limit the Board "in terms of thinking through what the alternatives might be for" the non-BAT shareholders; Wajnert explained that "at the end of the day, anything would be negotiable. So while BAT was expressing an interest in not participating in a transaction with someone else, the realities of the world, people change their minds." (Wajnert Tr. 69:18–70:19; Nowell[27] Dep. Tr. 57:01–59:21 ("Q[.] . . . Did the board believe that [BAT's statement] foreclosed the possibility of selling to another third party? A[.] No.").) Nevertheless, RAI disclosed to investors that "BAT's significant beneficial ownership interest in RAI[ ] and RAI's classified board of directors and other anti-takeover defenses could deter acquisition proposals and make it difficult for a third party to acquire control of RAI without the cooperation of BAT."[28] (DX0317.0026.)

---

[27] Lionel Nowell ("Nowell") became Lead Director of RAI's Board and Chair of the Transaction Committee on January 1, 2017 and served in that capacity at the time of the Merger. (Nowell Dep. Tr. 13:17–23; Crew Tr. 638:22–639:2; Parties' Witness Summaries 4.) Portions of Nowell's deposition were admitted into the trial record. (ECF No. 202.)

[28] For example, Goldman noted in its fairness opinion presentation that if "[BAT] is not supportive [of a third-party sale of RAI], a merger requires approximately 88% approval from all other shareholders." (DX0277.0011.)

109. Contemporaneous research analyst commentary on the October 20 Offer generally viewed the proposed transaction as a positive for RAI shareholders. (PX0115.0129, .0289, .0459; Gompers Tr. 802:25–803:8; Zmijewski Tr. 1380:17–1381:2.) In fact, some analysts perceived BAT to be overpaying or at least purchasing at a time when RAI was trading at a relatively high multiple to its earnings. (PDX0005.0025; Yilmaz Tr. 2004:16–19; PX0115.0623.)

b. Recusal and Formation of Transaction Committee

110. Between October 24, 2016 and October 28, 2016, the RAI Board and the RAI Other Directors met multiple times and interviewed potential legal and financial advisors. On October 24, 2016, Jerome Abelman and Ricardo Oberlander, the two BAT employees on the RAI Board, voluntarily recused themselves from any RAI board meetings at which any proposed transaction involving BAT or any potential alternative strategic transaction would be discussed or considered. They also did not participate in any discussion or consideration of a potential transaction with the BAT Board or any BAT employees. (PX0031.0001, .0003; PX0033.0001; JX0023.0069; Wajnert Tr. 76:3–6.)

111. On October 28, 2016, the RAI Board created a transaction committee comprised solely of the Other Directors to consider and evaluate the proposed transaction and any other strategic alternatives (the "Transaction Committee"). (JX0007.0002–.0005; PX0033.0003–.0005; JX0023.0069–.0070.) RAI's Board had fourteen directors at that time, seven of whom were Other Directors. The seven Other Directors were:

a. John A. Boehner, retired Speaker of the United States House of Representatives;

b. Luc Jobin, President and CEO of Canadian National Railway Company;

c. Holly Keller Koeppel, former Managing Partner and Co-Head of Corsair Infrastructure Management, L.P.;

d. Nana Mensah, Chairman and CEO of 'XPORTS Inc.;

e. Lionel Nowell, retired Senior Vice President and Treasurer of PepsiCo;

f. Thomas Wajnert, former Chairman and CEO of AT&T Capital Corporation;

g. John Zillmer, retired President, CEO and Executive Chairman of Univar.

(JX0023.0069.)

112. Wajnert was selected to serve as the Chair of the Transaction Committee. The remaining directors on the RAI Board in October 2016, none of whom served on the Transaction Committee, were Cameron (CEO of RAI), Murray Kessler (former CEO of Lorillard), and the five designees BAT added to the Board under the Governance Agreement, two of whom were BAT executives. (JX0007.0001, .0003; Wajnert Tr. 72:21–73:3, 146:6–14.)

113. The members of the Transaction Committee were fully independent of BAT and able to consider the proposed transaction (and any alternatives) free of any conflicts, focused only on the best interests of the RAI shareholders other than BAT. (Wajnert Tr. 63:5–10, 72:21–73:3.) The Transaction Committee was "sophisticated" and included a number of current and former CEOs, including "[a] lot of people with financial backgrounds" and experience with mergers and acquisitions. All members,

except Speaker Boehner, had participated in the complex Lorillard Transaction. (de Gennaro Tr. 214:9–215:14.)

114. The RAI Board delegated to the Transaction Committee the power and authority to, among other things, evaluate, discuss and negotiate the terms and conditions of, approve, recommend, and/or reject the October 20 Offer, any other potential transaction with BAT, and any potential alternative strategic transaction. The "Transaction Committee was empowered to analyze, accept, reject, full power to make recommendations to the board, and then eventually to the shareowners. But it had full power to move forward, one way or the other." (Wajnert Tr. 71:21–25; JX0007.0003–.0004; JX0023.0069–.0070.) The RAI Board resolved that if the Transaction Committee rejected the October 20 Offer or any other offer, that rejection would be final and binding on behalf of the full Board. (JX0007.0003–.0004; JX0023.0069–.0070; Wajnert Tr. 74:8–24 ("[W]e had the final authority to accept or reject and to move forward with another transaction.").)

  c. <u>Retention of Financial Advisors</u>

115. After interviewing several investment banks, the Transaction Committee appointed Goldman as its financial advisor based on its reputation and experience with large complex transactions, the tobacco industry, and with RAI and its business. Another reason the Transaction Committee selected Goldman was because Goldman had not been hired or compensated by BAT to provide any M&A financial advisory services in the prior two years and had no other material relationships with BAT that may have been expected to create a conflict of interest for Goldman. (Corr. Stip'd

Facts ¶ 16; JX0023.0070; PX0038.0005–.0006; Wajnert Tr. 74:25–75:8; Eckler Dep. Tr. 15:17–16:20, 18:11–19:03.)

116. On October 25, 2016, the Other Directors hired Weil, Gotshal & Manges LLP ("Weil") and Moore & Van Allen as legal counsel. Both were fully independent of both RAI and BAT. (Corr. Stip'd Facts ¶ 16; PX0035.0001–.0003; JX0023.0069; Wajnert Tr. 71:13–20, 73:11–23.)

117. Jones Day served as legal counsel to the Board and RAI in connection with the review of the October 20 Offer and any subsequent developments. The Board and RAI also hired both Lazard and JPMorgan as their financial advisors. (Corr. Stip'd Facts ¶ 16; JX0023.0070; de Gennaro Tr. 215:24–216:2; Gilchrist Tr. 437:5–10; Clark Tr. 1561:13–1562:1.)

118. The Financial Advisors were highly sophisticated and respected investment banks with extensive experience advising large companies in corporate transactions, including in the tobacco sector. (DX0151.0015; DX0065.0008; de Gennaro Tr. 210:6–19, 211:13–212:1; Clark Tr. 1427:10–25; Eckler Dep. Tr. 14:8–15:11.) The format of the Financial Advisors' compensation—each was to receive a percentage of any completed deal (a "success fee")—was typical in the industry and aligned the Financial Advisors' incentives with the Company's to get the highest price. (Wajnert Tr. 75:13–76:2, 77:8–12; de Gennaro Tr. 217:15–219:3, 257:22–258:8.) Investment bankers understand that they may not receive a fee for their work on a proposed transaction if the parties do not agree to a completed deal. (Clark Tr. 1428:23–1429:1; de Gennaro Tr. 256:19–21.)

119.  Although the Dissenters suggest that the Financial Advisors' contingent fee arrangements incentivized them to encourage the Transaction Committee and RAI to agree to the Merger at a depressed price to ensure their compensation, there is no credible evidence that any of the Financial Advisors took any action in connection with the Merger to cause a transaction with BAT at less than fair value.  To the contrary, there was credible testimony that the Financial Advisors' long-term reputations were more important to each of them than the compensation to be earned on the Merger and that attempting to depress the merger price would tarnish that reputation.[29]  (de Gennaro Tr. 257:2–18; Nowell Dep. Tr. 127:21–128:7.)

   d.    Information Provided to Financial Advisors

120.  In the days following BAT's initial offer, Gilchrist and Price spoke with members of the teams at Goldman, Lazard, and JPMorgan about clearing any conflicts of interest and determining what materials the Financial Advisors wanted to review if they were selected as a financial advisor for the Merger.  Gilchrist and Price prepared the materials within days, allowing the Financial Advisors the ability to get up to speed quickly.  (JX0008.0001; DX0039.0001; DX0041.0001; Gilchrist Tr. 441:4–442:13; Price Tr. 945:19–946:11, 1051:19–1052:2.)  The Financial Advisors likewise prepared to receive the information they expected from RAI management so that they would be able to run their analyses as quickly as possible if they were hired. (de Gennaro Tr. 273:12–274:3, 283:14–285:6.)

---

[29] The Financial Advisors eventually received deal fees of $46.3 million (Goldman), $41.1 million (JPMorgan), and $11.1 million (Lazard), nearly all of which was contingent upon the completion of the Merger.  (JX0023.0101, .0116, .0130.)

121. The parties' dispute over RAI's valuation in this action turns, in significant part, on the reliability of the information RAI provided to the Financial Advisors to inform their valuation analyses and whether RAI should have provided additional information in the form of internal, nonpublic, ten-year financial projections that underlaid RAI management's presentation to the Board at RAI's Strategy Day in July 2016 showing projections of 7% to 8% compound annual growth over the next ten years. Dissenters contend that these ten-year projections, and, in particular, years six through ten of those projections, were reliable and accurate, and when used in a discounted cash flow ("DCF") analysis to generate an adjusted blended terminal growth rate, result in a far higher valuation for RAI than the deal price. (Defs.' Opening Post-Trial Br. 31–43, ECF No. 221.) RAI argues that the out years of the Company's ten-year projections were never used or intended to value the Company and are largely extrapolations of existing trends such that they are entirely unsuited and unreliable for purposes of calculating RAI's fair value. (RAI's Post-Trial Br. 74–77, ECF No. 219.)

i. RAI's Financial Projections

122. RAI managed its business with a focus on attempting to provide regular returns to its shareholders in the form of growing EPS by a stated target of growth in the high-single digits. (Gilchrist Tr. 373:20–374:13; Wajnert Tr. 110:14–18.) EPS was the single most important metric for the RAI Board in measuring RAI's performance. Management therefore focused its decision making and financial presentations on maintaining target growth in RAI's EPS year over year. (Gilchrist

Tr. 373:20–374:13 ("That was what the shareholders were primarily focused on. That's what our board had structured, you know, a lot of our goals and objectives around.").)

123. RAI maintained a financial projection process as part of its ordinary operation of the business, which was designed to measure how well RAI was performing relative to its annual EPS target. (Gilchrist Tr. 374:14–375:1.)

124. Before Gilchrist became CFO of RAI, he oversaw a project to overhaul RAI's forecasting process from what was once disjointed and focused on the short-term into a more rigorous and disciplined process. (Gilchrist Tr. 452:22–455:6.) As part of this overhaul process, RAI started taking a "forward-looking" perspective to the forecasts, providing longer forecasts in the range of five to ten years, as opposed to focusing on only one year, and began to update the forecasts every month as opposed to only four times a year. (Gilchrist Tr. 454:22–455:15.)

125. The goal of the forecasting process was to stimulate more discussion and transparency among business units so they would have a more cohesive view as to what was happening at RAI as a whole. (Gilchrist Tr. 457:2–458:12.) To that end, everyone involved in forecasting was working off one forecast for the entire company. Gilchrist testified that "what we wanted to do was make sure that everybody – we didn't have people saying your forecast is wrong, our forecast is right. We had one forecast, and everybody was working off the same forecast." RAI developed a motto for the forecasts: "one version of the truth." (Gilchrist Tr. 458:20–459:11.)

126. As Gilchrist explained, RAI's projections were "assumption-based," in that they incorporated

> assumptions based on competitive activity, based on market dynamics. It would be assumptions based on litigation, regulation, taxation. You know, a lot of those things are unknown so we would obviously have to make assumptions. And the way . . . we structured that was basically to outline what those assumptions were so there was complete transparency on the assumptions. Obviously, you know, everybody was aware of what those assumptions would be and the – as those assumptions changed, you would expect to see changes flow through the [forecast].

(Gilchrist Tr. 378:6–18.)

127. The evidence shows that RAI's financial projection process was not designed to take into account the large looming risks to the industry, such as new or tightened regulations, increased or new excise taxes, large litigation judgments or settlements, or competitive changes like an alteration in Altria's pricing behavior, because these risks were difficult both to predict and to quantify and were largely beyond RAI's control. (Wajnert Tr. 58:2–59:9, 111:5–10, 119:5–120:5; Gilchrist Tr. 385:10–17, 391:4–9, 394:24–395:9.) As Jennette testified, "a company is not going to go forward to [its] Board of Directors and say, [']Hey, you know, the industry is coming apart and we don't have any answers.['] " (Jennette Dep. Tr. 31:23–32:1; Holland[30] Dep. Tr. 40:5–25.)

---

[30] Steven Holland ("Holland") was Senior Director of Capital Markets of RAI Services Co., a wholly-owned subsidiary of RAI, where he worked in the treasury group providing information to financial advisors at the time of the Merger. (Gilchrist Tr. 598:3–16; DX0115; Parties' Witness Summaries 4.) Portions of Holland's deposition were admitted into the trial record. (ECF No. 206.)

128. Accordingly, RAI management and the Board discussed the existence of the risks as downside sensitivities to the forecasts, which expressly assumed that the risks would not occur during the projection period. (JX0009.0001–.0002; PX0047.0002; JX0010.0006; PX0052.0004, .0006; Gilchrist Tr. 380:21–391:09.) If any of those risks did occur, RAI would have to change its projections and, more importantly, its business practices, in response to them. (JX0010.0006; JX0023.0134; PX0052.0004, .0006; Wajnert Tr. 49:12–50:7; Gilchrist Tr. 378:22–379:15, 382:09–391:09, 462:1–8; Fragnito Tr. 1774:3–11; Price Tr. 963:25–964:1.) As one example, Gilchrist explained that while the imposition of onerous state excise taxes was a large, looming risk to RAI's business, RAI incorporated into its financial forecasts a California ballot measure to raise its state excise tax in November 2016 only when it passed and its effective date determined. (Gilchrist Tr. 462:18–463:12.)

129. In short, RAI's projections "were intended to be the best estimate [of] the future performance based on the assumptions that [the Company] had[,]" (Gilchrist Tr. 377:23–378:5), but a proper consideration of those assumptions and sensitivities was critical in determining whether the projections could be reasonably relied upon for a particular purpose or use. Importantly, assumptions that "were unknown either in timing, impact or scale, or implementation . . . [were] outlined as risks and sensitivities" but not included in RAI's management's forecasts. (Gilchrist Tr. 378:22–379:15.)

## ii. The Latest Estimates

130. In the ordinary course of business, RAI developed financial projections every month except January. RAI's financial planning process began with management's forecast of industry-wide volumes and pricing for the forecast period. (Gilchrist Tr. 457:12–23.) These volume and pricing forecasts were the "foundation" of RAI's financial projections, and were based on publicly-available, historical pricing, market share and volume information, as well as publicly available information about Altria's financial results and stated EPS targets. (Gilchrist Tr. 529:12–25.) Once the volume and pricing forecasts were developed, division finance leaders would add projections for their specific businesses. From these, a single RAI forecast, called a "Latest Estimate" or "LE," was developed. (Gilchrist Tr. 376:19–377:12; Price Tr. 941:15–20.)

131. In the Latest Estimates from February through May every year, RAI projected the current year plus two additional years, providing quarterly projections for each of those years. (Gilchrist Tr. 375:2–24; DX0015, at tab "Consol Fcst.") This length of time was chosen because RAI's Board and management were focused on that short time horizon and because it was the most likely period of time to be accurate due to the assumptions included in the projections. (Gilchrist Tr. 376:4–18; Jennette Dep. Tr. 32:1–5.)

132. As Nowell testified,

> [RAI] is a business . . . trying to get through the next six months, the next quarter would have been, in some cases, long term because it's a declining industry based off of pricing and that. So getting out beyond

five years, . . . at that point in time, wasn't value added because there were too many variables that were outside of our control.

(Nowell Dep. Tr. 26:1–9.)

### iii.    The Operating Plan

133.   Once per year, typically in October, RAI management created an "Operating Plan" for the Board's approval, which set out the Company's financial targets and budget for the upcoming year.   Management based the financial portion of the Operating Plan on the October LE, which contained five years of projections. (JX0012.0017–.0019; JX0016.0005–.0007; Wajnert Tr. 41:25–42:13; Gilchrist Tr. 391:10–392:2.) The Operating Plan itself, as presented to the Board, contained high-level financial projections for only the following two years, including "industry, company and brand volume and market share; adjusted operating income; adjusted operating margins and adjusted EPS growth."  (JX0012.0018; PX0063.0042; Gilchrist Tr. 391:10–392:2.)

134.   As  Gilchrist explained, management used the additional years of  financial projections

> to make sure that we had an understanding of the dynamics of the business, to make sure that the strategies actually were working and really for an opportunity to make sure that we had visibility on some of the key milestones and/or gaps in the business so that we can identify three years out[.]

(Gilchrist Tr. 392:10–15.)  In contrast, the Board had no need for these additional years of projections for purposes of evaluating and approving the Operating Plan, which the Board used as a budget tool and to set financial performance and marketplace objectives only for the upcoming year.  (Gilchrist Tr. 392:7–394:23

(noting that projection years three through five were generally used "as a check to make sure things are still on track").)

135. The final Operating Plan prepared prior to the Merger was for 2017. On several occasions, RAI management identified the key assumptions underlying the 2017 Operating Plan. At the September 2016 Board meeting, RAI management presented those assumptions to the Board in preparation for the full plan review at the next Board meeting. (DX0025.0011–.0012.) The key assumptions underlying the 2017 Operating Plan projections also were included in the Operating Plan executive summary. (PX0063.0045–.0046.) Gilchrist discussed these same assumptions and sensitivities at the December 1, 2016 Board meeting, which had been outlined in PowerPoint slides shared with the Board prior to the meeting:



(PX0063.0100);

## Plan risks & sensitivities

| | |
|---|---|
| Price increase realization | • Plan includes ~$525 million annual net pricing benefit across OpCos<br>• $0.01 per pack overage or underage on cigarettes = ~$40 million |
| Industry growth / decline rates | • Acceleration in industry decline would require higher pricing to offset |
| FDA | • Plan incorporates increased costs and preparation for product standards<br>• Modification of the act as a contingency represents upside to the plan |
| Excise Taxes | • Plan assumes $0.05/pk. state excise tax impact to cigarettes and $0.01/can in moist snuff<br>• An incremental $0.05 SET = loss of 850MM cig. sticks; = 6MM moist cans |
| MSA/Transisition Credits | • Additional State Settlements or Transition year credits would be an upside to plan performance |
| Pension | • Pension valuation/interest rate environment may favorably impact pension expense over the plan period |
| Litigation | • Engle progeny activity (including trials) remains key sensitivity; trial success rate stable<br>• Activity in NAS/Vapor above plan |

(PX0063.0106–.0107; *see also* JX0012.0018.)

### iv. The Strategic Plan and Strategy Day

136. Once per year, typically in July, RAI held a Strategy Day Board meeting, when

> the board would gather with management to do – have deep thoughts and think about where the company was going over the next five to ten years, and discuss what the issues were that were obvious to everybody at that particular point and what opportunities might be there as well.

(Wajnert Tr. 50:11–19.)

137. Nowell described Strategy Day in similar terms, as a time when management would present

> an overview of the company and how we thought we were going to operate, say, going over the next two, three years. That would be then overlaid with an R&D discussion about new products, new generation products, other products we had in the pipeline, when we thought they would be introduced. We would talk about the regulatory environment in terms of what's happening in DC in view of that political environment, how that might impact us, what was going on in the

overall economy, and how that might impact us. And then rolling all that together, kind of have a closer view on . . . all that being considered along with . . . a lot of risk and other things that went through it, what does that look like for us going forward.

(Nowell Dep. Tr. 24:19–26:09.)

138. In preparation for each year's Strategy Day, members of RAI's finance team developed the June LE, which contained projections for the current year plus nine years, providing quarterly projections for the current year and the next two years and more generalized annual projections for the remaining years. (DX0140, at tab "Consol Fcst.") RAI management typically created a "Strategic Plan" for the Board's review at Strategy Day, the financial portion of which was based on the June LE. (DX0011; Martin[31] Dep. Tr. 34:21–37:08, 156:19–157:21). In preparing the June LE, the finance team applied a "broad brush approach[,]" used a "much higher" materiality threshold for forecasting years three through ten, and emphasized "identifying significant gaps in achieving the desired earnings[.]" (DX0023.0002.) RAI management used years six through ten of the June LE only in planning manufacturing capacity and funding for capital expenditures. (Wajnert Tr. 116:21–118:11; JX0004.0031).

139. Wajnert explained the purpose of the financial information presented at Strategy Day as follows:

the discussion related to the future state of the tobacco industry and, of course, Reynolds American. So you would have a discussion about three years, five years, what could happen, discussing various scenarios. We

---

[31] Stephen Thad Martin ("Martin") was the Senior Director of Financial Planning of RAI Services at the time of the Merger. (Gilchrist Tr. 465:19–21; Parties' Witness Summaries 4.) Portions of Martin's deposition were admitted into the trial record. (ECF No. 204.)

wouldn't be looking at approving financial projections for a long period of time. That was not the purpose. The purpose was to frame the conversation.

(Wajnert Tr. 57:7–15.)

140. RAI possessed "no material insight" about brand strength, trends or growth in the industry in years six through ten that was not also available to individuals outside the Company who were knowledgeable about the tobacco industry. (DX0023.0002; Gilchrist Tr. 405:2–406:6, 528:24–530:6, 620:8–11 ("Q. And did RAI have superior information over others in the tobacco industry to look at and analyze that historical information and pull it forward? A. No. It was public information.").) RAI management and the Board considered the forecasts for years three through five to be of ever-decreasing reliability and years six through ten to be extrapolations intended to provide information about whether a continuation of existing trends would allow the Company to meet its EPS targets. (Gilchrist Tr. 375:2–24, 404:9–405:1, 501:9–16; Price Tr. 1017:13–20.)

141. Gilchrist testified that "the very foundational elements of the forecast, industry volume, market share, pricing . . . were generally extrapolations" in years six through ten. (Gilchrist Tr. 626:20–627:1.) The contemporaneous evidence supports Gilchrist's explanation of RAI's forecasting process. For instance, the Yearly Cigarette Volume tab of the June 2016 LE shows that RAI's "Cigarettes – Share of Shipments" projections are straight-line extrapolations derived directly from RAI's industry volume forecasts:



Cigarettes - Share of Shipments
June LE 2016

| | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 | 2025 | '15-'25 chg | '16-'25 chg |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Newport | 7.1% | 13.4% | 13.8% | 14.1% | 14.4% | 14.7% | 15.0% | 15.3% | 15.6% | 15.9% | 16.2% | 9.1 | 2.8 |
| Camel | 7.9% | 7.9% | 8.1% | 8.2% | 8.3% | 8.4% | 8.5% | 8.6% | 8.7% | 8.9% | 9.0% | 1.1 | 1.0 |
| Pall Mall | 7.5% | 7.4% | 7.4% | 7.4% | 7.4% | 7.5% | 7.5% | 7.5% | 7.5% | 7.5% | 7.5% | (0.1) | 0.1 |
| Other RJRT | 4.4% | 2.2% | 1.9% | 1.7% | 1.5% | 1.3% | 1.1% | 0.9% | 0.8% | 0.7% | 0.5% | (3.9) | (1.6) |
| NAS - Santa Fe | 1.8% | 2.1% | 2.4% | 2.6% | 2.8% | 2.9% | 3.1% | 3.3% | 3.5% | 3.7% | 3.8% | 2.0 | 1.7 |
| Total SOS | 28.8% | 33.1% | 33.6% | 34.0% | 34.4% | 34.8% | 35.2% | 35.6% | 36.1% | 36.6% | 37.1% | 8.3 | 4.0 |

(DX0140, at tab "Yr – Cigt Vol," rows 42–79; *see also* Gilchrist Tr. 617:21–620:15 ("If you look at market share growth, for example, which is a key component, they would just project out a certain market share growth which then would be translated down to volume all the way through the process."); Price Tr. 961:18–962:10.)

142. The fact that extrapolations provided the most fundamental inputs to years six through ten of the ten-year projections was not contradicted. Although Dissenters identified certain entries in the June 2016 LE, including the entries entitled "discounting" in the RJRT Detail tab, that did not follow a straight-line pattern, (DX0140, at tab "RJRT Detail," row 940; Gilchrist Tr. 520:19–521:9), Gilchrist credibly explained that "discounting" entries and many others were derived from the volume, market share, and pricing elements, (Gilchrist Tr. 521:5–22). The results of the interaction among those foundational elements would not necessarily reflect straight-line patterns, despite the results having been based on entries that were themselves extrapolated. (Gilchrist Tr. 617:21–620:15, 623:25–627:1.)

143. Many topics were covered by the Board during the July 2016 Strategy Day, including competitive analysis, research and development, regulatory developments and risks, new business opportunities, and, briefly, a discussion of the impacts of RAI's Strategic Plan on RAI's financial projections. (PX0009.0010–.0013, .0021–.0025; JX0003.0003–.0005; JX0004.0020–.00231.)

144. At the end of the July 2016 Strategy Day meeting, Peters presented to the Board a short financial overview presentation, which showed summary and top-line projected financials for the years 2016, 2017, 2018, 2021 and 2025. These projections, presented in condensed fashion, reflected 7% to 8% compound annual growth over the next ten years, (JX0004.0027; Gilchrist Tr. 526:22–25), and were based on certain identified assumptions that there would be no significant changes from the status quo, (JX0004.0020–.0035; Nowell Dep. Tr. 46:23–47:12; Wajnert Tr. 56:10–57:1, 117:19–118:4). As was the case with projections generally, the financial information presented to the Board did not incorporate any of the large-scale risks facing RAI, in part because many of the risks were effectively an "on/off switch" which could not have been factored into the numbers accurately. (Wajnert Tr. 58:11–21; JX0004.0021.) The Board did not receive the underlying ten-year projections from the June LE, nor did the Board give feedback on the projections for management to consider. (Wajnert Tr. 56:10–57:1, 58:7–21.)

v.    The October 2016 Projections

145. On October 29, 2016, RAI sent each Financial Advisor a set of financial projections (the "October 2016 Projections"). (JX0008.0001; PX0039.0001;

DX0043.0001.) The October 2016 Projections were based on the October 2016 LE, the most recently completed LE available at the time of the October 20 Offer. The projections used by the Financial Advisors for years one through five were based on a three-tab spreadsheet containing an income statement, a balance sheet, and a cash flow statement. (JX0008.0001, .0003–.0005; PX00039.0003–.0005; DX0043, at sheets "Income Statement," "Balance Sheet," and "Cash Flow.") The October 2016 LE also served as the baseline for the 2017 Operating Plan that RAI's financial management was preparing prior to BAT's October 20 Offer. (Gilchrist Tr. 441:8–442:13.)

146. Prior to sending the October 2016 LE to the Financial Advisors, RAI's financial team made a series of adjustments to account for updated information and high-level financial decisions that had not yet been made public. These adjustments were called "Top-Side Adjustments" or "Management Overlays." The adjustments added roughly $300 million in income before tax to each year of the October 2016 LE projections, or approximately $1.4 billion in total. (DX0041, at tab "Top Side Adjs"; Gilchrist Tr. 443:9–12, 443:15–444:18; Price Tr. 1053:18–1054:14, 105:23–1055:4; Zmijewski Tr. 1246:5–12.) Some Top-Side Adjustments were based on public information that had not yet been incorporated into the October 2016 LE, including changes to state tax laws and effects from positive stock market performance. (Price Tr. 957:22–958:6.) Other Top-Side Adjustments related to information that was not widely known, such as a planned restructuring of RAI's sales force that was projected to increase RAI's income. (Price Tr. 957:10–21.) Although these Management Overlays were typically not included in the ordinary course forecasts, RAI added

them to provide the Financial Advisors with the most accurate and reliable information it had concerning RAI's business. (Price Tr. 983:3–985:14.)

147. Over the next few weeks, Gilchrist, Price, and others on RAI's finance team continued sending documents and information to the Financial Advisors, including information about RAI's projections, and participated in diligence calls with the Financial Advisors to discuss the materials that were sent and any additional questions or requested information. (Gilchrist Tr. 440:10–22, 445:17–20; Price Tr. 945:3–12; PX0047.0001–.0004; DX0046.0001–.0004.)

vi.     The Ten-Year Projections

148. Dissenters have alleged that Gilchrist and Price intentionally withheld certain information from the Financial Advisors, including RAI's ten-year financial projections developed in connection with the June 2016 Strategic Plan, in an attempt to mislead the Financial Advisors about the prospects of the Company and deceive the Board and Transaction Committee into accepting an offer from BAT below RAI's intrinsic value. (DX0067.0001; Clark Tr. 1518:1–21; Gilchrist Tr. 446:7–447:20, 628:13–629:5; Price Tr. 959:23–960:7, 1001:21–1003:2.) Dissenters' allegation is contrary to the evidence.

149. First, less than two weeks after the October 20 Offer, RAI management provided each of the Financial Advisors with the financial information given to the Board at the July 2016 Strategy Day, including projections of operating income and growth rates for years six through ten of the June 2016 Strategic Plan. (DX0069.0021; DX0169.0040; DX0234.0021.) The Financial Advisors were thus

aware of the forecasted compound annual growth rates of 7% to 8% for the out years of those projections. A management team intent on hiding the ten-year projections would not have provided the Strategy Day presentation with the ten-year operating income and growth rates. At that point, the supposed conspiracy would have been exposed because all three Financial Advisors knew the projected trajectory and could have insisted on further detail if they believed it was necessary. That simply did not happen here.

150. In addition, the June 2016 LE projections were several months old by October 2016, and Clark testified that JPMorgan "can't use [a] stale set of projections. We have to use the most up-to-date set of projections." (Clark Tr. 1519:7–11.) It is undisputed that the five-year October 2016 Projections were the most up-to-date projections available.

151. Further, years six through ten of the June 2016 LE projections were less informative than the projections in the October 2016 Projections because the later years, based in large part on extrapolations of existing trends, were developed with a "broad brush approach[,]" and used a "much higher" materiality threshold. (DX0023.0002; Gilchrist Tr. 375:2–24, 404:9–406:6 ("[I]t was the best view of what the business would do based on the assumptions that we laid out."), 501:9–16; Price Tr. 1017:7–23.)

152. Next, the evidence does not indicate that the Financial Advisors needed detailed ten-year projections to adequately perform their valuation analyses. Indeed, representatives from Goldman, Lazard, and JPMorgan each testified that such

information was unnecessary. (Eckler Dep. Tr. 61:3–12; de Gennaro Tr. 352:8–13; Clark Tr. 1432:23–1433:3.)

153. Contrary to Dissenters' suggestion at trial, de Gennaro testified that there is no "hard and fast rule" for the number of years of projections required for any of the banks to do their work, although typically "five, five to ten years" are used. (de Gennaro Tr. 205:24–206:11.) Although de Gennaro had an expectation that RAI would provide ten-year projections just as they had in connection with the Lorillard Transaction in 2015, (de Gennaro Tr. 273:18–23), he explained that

> [t]here's no magic to ten years, seven years, five years as long as it forms a reasonable and best view and management tells us, this is what we believe to be the case, we go through it, we get validation, that's what we use. And it's perfectly adequate for our purposes. So I genuinely have no recollection of being concerned that we might get ten years, five years, other than we were going to use what we got, and we wanted to be in a position to use what we got. There's no issue with a five-year set of numbers. There just wasn't this pressing question, other than from a procedural standpoint. We needed to know what numbers we were going to get in order to be able to do analysis if and when the time came.

(de Gennaro Tr. 293:18–294:6, 352:8–13 ("[W]e were very comfortable working with . . . a five-year forecast.").)

154. Similarly, after reviewing and analyzing the information from RAI management, Eckler determined that "the financial forecast was sufficient to make all of the necessary judgments for the purposes of [Goldman's] valuation analysis." (Eckler Dep. Tr. 61:3–12.) JPMorgan reached a similar conclusion. (Clark Tr. 1597:12–16.) Despite the preference of certain team members to work with ten-year projections and initially asking whether RAI management could provide such

projections, JPMorgan ultimately determined that a detailed ten-year forecast was "not necessary" to perform its valuation work. (Clark Tr. 1432:23–1433:3.)

155. Testimony from the Financial Advisors further indicates that it was typical when performing valuation work to receive and use five-year projections from management. (Clark Tr. 1432:3–8; Eckler Dep. Tr. 32:03–33:20, 34:01–14, 35:08–09, 35:11–19, 67:07–67:15; de Gennaro Tr. 205:24–206:11, 220:13–221:5, 222:19–223:5.) Indeed, Dissenters' own expert, Zmijewski, testified that he used ten-year projections only to calculate RAI's pension liabilities; he otherwise elected to perform his DCF analysis for purposes of this case using five years of RAI management projections. (Zmijewski Tr. 1247:1–1248:6.) And RAI itself, in preparing its share repurchase ceiling (as discussed below), used five-year projections when it obviously knew that ten-year projections existed. (DX00138; DX0622, at tab "Sheet1.")

156. Dissenters' suggestion that the Financial Advisors agreed, at RAI's request, to use five-year, rather than ten-year, projections to protect their compensation at the expense of providing an accurate and reliable valuation, is not supported by the evidence.

157. Price's statements at his deposition that he prepared "ten-year projections" for delivery to the Financial Advisors in late October 2016 does not change the Court's findings. At the time of trial, Price was no longer employed by RAI and had no incentive to be untruthful. He offered a credible explanation at trial that he meant to refer at his deposition to the five-year projections derived from the October 2016 Projections plus the Top-Side Adjustments and that he had not in fact prepared ten-

year projections in October 2016. (DX0039.0001; Price Tr. 946:18–952:5, 952:20–953:22, 954:4–7.) Price's trial testimony is corroborated by the fact that there is no evidence that RAI prepared ten-year projections for any purpose other than the Board's Strategy Day in June of each year, (Gilchrist 375:13–376:3), and Dissenters have not identified any evidence, documentary or otherwise, indicating the existence of up-to-date, ten-year projections as of October 2016. The Court finds that Price simply made an honest mistake at his deposition.

158. Similarly, Dissenters' focus on alleged discrepancies between the testimony of the Financial Advisors, Gilchrist, and Price does not diminish the credibility of the latter two. While the evidence shows that JPMorgan asked RAI for ten-year projections, (Clark Tr. 1433:4–17), and that Lazard had received ten-year projections from RAI in the Lorillard Transaction, (de Gennaro Tr. 260:20–24, 262:23–263:11, 312:24–313:7, 364:8–365:4; DX0148.0009–.0013), that evidence does not contradict Gilchrist's and Price's testimony that they did not recall Clark's requests, (Gilchrist Tr. 589:23–590:11; Price Tr. 1016:23–1017:6). Clark testified that Gilchrist and Price told him that RAI did not have "an up-to-date set of ten-year financial forecasts[,]" (Clark Tr. 1433:4–17), and that the ones that it did have were "stale[,]" (Clark Tr. 1518:12–21), which is consistent with all the credible evidence introduced at trial.

159. Considering all of the evidence, including the credibility of the relevant witnesses, the Court cannot conclude that RAI's decision to provide the Financial Advisors with the five-year October 2016 Projections rather than the ten-year projections from the June 2016 LE was calculated to deprive the Financial Advisors

of important information to drive down their valuations of RAI to a range affordable to BAT. All credible evidence is to the contrary. Ultimately, the record is clear that the Financial Advisors received all the information they believed they needed for their valuation work, (de Gennaro Tr. 352:8–13; Eckler Dep. Tr. 61:3–12), and no credible evidence was offered at trial supporting any effort by RAI management to hide information to depress the resulting valuation of the Company.[32]

e.  Share Repurchase Plan

160. In the summer of 2016, the RAI Board approved a share repurchase program in response to unique circumstances related to RAI's MSA payment obligations in 2017 that gave rise to a $250 million increase in RAI's costs. RAI referred to this increase as the "NPM cliff":

> [I]n 2013 a settlement was reached with 22 states and jurisdictions on disputed 2003-2012 NPM [non-participating manufacturer] credits, plus two more states in 2014, for credits to be paid over five years. Additionally, a settlement was reached with the State of New York related to payment years 2004-2014 for credits to be paid over a four-year period. The NPM credits account for a total financial benefit of approximately $1.2 billion through 2019. Some transition credits expire[d] after 2014, with most of the remaining credits expiring after 2016, creating a one-time $250 million drop in 2017 and $100 million in 2019 – the "NPM cliff." The removal of these credits will increase Cost of Goods Sold for RJRT in 2017, causing year over year profit to be flat.

(PX0063.0046.)

161. RAI management expected to mitigate the 2017 NPM cliff "through actions that will not impact the commercial business[;] these mitigation activities will appear

---

[32] As will be discussed *infra*, the evidence actually shows that RAI management advocated to the Financial Advisors for a *higher* valuation, in order to obtain the best possible purchase price for the Company. (Price Tr. 1054:23–1055:14.)

below operating income." (PX0063.0046, .0100.) Management recommended to the Board a share repurchase plan in the summer of 2016 using RAI's excess cash to help boost EPS, describing the share repurchase program as a "cliff mitigation element to help overcome the impact of the loss of those credits." (Gilchrist Tr. 412:16–413:14.)

162. A share repurchase plan involves a company's "go[ing] on the open market and repurchas[ing] its shares to reduce its overall share count." (Gilchrist Tr. 412:7–12.) By reducing a company's share count, the share repurchases reduce the denominator in the EPS calculation and therefore increase EPS. (Gilchrist Tr. 413:15–21.)

163. To proceed with the share repurchase plan, RAI management requested and obtained Board approval for the time frame of purchases (two-and-a-half years), the amount of capital to be used ($2 billion), and the authorization ceiling at which management would be permitted to repurchase shares without further Board approval ($65 per share). (Gilchrist Tr. 413:22–414:14.)

164. The share repurchase authorization ceiling was an internal corporate grant of authority from the Board to management, allowing management to purchase shares on the open market up to the ceiling price if management believed it was in the best interest of the Company to do so. (Gilchrist Tr. 415:2–5, 416:10–417:13, 417:20–418:1, 418:11–15.) Consistent with standard practices of publicly traded companies, RAI's share repurchase authorization ceiling was an internal matter and was not disclosed to the market. (Wajnert Tr. 166:5–21; Crew Tr. 714:15–25.)

165. RAI arrived at the $65 share repurchase authorization ceiling after performing a rough discounted cash flow calculation using "conservative assumptions" over the two-and-a-half year length of the proposed program. (DX0284.0003–.0004; Holland 30(b)(6)[33] Dep. Tr. 37:16–40:18 ("We would purposefully kind of weight it on the higher end."), 43:5–44:8; Gilchrist Tr. 418:2–10, 548:15–549:2.) The share repurchase DCF was not intended to value the Company, but rather to derive a reasonable request for RAI management to make to the Board as a ceiling price for management's authority to repurchase shares. It was not management's intention to set the share repurchase authorization ceiling at the "intrinsic value" of RAI's shares; rather, RAI management sought to

> get authorization from the board to purchase shares up to a certain point if the market took the stock to that point. So we were intending to obviously reduce our share count over a period of time to help overcome that NPM cliff. That's really what we were trying to accomplish.

(Gilchrist Tr. 414:19–415:1.)

166. Once the ceiling price was set, RAI management retained discretion to make a judgment in each quarter as to whether buying shares at the then-prevailing market price was an appropriate use of the Company's resources. It was not required to proceed with the purchases, even if the shares were trading below $65. (Gilchrist Tr. 412:7–15, 417:14–21; Wajnert Tr. 149:16–23 (noting that in a share repurchase a

---

[33] Holland was designated pursuant to N.C. R. Civ. P. 30(b)(6) to testify regarding certain topics on behalf of RAI. (Parties' Witness Summaries 4.) Portions of Holland's 30(b)(6) deposition were admitted into the trial record. (ECF No. 210.)

company will not pay shareholders "more than what the company believes the stock is worth").)

167. Indeed, the status of the share repurchase program and management's intended purchases were subject to regular review by the Board's Audit and Finance Committee. (Gilchrist Tr. 413:22–414:14, 419:12–420:2; DX0284.0003–.0006; DX0622.0003.) Gilchrist testified that even though he had requested authority from the Board to buy shares at a price up to $65 per share, he intended to discuss the matter with the Board again if the stock traded higher and he determined the price was not attractive. (Gilchrist Tr. 417:22–418:15.) RAI ended up purchasing only a "very small amount" of shares pursuant to the plan because RAI suspended the plan once BAT made its first offer. (Gilchrist Tr. 416:23–417:13.)

168. The inputs used in the share repurchase DCF included a very wide range of terminal growth rates from 1% to 4% and a very wide range of weighted average costs of capital from 7% to 9.5%. (DX0622, at tab "Sheet1"; DX0138, at tab "Sheet1"; Holland 30(b)(6) Dep. Tr. 58:16–59:7.) The DCF analysis RAI created for the share repurchase program ultimately used a 7.5% weighted average cost of capital ("WACC") and a 3.0% perpetuity growth rate ("PGR") for RAI. (Gilchrist Tr. 543:20–24; DX0284.0003.) The analysis was "based on the 2016 Strat[egy] Plan as of June 2016 for a five-year period" and did not include the projected compound annual growth of 7% to 8% in years six through ten referenced in the 2016 Strategic Plan. (Gilchrist Tr. 545:7–12, 547:3–13; DX00138.)

169. These inputs are not a reliable basis for valuing RAI. The range of weighted average costs of capital is much higher than is supported by any of the other evidence in the case, including from both sides' experts and all three Financial Advisors. Indeed, in the context of a valuation, there are significant methodological flaws with RAI's selection of the weighted average cost of capital. (Gompers Tr. 759:7–762:10, 762:15–19.) These problems undermine the utility of both the weighted average cost of capital and the perpetual growth rate in the share repurchase DCF because the two are linked, and RAI management considered them together in making its selection as to the authorization ceiling to request from the Board. (DX0622, at tab "Sheet1"; DX0138, at tab "Sheet1"; Gilchrist Tr. 421:12–20; Gompers Tr. 760:3–13; Flyer Tr. 1226:23–1228:18 ("So the higher the WACC, the actually higher my implied PGR would be, because I'm weighing the beginning period more. The lower the WACC, the lower the PGR would be, because I'm weighing the later periods more.").)

   f.   Further Deliberations and Negotiations

170. On November 6, 2016, RAI sent each Financial Advisor a planned presentation for Board and Transaction Committee meetings on November 8 that outlined the assumptions and sensitivities to the October 2016 LE Projections as well as some of the high-level figures. (PX0052.0001, .0004, .0006; JX0010.0001, .0004, .0006; Gilchrist Tr. 380:21–381:8.)

171. On November 8, 2016, the RAI Board met and reviewed the October 2016 Projections. During the meeting, Gilchrist gave a presentation to the Board in which he explained that the financial forecasts incorporated significant assumptions about the industry dynamics, including "[c]ontinuation of recent pricing environment – no

significant disruption[,]" "cigarette industry volume down ~3 - 4 percent[,]" "moist and vapor industry volume up ~2 percent[,]" "3 percent inflation[,]" "[state excise taxes] $.05 per pack annually, moist snuff $.01 per can annually[,]" "Share repurchase beyond 2018 at $1 billion per year[,]" and "Capital expenditures continue at $150 - 200 million per year[.]" (PX0052.0004; JX0010.0004.)

172. Gilchrist also identified upside and downside sensitivities to the financial projections, including "Accelerated growth from new revenue streams – Vapor/Transformation" as an upside and the greater risk of adverse FDA regulations as a downside. (JX0010.0006.) After his presentation, Gilchrist and Crew spoke with the Board about "potential upside and downside to the business based on their current thinking[,]" (PX0054.0002–.0003), and specifically advised the Board that "the upside sensitivities and the downside sensitivities are not all created equal[.]" (Gilchrist Tr. 389:1–3; JX0010.0003, .0006; PX0115.0127, .0377; JX0023.0070–.0071.)

173. On November 11, 2016, RAI rejected BAT's October 20 Offer. (JX0023.0071–.0072). On December 5, 2016, BAT made a revised offer to acquire RAI, which RAI also rejected. On neither occasion did RAI make a counterproposal. As shown on the following chart, BAT ultimately raised its offers four times before a final deal was reached on January 17, 2017:

| Date | BAT Shares | Cash | Value Per Share on Date | Total Value on Offer Date[34] |
|---|---|---|---|---|
| Oct. 20, 2016 | 0.5502 | $24.13 | $56.50 | $80.56 billion |
| Dec. 5, 2016 | 0.4923 | $29.44 | $56.60 | $80.70 billion |
| Dec. 20, 2016 | 0.5105 | $29.44 | $58.30 | $83.12 billion |
| Jan. 10, 2017 | 0.5250 | $29.44 | $59.15 | $84.34 billion |
| Jan. 10, 2017 | 0.5260 | $29.44 | $59.20 | $84.41 billion |
| Jan. 17, 2017 | 0.5260 | $29.44 | $59.64 | $85.04 billion |

(Corr. Stip'd Facts ¶ 17; JX0023.0068–.0078.)

174. The Transaction Committee never demanded that BAT support an alternative transaction to allow for an auction process, (Wajnert Tr. 70:7–11, 90:7–9), although there was no evidence at trial that BAT would have agreed to withdraw its announced opposition had it been pressed. Nor did the Transaction Committee authorize the Financial Advisors to solicit any expressions of interest from other parties concerning the sale of the Company or an alternative transaction, (JX0023.0650, .0652, .0655; DX0272), but, similarly, there was no admissible evidence at trial from any source that any third party was interested in purchasing RAI with or without BAT's support.

175. Indeed, given the nature of the tobacco industry, regulatory requirements, RAI's large size, and antitrust concerns, there were few (if any) companies in the world—in the tobacco industry or adjacent industries—that could have made an offer for RAI, regardless of BAT's stock ownership. (JX0023.0070; PX0115.0469; Eckler Dep. Tr. 51:08–52:08.) Significantly, although BAT's offer was widely publicized, no

---

[34] Offer value is calculated based on the trading price of BAT stock and the British pound/U.S. dollar exchange rate as of the closing price on the date of the offer. (JX0023.0068–.0070.) Total value is the implied market capitalization, *i.e.*, RAI's total shares outstanding on the offer date multiplied by the value per share of the offer. (JX0023.0084–.0085.)

third party ever contacted the Transaction Committee, RAI management, or any of RAI's Financial Advisors about the possibility of engaging in diligence or making a competing bid. (Wajnert Tr. 90:3–6; Clark Tr. 1429:16–18.)

176. Goldman reviewed alternatives to negotiating a merger with BAT with the Transaction Committee. (Eckler Dep. Tr. 50:13–50:25.) The Transaction Committee considered whether Japan Tobacco could be a serious potential alternative buyer but concluded that it was not. This conclusion was based on RAI's previous dealings with Japan Tobacco in which Japan Tobacco was quick to respond to RAI's offers but maintained a difficult internal process to move forward. Past conversations with Japan Tobacco also led the Transaction Committee to reasonably believe that Japan Tobacco would not be interested in dealing with the U.S. regulatory regime. The Transaction Committee also reasonably believed that, given their positive relationship with Japan Tobacco and Japan Tobacco's 2016 purchase of the international rights to RAI's Natural American Spirit brand, if there had been any real interest in purchasing RAI, Japan Tobacco would have reached out to RAI directly. (Wajnert Tr. 91:1–3, 99:17–100:1, 171:19–172:12 ("[W]e were not optimistic at all about Japan Tobacco being a potential bidder. And we knew them well enough individually, had visited together and the like, that if there had been an interest, a real interest, they would have called.").)

177. While BAT indicated that it was not interested in selling its shares to an alternative buyer, that did not mean RAI had to sell the Company to BAT, nor did it mean that the members of the RAI Transaction Committee and Board were willing

to—or had any reason to—sell the Company for less than its fair value. (JX0021.0003; Wajnert Tr. 73:24–74:24.) Multiple witnesses testified that RAI seriously considered strategic alternatives, including remaining independent from BAT. (Nowell Dep. Tr. 150:13–24; Cameron Dep. Tr. 106:16–107:11; Crew Tr. 665:16–666:15.) Indeed, the Transaction Committee twice rejected BAT's merger offers without making a counterproposal—showing the Transaction Committee thoroughly explored the viability of RAI's remaining independent as an alternative to executing a transaction with BAT. (JX0023.0067–.0073.)

178. It was not until after the Transaction Committee successfully negotiated four price increases, securing an additional $4.5 billion in value for shareholders by the time of signing, that the Transaction Committee concluded that a merger with BAT was more attractive than other alternatives. (JX0023.0065–.0078.) In fact, JPMorgan advised RAI on various alternatives to BAT's offers, including

> continuing to operate as a stand-alone entity, looking at other M&A transactions where Reynolds would not – not be the seller but be a potential acquirer of assets . . . [,] alternatives related to the company's capital structure, whether or not a leveraged recapitalization could make sense, alternatives as it relates to its use of free cash flow in the context of repurchases or dividends. A variety of alternatives.

(Clark Tr. 1429:2–12.)

179. The Transaction Committee and its advisors ran a thorough deal process from October 28, 2016 to the signing of the Merger Agreement on January 16, 2017. All negotiations with BAT were conducted by the Transaction Committee or its representatives. Wajnert, as Transaction Committee Chair (and after his retirement on December 31, 2016, his replacement, Nowell), negotiated directly with BAT CEO,

Nicandro Durante. (Wajnert Tr. 79:13–81:9; Nowell Dep. Tr. 169:11–170:6, 170:13–171:4, 171:12–173:9, 174:21–176:25; JX0023.0072–.0076.)

180. Likewise, Goldman negotiated directly with BAT's bankers at Centerview and Deutsche Bank. The Transaction Committee repeatedly rejected BAT's offers and did not make a counterproposal until after BAT made its third offer, on December 20, 2016, which BAT had said was its final proposal. (Wajnert Tr. 79:13–81:5; JX0023.0073–.0074.) The Transaction Committee regularly met and spoke with Goldman about the offers and investor reactions. (JX0023.0070–.0078.) Goldman and JPMorgan made many presentations of their valuation analyses to the Transaction Committee and to the Board during the negotiation process. (JX0023.0070–.0078.)

181. As a result of the Transaction Committee's efforts, BAT increased its offer to purchase RAI's common stock four times from a per-share value of $56.50 in the October 20 Offer to a per-share value of $59.64 when the transaction was announced on January 17, 2017, amounting to an additional $4.5 billion in deal value for RAI's shareholders and a 26.4% premium over the Unaffected Stock Price. (Wajnert Tr. 80:19–22; Nowell Dep. Tr. 173:25–176:25; JX0023.0068–.0076, .0088.)

g.  Financial Advisors' Fairness Opinions and Shareholder Vote

182. Corporate boards contemplating a sale of a company often seek fairness opinions from their financial advisors before agreeing to recommend the transaction to stockholders. In order to arrive at a fairness opinion, a financial advisor performs

a financial analysis of the company typically using a variety of techniques. (de Gennaro Tr. 192:24–194:3.)

183. To prepare their fairness opinions in connection with the Merger, Goldman, Lazard, and JPMorgan each separately evaluated the final BAT offer from January 10, 2017 and determined that it was fair from a financial point of view to the RAI shareholders other than BAT. Each of the Financial Advisors presented a draft fairness opinion to its fairness committee prior to giving the bank's final fairness opinion to the Board or the Transaction Committee or both on January 16, 2017.

184. Each Financial Advisor conducted several types of valuations of RAI, including analyses of comparable companies' market multiples, precedent transaction multiples, and DCFs, based on their knowledge of RAI, the tobacco industry, and the market. These valuation analyses were meant to be examined together. (JX0023.0077–.0078; PX0115.0252–.0282, .0526–.0570, .0572–.0635; de Gennaro Tr. 227:19–229:14, 232:19–235:20; Clark Tr. 1448:24–1449:8, 1435:14–1436:5, 1448:24–1449:8; Eckler Dep. Tr. 49:4–15, 201:7–22.)

185. RAI management represented to the Financial Advisors that the five-year projections provided earlier were management's best estimates of its future cash flows, and the Financial Advisors relied on that representation, stating in their fairness opinions (also published in SEC filings in connection with the Merger): "[T]he unaudited financial forecasts were prepared on a reasonable basis and reflected the best then-currently available estimates and judgments of RAI's management." (JX0023.0133, .0649; Martin Dep. Tr. 113:05–113:10 ("Q. . . . [D]o you

recall anyone at Reynolds commenting that the projections that were going to go into the proxy statement were unrealistic?  A.  No."); Price Tr. 710:15–19 ("Q.  [Y]ou would never give the financial advisors projections that were – that you thought were unreliable . . . .  A.  Well, no.  We're going to be very transparent with everything we can.  We disclose all of this.").)

186.  In preparing their valuations, the Financial Advisors had access to whatever information they requested from RAI for their analyses.  (Gilchrist Tr. 445:17–20, 446:7–447:20, 481:1–13, 481:19–482:12 ("I am certain they had everything that they requested and that they needed."), 587:8–12; Price Tr. 1017:5–6; de Gennaro Tr. 222:12–18.)  As illustrated by the "football field" slides reproduced below from each of the Financial Advisors' January 16, 2017 presentations to the RAI Transaction Committee and/or Board, the $59.64 per-share deal price was well within the calculated ranges of equity value per share:



(PX0115.0539);



(PX0115.0258);



**Royals Preliminary Valuation Summary**

($ per share)

| Methodology | Equity Value per Share | Comments |
|---|---|---|
| **1 DCF Valuation Standalone** | $50.00 – $73.38 | • Based on Royals Management 5-year projections<br>• DCF valuation as of December 31, 2016<br>• Weighted average cost of capital of 5.00% – 6.00%<br>• Perpetuity growth rate of (0.5%) – 0.5%<br>• Does not include value of potential combination synergies<br>• Based on December 31, 2016 net debt of $10.9bn and FDSO of 1,433m as per Royals Management guidance |
| **2 Precedent Transactions** | 2016E EBITDA $42.08 – $54.50<br>Adj. 2016E EBITDA[1] $43.03 – $55.69 | • 12.0x – 15.0x LTM EBITDA valuation range based on selected precedent tobacco transactions<br>• Applied to Royals 2016E EBITDA of $5.9bn and Royals adjusted 2016E EBITDA of $6.1bn as per Royals Management<br>• Based on December 31, 2016 net debt of $10.9bn and FDSO of 1,433m as per Royals Management guidance |
| **3 Trading Comparables** | EBITDA-Based $40.86 – $49.67<br>P/E-Based $43.08 – $50.68 | • 11.0x – 13.0x 2017E EBITDA and 17.0x – 20.0x P/E valuation ranges based on relevant peer sample<br>• Applied to Royals 2017E EBITDA and EPS of $6.3bn and $2.53, respectively, as per Royals Management projections<br>• Based on December 31, 2016 net debt of $10.9bn and FDSO of 1,433m as per Royals Management guidance |
| **52-Week High/Low** *(Up to 10/20)* | $43.38 – $54.38 | • Intraday 52-week high and low prices as per Bloomberg as of October 20, 2016<br>• Low: October 19, 2016<br>• High: July 5, 2016 |
| **Precedent Premia** | $56.60 – $63.68 | • Range of 20% - 35% premium, based on precedent public company transactions (i) from 2011 to 2016 with the target in the U.S. and deal values greater than $500m and (ii) from 2005 to 2016, where significant shareholders with >20% ownership of the target acquires the remaining shares of the company<br>• Premia applied to Royals unaffected share price of $47.17 as of October 20, 2016 |
| **Analyst Price Targets** | $47.00 – $62.00 | • Price target range as per Bloomberg as of October 20, 2016<br>• Includes forward price targets (not discounted back) |

*For reference only*

Braves Final Offer[3]: $59.74

Royals Selected Prices → 30-Day VWAP[2]: $47.13 | 10/20 Price: $47.17

**LAZARD**

Source: Royals Management projections, Bloomberg, FactSet as of 1/13/17.
Note: Analysis based on December 31, 2016 net debt of $10.9bn and FDSO of 1,433m as per Royals Management guidance.
1  Includes adjustments for run-rate Lantern synergies in the amount of $113.6m.
2  As of October 20, 2016.
3  Based on Braves ADR price of $115.21 as of 1/13/17, exchange ratio of 0.2630x (0.5260x for Braves ordinary share price) and $29.44 cash per share.

6

(PX0115.0582).

187. The deal price that RAI negotiated with BAT, as described by Lazard's de Gennaro, was a "very full price" and a "landmark price." (de Gennaro Tr. 236:6–16.) JPMorgan's Clark described it as a "homerun transaction for [RAI,]" (Clark Tr. 1443:24–1444:5); he further testified that he had no concerns about issuing a fairness opinion for the Merger, stating that "it was a fantastic transaction[,]" and that he wished he "had the ability to get transactions like this for all of [JPMorgan's] clients[,]" (Clark Tr. 1451:7–12). A number of analysts even expressed concern that BAT was overpaying. After the announcement of the Merger, research analysts did not comment that BAT was receiving a bargain or that RAI was undervalued in the deal. (Gompers Tr. 802:25–803:8; Yilmaz Tr. 2003:4–22.)

188.  From BAT's October 20 Offer until the Transaction Date in July 2017, the S&P 500, a broad measure of large U.S. companies, rose 17.15%.  Altria, the only other major U.S. tobacco company, rose 20.44% over that same period.  (Gompers Tr., 792:2–11.)

189.  At the shareholder vote on the Merger, RAI's shareholders overwhelmingly approved the deal, by both a majority (83%) of the outstanding shares and by a majority (71%) of the non-BAT-owned outstanding shares.  Nearly 72% of the non-BAT-owned shares were voted in the Merger, and 99% of those shares were voted in favor of the Merger.   (Corr. Stip'd Facts ¶ 18; DX0277.0011; DX0324.0002; JX0023.0044; Crew Tr. 671:23–672:10.)

190.  Roughly 80% of RAI's public shareholders were sophisticated, institutional investors.  (PX0115.0618.)  Among those voting in favor of the Merger were RAI's directors and officers, who had the best information about the value of the Company.  RAI witnesses testified that they voted in favor of the deal, including Price, who lost his job as a result of the Merger.  (Wajnert Tr. 85:13–24; Price Tr. 1061:1–1062:2.)  None testified that they voted against it.

191.  On July 25, 2017, the Merger became effective, and an indirect, wholly-owned subsidiary of BAT was merged with and into RAI, with RAI continuing as an indirect and wholly-owned subsidiary of BAT.  (Corr. Stip'd Facts ¶ 19; PX0109.0002, .0085–.0086; DX0325.0003.)  The merger consideration on that date had a cash value of $65.87.  The increase in the value of the merger consideration from January 16, 2017 to the Effective Date of the Merger was due to the increase in the BAT share

price and favorable changes to the British pound/U.S. dollar exchange rate. (DX0325.0003–.0004; Zmijewski Tr. 1241:24–1242:10.)

192. In September 2017, RAI sent payment to Dissenters for RAI's $59.64 per-share estimate of the fair value of the shares held by Dissenters, plus interest calculated pursuant to N.C.G.S. § 55-13-01(6). (Corr. Stip'd Facts ¶¶ 20–25; Appendix A.)

F.   Evidence of Value

193. At trial, RAI introduced evidence of value using various valuation concepts and techniques that, when cross-checked against one another, show that the price paid by BAT reflected the fair value of RAI. Additionally, RAI presented testimony from its executives, Board members, and Financial Advisors regarding the contemporaneous analyses and assessments they performed based on their knowledge of the Company and the industry—most of which supported the conclusion that RAI shareholders received fair value in the transaction.

194. The conclusion that the deal price reflected fair value was further corroborated by the testimony of RAI's valuation expert, Gompers, who testified about his own valuation analyses and those of the Financial Advisors. Based on that evidence, and for the reasons set forth below, the fair value of RAI at the Merger closing on July 25, 2017 was no more than the deal price of $59.64.

195. Dissenters sought to explain why all of the valuation evidence presented by RAI should be ignored, and that the value of RAI should be determined based solely on the DCF model developed by their experts, Zmijewski and Flyer. Relying entirely on this made-for-litigation analysis, Dissenters request that the Court find that RAI's

fair value as of July 25, 2017 was $92.17—an amount that far exceeds any other evidence of value in the record and suggests that RAI's management, RAI's Board, RAI's Financial Advisors, RAI's shareholders, stock market analysts, and the market itself mispriced RAI by as much as $50 billion.[35]

### a. Market-Based Valuations

196. Extensive evidence was offered showing that RAI's fair value was in line with the value that the market ascribed to RAI. In the circumstances presented here, the market's view of the value of RAI is persuasive evidence of underlying fair value. As Gompers testified, "[I]f the market is efficient and there's no material, non-public information, then the market price will be the best estimate of a firm's . . . intrinsic or fundamental value." (Gompers Tr. 784:1–6.)

#### i. RAI's Stock Price

197. On October 20, 2016, RAI's common stock closed at $47.17 per share (the "Unaffected Stock Price"). (Corr. Stip'd Facts ¶ 13.) The evidence shows that this price did not represent a substantial deviation from the price at which RAI's stock was previously trading. RAI's 52-week trading average prior to BAT's initial offer was approximately $49.00. (PX0115.0258.) RAI's common stock hit its all-time high of $54.48 per share on July 5, 2016. (PX0115.0390.) In fact, RAI's share price had

---

[35] Zmijewski also testified at trial about a series of late-made calculations that were disclosed to RAI the morning prior to his testimony. He acknowledged, however, that "[he] did one valuation. . . . And that value is $92.17." (Zmijewski Tr. 1325:3–13, 1325:21-23 ("Q. So is it fair to say that the rest of these just illustrate the math if I asked you 'what would it be if?' A. Yes.").)

realized significant gains in the years leading up to BAT's initial offer. (PX0063.0039.)

198.  RAI's stock was trading "at a peak multiple in the marketplace" prior to BAT's October 20 offer.  (Gilchrist Tr. 560:22–561:11.)  Although RAI's share price had dropped at that time from its all-time high three months before, from the time the Lorillard Transaction closed in June 2015 until October 20, 2016, the volume weighted average price of RAI stock was $46.26—slightly below the Unaffected Stock Price.  And trading data shows that the deal price was substantially above prior price levels:





(PX0115.0071.)

199. Yilmaz testified that there are certain circumstances where the presence of large blockholders that have access to nonpublic information can lead to an increase, rather than a decrease, in a company's value. (Yilmaz Tr. 1967:18–1968:13 ("Q. . . . [I]f the large blockholder does a good job . . . monitoring management's performance, that could lead to an increase in value . . . ? A. Yes. Q. And if the large blockholder has expertise in the industry . . . it can provide to management, that too can increase the company's value . . . ? A. It is possible. Yes.").) While Zmijewski suggested that BAT's ownership stake in RAI could have depressed RAI's market price to some degree, (Zmijewski Tr. 1384:25–1387:1), he presented no evidence to support his suggestion or the magnitude of any hypothetical depressive effect of BAT's stake. Contrary to his suggestion, numerous analysts indicated that, prior to BAT's October 20 Offer, RAI's unaffected stock price incorporated some value attributable to a possible acquisition by BAT. (Cameron Dep. Tr. 80:14–81:2; Nowell Dep. Tr. 107:11–19; PX0115.0091.)

200. A detailed analysis of market efficiency requires an answer to three questions: (i) "[d]id the . . . stock trade in [an] efficient market?"; (ii) were "there market frictions that would cause a disconnect between the company's publicly traded stock price and its fair value?"; and (iii) "was there value-relevant, non-public information?" (Zmijewski Tr. 1317:19–1318:8.)

201. RAI possessed many attributes that courts have found to suggest that a stock trades in an efficient market. Experts for both sides testified that they had identified no "trading frictions" or other evidence suggesting that RAI's stock was not

trading efficiently. (Yilmaz Tr. 1966:18–1967:6; Gompers Tr. 785:9–11, 785:24–786:8.)

202. Experts for both sides also agreed that the market for most publicly traded stocks on most days is close to semi-strong form efficient, particularly stock for large companies like RAI.[36] (Yilmaz Tr. 1967:7–13; Gompers Tr. 785:3–8.) Although both sides' experts agreed that the fact a company is widely traded on a national exchange does not mean it automatically trades in a semi-strong efficient market at any given point, (Gompers Tr. 833:23–834:6; Zmijewski Tr. 1320:17–1321:2), given the evidence introduced by RAI, which was not disputed by Dissenters, there is a sufficient factual record[37] for the Court to determine that the market for RAI's stock was semi-strong form efficient:

    a. Until the Merger, RAI was publicly traded in high volumes and with high liquidity on the NYSE, the largest stock exchange by market capitalization and monthly trading volume in the world. (JX0017.0003.)

    b. RAI was a very large company with a market capitalization of approximately $67.3 billion on October 20, 2016. (Gompers Tr. 777:25–778:10; PX0115.0181.)

---

[36] A market that is semi-strong form efficient quickly incorporates into the price of a security the release of all new publicly available information. (Gompers Tr. 833:11–15; Yilmaz Tr. 1874:18–21.)

[37] RAI did not offer expert testimony to establish that the market for RAI's stock was semi-strong form efficient, an alleged failure of proof Dissenters suggest precludes the Court from finding market efficiency. (Defs.' Resp. Post-Trial Br. 19, ECF No. 231.) The Court disagrees and concludes that expert testimony on market efficiency is not necessary to the Court's determination in light of the undisputed evidence of record establishing that the market for RAI's shares was semi-strong efficient at the time of the Merger. (*See* Appendix B at § E.)

c. Information about RAI was both widely available and readily disseminated to the market. (de Gennaro Tr. 215:15–23 ("No indication that the market wasn't absorbing news on a regular basis.").) For most public companies, "most of the relevant information is disclosed." (Wajnert Tr. 124:4–7.)

d. RAI's historical stock price increased and decreased in relation to the release of new Company-specific information and market-wide trends. (Wajnert Tr. 59:10–60:4; de Gennaro Tr. 215:15–23.)

e. RAI's stock was followed by 16 equity analysts, who frequently published research about the Company. (PX0063.0010, .0025; de Gennaro Tr. 187:18– 188:8 (RAI was "a well-covered company . . . . A lot of analysts issued regular reports.").) These analysts were well-informed about RAI's business and the U.S. tobacco industry. (PX0063.0010, .0025; de Gennaro Tr. 187:18–188:8, 199:2–19.)

f. RAI did not have a controlling shareholder at any time prior to the Merger. (JX0023.0080; Wajnert Tr. 63:18–64:18.)

203. Dissenters also sought to prove at trial that RAI's stock price was not a reliable indicator of fair value because of the existence of certain material nonpublic information that was not reflected in the stock price: (i) the Top-Side Adjustments to the October 2016 Projections provided to the Financial Advisors, (ii) the projected growth rates for years six through ten in the June 2016 LE, and (iii) the $65 share repurchase authorization ceiling. (*See* Defs.' Resp. Post-Trial Br. 22–24.) None of this nonpublic information warrants disregarding RAI's Unaffected Stock Price as

evidence of value. Indeed, Dissenters' expert, Yilmaz, admitted that he did not have an opinion "one way or the other on whether the private information at the company, on balance, was more negative or more positive[.]" (Yilmaz Tr. 1959:1–12 ("Given that I have not done the work, I [can] not opine on that.").)

204. First, the Top-Side Adjustments amounted to an additional $1.4 billion in RAI's income before taxes, or roughly $300 million added to each year of the five-year projections. (DX240, at tab "top side adj," row 14; Price Tr. 989:18–990:16.) As of the record date of June 12, 2017, RAI had approximately 1.426 billion shares of common stock outstanding. (JX0023.0029.) Given RAI's immense size, public disclosure of this additional projected income would not likely have affected the stock price in a meaningful way, and it does not undermine the relevance of the Unaffected Stock Price as evidence of value. There is certainly no basis to find that this information could justify the massive premiums to RAI's Unaffected Stock Price for which Dissenters advocate. Further, some of the Top-Side Adjustments were based on public information that had not yet been incorporated into the October 2016 LE, such as changes to state tax laws and effects from positive stock market performance. (Price Tr. 957:22–958:6.)

205. Next, as discussed previously, the growth rates in years six through ten of the June 2016 LE were based largely on extrapolations of current volume and pricing trends in the industry, which were publicly available and therefore already likely to be reflected in RAI's stock price. (Gilchrist Tr. 375:2–24, 404:9–406:6, 529:12–25.)

206. Moreover, and also as previously discussed, RAI management credibly testified—and the documents relating to the ten-year projections confirmed—that the projections for these later years did not account for any of the various serious risks facing the Company. (DX0023.0002; Gilchrist Tr. 410:8–412:2.) In particular, they were not intended to be used to value RAI's shares but only in connection with certain limited planning objectives. The projected growth rates were not based on any underlying material, value-relevant information about specific business plans or other developments. They did not constitute the kind of information that, if disclosed, would have meaningfully affected the stock price, and they do not provide any reason to believe that the fair value of RAI materially deviated from the Unaffected Stock Price. Dissenters do not contest that RAI was not required to have disclosed these projections. (Yilmaz Tr. 1959:15–25.)

207. Finally, the authorization ceiling for the share repurchase approved by the Board is not material, value-relevant information because it was not a valuation of RAI. Rather, as discussed above, it was an internal corporate authorization for a purchasing program, which was intentionally set at a price that was higher than what RAI management ever expected it would need to spend. (Gilchrist Tr. 414:19–415:1.) Indeed, Zmijewski pointedly declined to testify that the authorization ceiling was value-relevant information even when prompted by counsel. (Zmijewski Tr. 1316:10–1317:3.)

### ii. Adjusted Unaffected Stock Price

208. RAI's July 24, 2017 stock price is not a relevant proxy for fair value on the Transaction Date because after BAT's announcement of its October 20 Offer, RAI's

stock price would have reflected the expected deal price, including expected synergies created by the Merger, and the market's view of the likelihood of the deal closing. (Gompers Tr. 790:1–11.)

209.   In addition, in the time between the October 20 Offer and the Transaction Date, events took place that may have affected RAI's standalone value and been reflected in RAI's stock price had BAT not made its October 20 Offer.  (Gompers Tr. 790:12–791:12.)   In particular, Donald Trump had been elected President of the United States, and the Republican Party held a majority in both the Senate and the House of Representatives.   Both President Trump and Republican congressional candidates had campaigned on a lowered corporate tax rate.   While no formal tax plan had been proposed or implemented prior to the Transaction Date, there was speculation that the Republican-led Congress would pass a tax bill that would lower the corporate tax rate and that there would be a more benign regulatory climate for the U.S. tobacco industry.  (PX0115.0185, .0446, .0456; Eckler Dep. Tr. 101:07–102:3.)

210.   To estimate the effect that these and other market industry developments would likely have had on RAI's stock price between BAT's October 20 Offer and the closing of the Merger on July 25, 2017,[38] Gompers calculated an "Adjusted Unaffected Stock Price" that indexed RAI's Unaffected Stock Price to the performance of its closest competitor, Altria, and to the performance of the S&P 500 generally from October 20, 2016 through July 24, 2017.  Based on the performance of the S&P 500

---

[38] At trial, no evidence was offered of a material, value-relevant event between October 20, 2016 and July 25, 2017 that affected RAI separately from the tobacco industry or the market as a whole.

Total Return Index, Gompers calculated that RAI's unaffected stock price of $47.17 would have grown to $53.78 as of July 24, 2017. Based on the performance of Altria's stock during that period, Gompers calculated that the implied value of RAI's stock as of July 24, 2017 would be $55.33. (Gompers Tr. 791:13–792:25; PDX0005.0020.)

211. Using either metric, the evidence shows that, while RAI's stock price may have appreciated to some degree in the time between the October 20 Offer and the Transaction Date, RAI's stock would still have traded 7% to 10% below the deal price as of July 24, 2017. The Court finds Gompers's Adjusted Unaffected Stock Price to be persuasive evidence that suggests that the deal price is consistent with, and Dissenters' proposed valuation is inconsistent with, RAI's fair value on the Transaction Date.

### iii. Comparable Companies

212. A comparable companies analysis is a valuation technique that involves comparing a company's valuation multiples to those of its peers. Often, an enterprise value to EBITDA multiple is used. (Gompers Tr. 770:12–20; de Gennaro Tr. 198:1–17.) Companies with more shared characteristics will be more informative for valuation purposes, but disregarding companies that share important characteristics, even if not a perfect twin, would not be constructive. (Gompers Tr. 771:7–24; de Gennaro Tr. 329:21–330:16.)

213. Two of RAI's Financial Advisors, Lazard and JPMorgan, performed comparable companies analyses in their valuation work on behalf of RAI. (PX0115.0258, .0586.) According to Lazard's de Gennaro, there was a "fairly well-defined set of tobacco companies" that provided "informative and relevant"

information for purposes of determining the value of RAI. (de Gennaro Tr. 198:1–13, 233:21–234:7.)

214. Not all of the tobacco companies identified as comparable to RAI operated in the United States or even sold cigarettes. But as de Gennaro explained, the goal of performing a comparable companies analysis is not to identify a perfect twin but to develop information that would be informative for valuation purposes. (de Gennaro Tr. 331:19–332:20, 335:12–337:9; Gompers Tr. 772:16–773:3 ("[C]ertainly some of these are going to provide more information about value than others.").)

215. Lazard and JPMorgan each calculated RAI share values based on the price to earnings ratio (the "P/E Ratio"), which compares a company's stock price to its earnings per share, for comparable companies. JPMorgan's range was $32.50 to $51.25, and Lazard's range was $43.08 to $50.68. (PX0115.0258, .0582; Clark Tr. 1439:5–1440:2; de Gennaro Tr. 233:21–234:7.) Both Financial Advisors also calculated RAI share values based on the enterprise value ("EV") to EBITDA trading multiple. JPMorgan's range was $36.50 to $51.75, and Lazard's range was $40.86 to $49.67. (PX0115.0258, .0582; Clark Tr. 1439:5–1440:2; de Gennaro Tr. 233:21–234:7.)

216. One purpose for calculating the multiples of comparable companies is to check the results of other valuation techniques. (de Gennaro Tr. 227:19–229:14; Gompers Tr. 770:21–771:6.) Gompers also conducted a comparable companies analysis for RAI as part of his review of the reasonableness of the DCF analyses of

the Financial Advisors.  In picking his set of comparable companies, he looked in the tobacco industry because those companies

> are going to have similar sets of regulatory risk and use issues and that will help them provide information to the value of RAI.  Certainly the closer a company is in terms of the geography, operating in the U.S., its product mix in terms of mostly being cigarettes, that will provide more information.  But to disregard companies that have other characteristics which are shared with RAI would be inappropriate.

(Gompers Tr. 771:7–24.)

217.  Gompers used eight companies in his comparable companies analysis: Altria, ITG, ITC Limited, Japan Tobacco, Philip Morris International, Scandinavian Tobacco Group, Swedish Match AB, and Vector Group.  (PDX0005.0008.)  Lazard and JPMorgan both used most of this same group for their analyses as well.  (PX0115.0259, .0586.)  Gompers found that Altria was the most informative company because

> it's – you know, it's the biggest rival of RAI in the U.S.  In fact, it's the market leader larger than RAI.  Its sales are primarily cigarettes. Virtually all of their sales are cigarettes.  And they operate in the U.S. And so it has – you know, it's subject to the same regulatory environment, the same consumer issues and the like.  And so while it's not a perfect twin, it's probably the most important as a check of value.

(Gompers Tr. 773:4–20; PDX0005.0009.)

218.  Gompers also calculated the multiples for a full set of RAI's peers.  (Gompers Tr. 774:10–775:16; PDX0005.0010.)  He applied those multiples to RAI's EBITDA projections and arrived at the following valuations:

|  | Peers' Mean | Peers' Median | Altria |
|---|---|---|---|
| Next Twelve Months EBITDA | $49.70 | $46.79 | $46.18 |
| 13-24 Months EBITDA | $51.76 | $48.52 | $48.52 |

(Gompers Tr. 776:4–13; PDX0005.0011.)

219. Zmijewski reviewed market multiple methodologies, including a comparable companies analysis, and concluded that such an analysis would not result in a reliable valuation of RAI. (Zmijewski Tr. 1287:8–24.) He testified that a robust comparable company analysis requires review of all determinants of a company's EBITDA multiples: "risk, growth, for EBITDA multiple, working capital requirements, capital expenditure requirements, tax rates, cost structure, rates of return, margins, all of those factors drive multiples in one direction or another." (Zmijewski Tr. 1289:3–13.) Zmijewski concluded that potentially comparable companies that were not located in the United States or did not sell products in the United States were likely not reliable comparators to RAI due to differences between the U.S. and foreign markets as to (i) tax rates, (ii) accounting principles, (iii) GDP growth rates, (iv) inflation rates, (v) regulatory structures, and (vi) competitive landscapes. (Zmijewski Tr. 1289:14–1291:15.) In light of these concerns, Zmijewski determined that for a company to be comparable for valuation purposes, it must (i) generate at least 25% of its revenue in the United States, (ii) sell cigarettes, and (iii) follow U.S. Generally Accepted Accounting Principles ("GAAP"). (Zmijewski Tr. 1291:16–1292:12.)

220. The only company selected by the Financial Advisors and Gompers that met Zmijewski's selection criteria was Altria. ITG, ITC Limited, and Philip Morris International all generated less than 25% of their revenue in the United States; Scandinavian Tobacco Group and Swedish Match did not sell cigarettes and did not follow U.S. GAAP reporting standards. (Zmijewski Tr. 1291:21–1292:17.)

221. Zmijewski opined that where, as here, "you [have] one comparable company, there's no group. The comparable company has to be very near a twin, because you cannot put it in a distribution somewhere. You have to use it. You only have one. So it has to be very, very similar." (Zmijewski Tr. 1294:20–1295:7.) In Zmijewski's view, Altria was not a "near twin" because it had different business lines, including cigars, wine, and beer (most importantly, its substantial ownership stake in the brewery AB InBev, the manufacturer of Budweiser and other alcoholic products), and it had a much different growth profile. (Zmijewski Tr. 1292:18–1294:6.) He testified that because Altria's growth rates were lower than RAI's (as reflected in the June 2016 LE), "its market multiple is going to be lower[,]" (Zmijewski Tr. 1294:2–5), and that although RAI had a similar market capitalization to Altria, the two companies had different revenues, growth rates, and margins and were therefore not comparable, (Zmijewski Tr. 1298:2–24). Zmijewski concluded that none of the companies selected by the Financial Advisors and Gompers, including Altria, was a comparable company for purposes of valuation. (Zmijewski Tr. 1292:13–17, 1294:1–6.)

222. While providing persuasive evidence that Altria and the other companies selected by the Financial Advisors and Gompers for their comparable companies

analyses were not perfect twins of RAI,[39] Zmijewski's testimony did not establish that Altria was wholly irrelevant as a benchmark in the analysis of RAI's fair value. To the contrary, there are obvious similarities in many aspects of RAI's and Altria's businesses as the two largest United States cigarette companies, and a comparison of the two companies provided useful information to the Financial Advisors and served as a helpful market check in performing their work.

223. Moreover, in addition to the peer multiples, Gompers calculated the implied multiple based on Zmijewski's valuation of $92.17 per share. Zmijewski's valuation implied a 24x multiple compared to Altria's multiples of 11.79x (for next 12 months EBITDA) and 12.29x (for 13–24 months EBITDA), which if correct would suggest that RAI's "prospects are twice as good as . . . the other peer companies in the industry[,]"(Gompers Tr. 777:8–22), including companies that operate in countries where "there are almost twice as many smokers . . . than there are in the United States" and where "over 60 percent of men" smoke, (de Gennaro Tr. 334:11–17). That would be an unrealistic conclusion not supported by the evidence presented at trial and raises significant doubt concerning the reliability of Zmijewski's valuation.

224. Based on the evidence presented, the Court finds that the comparable companies analyses performed by RAI's Financial Advisors and by Gompers provide

---

[39] Indeed, Gompers acknowledged that (i) Philip Morris International sells cigarettes in countries with vastly different regulatory environments, economies, and smoking populations including Indonesia, the Philippines, Russia, Taiwan, Saudi Arabia, Japan, Sweden and Norway, (Gompers Tr. 899:2–8); (ii) ITC Limited is an Indian conglomerate that sells a "very high percentage" of its tobacco in India, (Gompers Tr. 899:9–11); and (iii) four of the five other potentially comparable companies are, at best, "weak comparables" to RAI, (Gompers Tr. 897:13–898:14). Peters also testified that "the international players compete in a very different market with very different structures." (Peters Dep. Tr. 188:20–22).

relevant information that, when considered in connection with other valuation concepts and techniques, supports a conclusion that Zmijewski's $92.17 per share valuation is excessive. The Court further finds, however, that the many differences in the peer group companies compel the Court to give no weight to these analyses in assessing the deal price as fair value for RAI's shares.

### iv. Precedent Transactions

225. A precedent transactions analysis is a valuation technique that is similar to a comparable companies analysis and involves comparing a company's multiple to the multiples of the prices paid for selected peer companies. (Gompers Tr. 779:25–780:16; de Gennaro Tr. 196:22–197:25; Clark Tr. 1440:3–1441:5.) The same factors that help determine comparability between the subject company and selected public companies in a comparable company valuation apply equally to a precedent transactions analysis. (Zmijewski Tr. 1299:5–15.)

226. Each Financial Advisor presented a range of RAI share values based on the Advisor's analysis of comparable precedent transactions.[40] Goldman's range was $38.12 to $59.51, Lazard's was $43.03 to $55.69,[41] and JPMorgan's was $43.00 to

---

[40] Each Financial Advisor used a slightly different calculation in its precedent transactions analysis. Goldman used the transaction multiples derived from dividing the EV by the EBITDA from the last twelve months ("LTM EBITDA"), Lazard used the transaction multiples derived from dividing the EV by the adjusted 2016 EBITDA, and JPMorgan used the transaction multiples derived from dividing the implied firm value ("FV") by the adjusted LTM EBITDA. (PX0115.0258, .0539, .0582.)

[41] Lazard also calculated the EV/LTM EBITDA multiple implied by the proposed transaction with BAT as 16.9x, significantly higher than the EV/LTM EBITDA multiple for the Lorillard Transaction, 13.1x, a transaction which occurred fewer than three years prior. (PX0115.0578, .0585.)

$60.00. (PX0115.0258, .0539, .0582; de Gennaro Tr. 233:12–20; Clark Tr. 1440:23–1441:5.) Goldman and Lazard also calculated RAI share values based on the premiums paid to the trading prices in precedent transactions. Goldman's range was $54.25 to $61.32, and Lazard's range was $56.60 to $63.68. (PX0115.0539, .0582.)

227. As with his comparable companies analysis, Gompers conducted a precedent transactions analysis for RAI as part of his review of the reasonableness of the DCF analyses of the Financial Advisors. (Gompers Tr. 779:25–780:8.) He testified that he selected his precedent transactions by searching

> the Capital IQ database which is just a database of transactions. I looked at all the mergers or acquisitions which were in the tobacco industry that closed within five years of the transaction here closing. And then I restricted it to those that had an enterprise value greater than $500 million.

(Gompers Tr. 780:17–25.)

228. Gompers used five precedent transactions: Japan Tobacco's acquisition of Gryson NV, Japan Tobacco's acquisition of JT International, ITG's acquisition of the U.S. cigarette brands and other assets of Lorillard and RAI ("ITG Transaction"), RAI's acquisition of Lorillard, and BAT's acquisition of Souza Cruz. (PDX0005.0015; Gompers Tr. 780:17–781:8; PDX0005.0015.) Goldman, JPMorgan, and Lazard considered more precedent transactions than Gompers in their analyses, but each included a number of the transactions later examined by Gompers. (PX0115.0260, .0542, .0586.)

229. Gompers determined the multiples from his five precedent transactions, (PDX0005.0017), applied those multiples and the multiple from the Lorillard

Transaction alone to RAI's EBITDA projections, and calculated the following valuations:

| | Precedent Transactions' Mean | Precedent Transactions' Median | Lorillard Transaction |
|---|---|---|---|
| Last Twelve Months EBITDA | $46.46 | $41.04 | $41.04 |
| Next Twelve Months EBITDA | $45.80 | $41.17 | $41.17 |
| 13–24 Months EBITDA | $47.19 | $42.50 | $42.50 |

(Gompers Tr. 783:8–21; PDX0005.0018.)

230. Dissenters challenged the relevance and applicability of each of the precedent transactions chosen by the Financial Advisors and Gompers. In particular, Zmijewski testified that the following selection criteria were appropriate for determining potential comparable transactions: (i) transactions in the tobacco industry within five years of the Transaction Date, (ii) transactions where the target was a domestic U.S. company, and (iii) transactions where consideration was $1 billion or greater (approximately 2% of the value of the BAT-RAI transaction). (Zmijewski Tr. 1300:4–12.) He found only two transactions that met his three criteria—the Lorillard Transaction and the ITG Transaction, (Zmijewski Tr. 1302:18–1303:3)—and concluded that neither was comparable enough to the Merger to perform a comparable transactions analysis,[42] (Zmijewski Tr. 1307:2–9 ("There just aren't any comparable transactions. Therefore, you can't use that analysis.").

---

[42] Zmijewski excluded the ITG Transaction because it was a forced sale involving weaker tail brands in contrast to RAI's strong premium and super-premium brands. (Zmijewski Tr. 1303:4–25.)

231. Dissenters put particular emphasis on Zmijewski's rejection of the Lorillard Transaction on grounds that RAI had much higher growth prospects at the time of the Merger than it did at the time of the Lorillard Transaction. (Zmijewski Tr. 1304:1–1305:18.) As Gompers and de Gennaro testified, however, regardless of differences in the structures of the Lorillard Transaction and the Merger, the Lorillard Transaction closed just two years earlier, it involved a U.S. company whose business primarily sold cigarettes, and Lorillard's largest brand was Newport (which became the largest brand at RAI and which was subject to the same menthol-related regulatory risks before and after the Lorillard Transaction). (Gompers Tr. 781:9–21; de Gennaro Tr. 339:18–342:7; Wajnert Tr. 120:6–121:2.)

232. While de Gennaro and Gompers agreed that not all of the selected precedent transactions are equally informative, a conclusion with which the Court agrees,[43] as with comparable companies analysis, the goal in performing a precedent transactions analysis is not to identify a perfect or near twin transaction, but to develop information that would be informative and relevant for valuation purposes. (de Gennaro Tr. 337:14–338:1; Gompers Tr. 772:16–773:3; Clark Tr. 1588:23–1589:8.)

233. The precedent transactions analysis, particularly as it relates to the Lorillard Transaction, is informative in considering the value of RAI. In particular, the deal price was at a higher multiple over RAI's EBITDA than any other prior

[43] For example, Japan Tobacco's acquisitions of Gryson NV, a company operating in Belgium, and JT International, a company operating in Malaysia, are weak comparable transactions to BAT's acquisition of RAI, a company operating primarily in the United States. So is BAT's acquisition of Souza Cruz, a company operating primarily in Brazil. (PDX0005.0015; Gompers Tr. 780:17–781:8.)

transaction involving a U.S. tobacco company that Lazard had analyzed. (de Gennaro Tr. 236:6–16; PX0115.0578, .0585.) This undercuts Dissenters' contention that BAT paid less than fair value for RAI. Further, although the precedent transactions analysis is of limited value because of the differences in the selected transactions, the specific values generated by the various precedent transactions analyses contemporaneously performed by the Financial Advisors, as well as by Gompers in his analysis, provide support that the deal price of $59.64 was at or above RAI's fair value and that Zmijewski's valuation was clearly excessive.

v.      Analyst Price Targets

234.   Goldman, Lazard, and JPMorgan each presented a range of equity analyst price targets. The range found by Goldman was $52 to $62 per share, and the range found by both JPMorgan and Lazard spanned from $47 to $62 per share. (PX0115.0258, .0539, .0582.) The $59.64 per share deal price, measured as of January 16, 2017, was at the upper end of the unaffected analyst price targets for RAI as a standalone company. (PX0115.0539.) Gompers testified that "not a single analyst . . . said that BAT was getting a steal." (Gompers Tr. 803:7–8.) By contrast, in a transaction that Dissenters identified to try to show that the large disparity between RAI's Unaffected Stock Price and Zmijewski's valuation is not unprecedented—the leveraged buyout of RJR Nabisco in the 1980s—analysts contemporaneously opined that the initial offer for RJR Nabisco was a "lowball bid" and that in that case, management was "trying to steal the company." (Yilmaz Tr. 1997:15–1998:2, 2000:17–21.) There was no such concern with BAT's initial offer for RAI.

vi.     Mason Capital's Market Valuation

235. In November 2016, after BAT made its initial offer but before the final deal price was agreed, Dissenter Mason Capital sent to the Transaction Committee two substantially similar letters intended to argue for a higher deal price than BAT was then offering.  (JX0022.0002–.0004; PX0065.0002–.0005.)  In these letters, Mason Capital attempted to identify "any credible arguments or information that would support a higher stock price for Reynolds than what the market price reflected or what was reflected in BAT's offer[.]" (Constantino Tr. 1843:21–1844:1; JX0022.0002–.0004; PX0065.0002–.0005.)

236. Mason Capital incorporated its views into a chart containing a multiples-based valuation of RAI.  (JX0022.0004; PX0065.0004.)  In its chart, Mason Capital started with the last year of earnings for each of RAI's separately reported business segments.  For each segment, Mason Capital multiplied the earnings by what Mason Capital believed to be a reasonable multiple for that segment.  (JX0022.0004; PX0065.0004; Constantino Tr. 1827:6–1829:1, 1846:18–23.)  Mason Capital then added several dollars per share to reflect additional points of value that it did not believe were fully incorporated into the reporting segments' earnings.  (JX0022.0004; PX0065.0004; Constantino Tr. 1827:6–1829:1, 1847:12–1848:5.)  After adding these estimates together and subtracting RAI's net debt and other liabilities, Mason Capital arrived at a "Market Value of Equity" of $54.44 per share.  (JX0022.0004; PX0065.0004; Constantino Tr. 1827:6–1829:1, 1848:6–25.)

237. Mason Capital referred to the Market Value of Equity as a "reasonable starting valuation" for purposes of negotiation with BAT, (JX0022.0004;

PX0065.0004), and Constantino admitted that it was "how we, Mason Capital, think that [RAI's] stock should be valued on its own[,]" (Constantino Tr. 1830:16–17, 1845:19–22; 1850:8–1851:7). She further testified that "in terms of fundamental value, I think [the $54.44/share] represents what we thought the market would trade the stock at if they had the advantage of kind of being caught up with regard to what Reynolds owns." (Constantino Tr. 1829:9–16, 1848:19–25 ("Q. The way the valuation's constructed, it's an enterprise value analysis. And enterprise value means the value of the enterprise, right? A. Yes.").)

238. Constantino made clear that the $54.44 per share valuation did "not include any sort of overhang from BAT's holdings[,]" (Constantino Tr. 1846:10–17), and did "not include any sort of minority discount[,]" (Constantino Tr. 1848:16–18). Mason Capital's letter to the Transaction Committee is persuasive evidence of Mason Capital's pre-litigation views of RAI's value.

239. The difference between Mason Capital's contemporaneous $54.44 valuation and its litigation valuation of $92.17 cannot be explained by the discovery of nonpublic information in the litigation process, including of the June 2016 LE year six- through ten-year projections. Indeed, as part of asserting its appraisal rights, before the litigation began and before any discovery was had, Mason Capital provided a fair value estimate of $88.16 per share. (Compl. Judicial Appraisal ¶ 47.) Thus, based on Mason Capital's own calculations, the nonpublic information obtained through discovery could have had, at most, an impact of only $4.01 per share. (Constantino Tr. 1854:19–1856:1.) The substantial discrepancy in Mason Capital's

contemporaneous and litigation-driven valuations of RAI's shares undermine the credibility and reliability of the latter.

b. Discounted Cash Flow Valuations

240. In addition to their market-based valuations, each of the three Financial Advisors conducted an independent DCF analysis. (PX0115.0261, .0541, .0583; Price Tr. 1060:8–16; de Gennaro Tr. 217:1–14.) A DCF valuation requires three steps, each of which entails making a number of assumptions: (i) estimating the free cash flows that RAI would have been reasonably expected to earn through a projected number of years into the future, (ii) estimating the appropriate perpetuity growth rate ("PGR") after the end of the projection period, and (iii) estimating the appropriate rate at which to discount the expected future cash flows to the valuation date (the "Discount Rate," often calculated as a WACC). (Gompers Tr. 725:12–726:15; Zmijewski Tr. 1243:18–1244:11.) The parties do not dispute that a DCF is a reliable methodology, and no evidence was introduced at trial that a DCF is not a "customary and current valuation technique." N.C.G.S. § 55-13-30(c)(5).

241. Each of the Financial Advisors conducted an independent DCF analysis. (PX0115.0261, .0541, .0583; Price Tr. 1060:8–16; de Gennaro Tr. 217:1–14.) They used a range of inputs to get a resulting range of DCF valuations, which were used to account for the fact that small changes to the DCF inputs, like the WACC or PGR, would lead to significant variations in the Company's value. (PX0115.0261, .0541, .0583; de Gennaro Tr. 203:13–19, 229:15–230:6; Clark Tr. 1441:9–21; Eckler Dep. Tr. 48:24–15, 79:19–80:18, 108:17–18.)

242. While a company's WACC and its PGR are calculated separately, these inputs must be scrutinized to ensure that, when incorporated into a DCF, the results are not "untethered to reality." (de Gennaro Tr. 360:5–361:1 ("[T]here is an interrelationship between the inputs, and . . . we don't have a perfect view of the future so we're applying a judgment.").) Therefore, inputs to a DCF analysis must be analyzed together to determine reasonableness. As de Gennaro testified, the inputs "[a]re part and parcel. You can't just look at one assumption in isolation." (de Gennaro Tr. 328:10–329:4, 325:22–327:1.)

243. In the presentation made with its Fairness Opinion, Goldman's DCF yielded a range of $45.16 to $72.17 and a midpoint of $55.74. (PX0115.0541.) JPMorgan's DCF led to a range of $47.54 to $68.63 and a midpoint of $56.26. (PX0115.0261; Clark Tr. 1441:6–12.) Lazard's DCF led to a range of $50.03 to $73.38 and a midpoint of $59.59. (PX0115.0583; de Gennaro Tr. 232:19–233:2.) Gompers testified that, after analyzing and evaluating the inputs of the Financial Advisors' DCF analyses, he concluded that the results are "reasonable in this context," even though he believed "their valuations are optimistic because of the projections they used." (Gompers Tr. 767:5–20 ("[T]hose five-year projections don't take into account the possibility that even over the next five years, one of those negative events or more may occur.").)

244. Financial projections used in a DCF analysis must be probability-weighted, or risk-adjusted, to reflect the expected value of the future cash flows because, as Gompers testified, "[i]f you don't have . . . expected cash flows, you're not going to get to that intrinsic or fundamental value." (Gompers Tr. 726:16–729:23 (noting the

"value when you do a DCF is wholly dependent, entirely dependent on using the expected cash flows, not the best case or upside scenarios"); Zmijewski Tr. 1243:18–1244:11; Yilmaz Tr. 1964:1–1965:23 ("Q. And what you need are the expected cash flows of the company; right? A. That's correct. Q. You're not looking for the best case or the worst case; right? A. . . . Yes, I am looking for the expected one, not the best-case scenario.").)

245. RAI's regular financial projection process was not intended to create a probability-weighted value of future cash flows, but instead expressly assumed that current industry trends and dynamics would continue without substantial change. (JX0009.0001–.0002; PX0047.0002; JX0010.0006; PX0052.0004, .0006; Gilchrist Tr. 380:21–391:09 ("Q. And were these various sensitivities actually modeled into the numbers themselves? A. No, they were not. So this was really intended to show that there is a sensitivity to this and these things could happen.").)

246. As Crew testified, projections that are developed for valuation purposes are different from the projections that RAI used to operate on a day-to-day basis. (Crew Tr. 711:10–13.) Specifically, Crew testified that she would not want to use RAI's ten-year projections for valuation purposes because in a valuation

> the unknowable, the unquantifiable, you have to somehow figure that
> into your thinking as a board. So you can't just look at these numbers
> and say nothing's ever going to change. You have to look at the total
> picture.

(Crew Tr. 705:22–706:5.) She further explained that the projections for a valuation have to be considered

in the context of all of the risks and the potential upsides. So you have to look at it all. So you can't just lift this and say, oh, this is what the company's worth. No, you've got to look at a total context. . . . Which is very difficult in tobacco.

(Crew Tr. 706:9–17; Gompers Tr. 732:24–733:7, 733:20–734:18 ("[I]t's not only what I teach, it's what I've advised when I've been on the board that you can have projections for business purposes, but the evaluation for valuation purposes could be substantially different.").)

247. The Financial Advisors used the October 2016 Projections in their DCF calculations. As described in detail above, those projections were based on the October 2016 LE, which was developed as part of RAI's regular financial projection process, including assumptions concerning, among other things, a "continuation of recent cigarette industry pricing dynamics[,]" "moderate share growth[,]" a "stable regulatory environment[,]" and no litigation risk. (JX0023.0134; JX0010.0004, .0006; Gilchrist Tr. 382:09–391:09; Gompers; 730:10–731:17 ("The projections were business as usual, but they were very clear at saying that these risks were out there and were real probabilities occurring.").)

248. Zmijewski used the July 2017 LE as the basis for his DCF valuation. (Zmijewski Tr. 1246:13–1247:8.) Flyer used the June 2017 LE as a set of ten-year projections to calculate a perpetuity growth rate. (Flyer Tr. 1075:3–1076:6.) Like the October 2016 Projections, the June 2017 LE and the projections therein came out of RAI's regular financial projection process and assumed "business as usual" without accounting for major "downside risks." (Gompers Tr. 730:10–731:17; JX0009.0001– .0002; PX0047.0002; JX0010.0006; PX0052.0004, .0006; Gilchrist Tr. 380:21–391:09.)

249. Although Dissenters suggested at trial that the projections used by the Financial Advisors were viewed as "out of date" by April 2017 based on a set of BAT talking points sent to Price, the forecasts were not out of date for the Financial Advisors' purposes

> because that's valuing the company as a stand-alone entity. This [BAT document] is looking at the entity as a combined entity going forward. And I think they're talking into their shareholders . . . that don't expect the results that we show for Reynolds American to be the exact same as what's in the forecast because there are these things . . . that didn't occur that we would have done in the ordinary course of business, but we did not do because the transaction was being contemplated.

(Price Tr. 1044:9–1047:19; DX0056.0003.) In fact, the evidence indicates that, for the periods that overlapped, the October 2016 Projections were a bit more optimistic than the July 2017 LE relied on by Zmijewski. (Zmijewski Tr. 1370:17–1372:7 ("Q. In between . . . November of '16 . . . [and] June 2017 . . . , did the company's outlook for those five years improve or did it worsen? A. It's about the same without the management overlays. So probably a little lower, but about the same."). *Compare* DX0240, at tab "Top Side Summary," *with* DX0141, at tab "Consol Fcst.")

250. The Financial Advisors understood that RAI included certain assumptions in its ordinary course financial projections and that these projections were subject to specifically identified sensitivities that were not reflected in the numerical forecasts. These sensitivities included major competitive, regulatory, litigation, or other exogenous shocks. (JX0010.0003–.0004, .0006; JX0023.0134.)

251. As Clark testified, JPMorgan's understanding was that there were "significantly larger downsides to the financial forecasts than there were upsides." (Clark Tr. 1435:6–8.) Gompers likewise noted that RAI was susceptible to a

"tremendous number of game changing downside risks." (Gompers Tr. 730:10–731:17.) For these reasons, the RAI Board and management recognized that the projections were optimistic and biased upwards. (Wajnert Tr. 49:8–11; Price Tr. 984:20–24; Gompers Tr. 734:19–735:7.) Gompers agreed, noting that the projections were "more like an upside case" rather than "the expected value case." (Gompers Tr. 729:24–730:9.)

252. At trial, Zmijewski disagreed with this characterization of RAI's financial projections. He noted that the downside risks faced by RAI are largely unknowable in their scope, unpredictable in their timing, and unquantifiable in their impact to RAI. He therefore used the management projections as if they were a set of expected cash flows. (Zmijewski Tr. 1255:1–1259:21 ("But uncertainty doesn't in any way eliminate the validity of having expected cash flow. Expected cash flows are based on uncertain forecasts.").)

253. Zmijewski explained that RAI "had experience forecasting and they do that on a regular basis. As you see, they forecast annually a ten-year forecast and then they have an operating plan once a year, and then they update those forecasts every month. So they pay a lot of attention to the forecasts[.]" (Zmijewski Tr. 1251:22–1252:8.) As a result, Zmijewski determined that management's projections were a reliable estimate of RAI cash flows because they were bottoms-up estimate forecasts created in the ordinary course of business. (Zmijewski Tr. 1251:4–21.)

254. Zmijewski's approach disregards the expressly stated assumptions and sensitivities to RAI's financial projections. While these assumptions and sensitives

were not incorporated into the numerical projections that RAI developed and used in the ordinary course of business, that does not mean that they can be ignored when valuing the Company. The evidence indicates that if one or more of these risks were to materialize, it would have a dramatic, negative effect on the Company's growth and profitability. A valuation predicated upon the theory that a tobacco company like RAI will suffer no significant adverse regulatory, tax, or competitive effects in the future is simply not credible or reliable.

255. In defending his view that the management forecasts did not have an upward bias, Zmijewski testified that "*as long as* the upside and downside, after adjusting for the timing, the amount, and the probability, i[f] they offset each other, the forecasts that we're using in the management forecasts are exactly the right forecasts to use." (Zmijewski Tr. 1258:19–23 (emphasis added).) But the evidence was clear that the upside and the downside to the management forecasts do not "offset each other," because the downside was much more serious, meaning that the forecasts are more optimistic than the expected cash flows.

256. Dissenters also contended that RAI's Financial Advisors' DCF valuations were too low because the October 2016 Projections contained five years, and not ten years, of projections. First, as discussed previously, there is no evidence to support Dissenters' contention that RAI deliberately withheld ten-year projections to drive a lower valuation within BAT's price range. (*See supra* § II(E)(d)(vi)). Moreover, each Financial Advisor testified unequivocally that the information it received from RAI management, including the five-year October 2016 Projections, was entirely

sufficient to adequately and competently perform the Advisor's valuation analysis. (Eckler Dep. Tr. 61:3–12; de Gennaro Tr. 352:8–13; Clark Tr. 1597:12–16.)

257. To support its contention that five-year projections were inadequate, Dissenters introduced evidence that (i) Lazard, in its work on the Lorillard Transaction, was provided with ten-year projections, (DX0148.0009–.0010; de Gennaro Tr. 260:20–262:9); (ii) prior to receiving the October 2016 Projections, junior members of the Lazard deal team were unsure whether the projections they received would contain five or ten years, (DX0157.0001; de Gennaro Tr. 280:17–281:14); and (iii) a junior member of the JPMorgan deal team emailed RAI's Holland asking for a detailed ten-year projection, (DX0067.0001; Clark Tr. 1518:1–21).

258. This evidence, however, does not warrant a conclusion that the Financial Advisors' use of five-year projections was unreasonable; it indicates only that the Financial Advisors considered whether ten years of projections were available. The evidence shows that when BAT's offer arrived in October 2016, RAI did not have up-to-date ten-year projections and provided the Financial Advisors with the most recent set of projections the Company had completed, which were the five-year projections in the October 2016 LE. The Financial Advisors wanted the most recent set of projections rather than projections from June 2016 that had already been revised four times. (Clark Tr. 1519:1–11.) Despite Dissenters' arguments to the contrary, the record is clear that the Financial Advisors received all the information they believed they needed for their work.

259. Moreover, the evidence shows that RAI management was actually advocating for a *higher* valuation and the *highest* possible purchase price for the Company. (Price Tr. 1054:23–1055:4, 1055:11–14.) For example, in October 2016, before providing its most recent projections to the Financial Advisors, RAI management added the Top-Side Adjustments that served to increase projected pre-tax income by approximately $300 million per year. (DX0240, at tab "Top Side Summary"; Price Tr. 990:10–16.)

260. In response to this evidence, Dissenters asked questions suggesting that the $1.4 billion increase attributable to the Top-Side Adjustments was "swamp[ed]" by a $3 billion planned share repurchase program, (Price Tr. 1055:15–16), but that suggestion is not supported by the evidence, (DX0075.0001; Price Tr. 1021:14–1022:1). As Price testified, the cash used for a share repurchase program is a non-operating expense and does not affect the cash flow figures used in a DCF analysis. (Price Tr. 1055:5–17.)

261. Further, when negotiations between RAI and BAT had reached an impasse in December 2016, RAI management assisted the Financial Advisors in providing information to BAT intended to support a higher valuation than BAT's models showed. Indeed, at the Transaction Committee's behest, Goldman and JPMorgan attempted to convince BAT to pay a higher price by showing that BAT's financial model was flawed, and that updating BAT's valuation model with proper inputs would demonstrate that a higher price would still be accretive for BAT. (DX0057.0002; Price Tr. 1034:20–1035:12, 1060:17–25.) These types of actions are

inconsistent with Dissenters' allegations of a concerted effort by RAI management to mislead the Financial Advisors into undervaluing RAI. (Price Tr. 1034:20–1035:12, 1060:17–25; DX0057.0002.)

262. Based on the evidence, the Financial Advisors' use of the October 2016 Projections as an input in their DCF calculations was reasonable. These projections were RAI's most current financial projections at the time, and RAI management supplemented those projections with a wealth of additional information for the Financial Advisors' consideration, including the financial presentation from the 2016 Strategy Day with ten years of operating income and growth rates.

### i. Perpetuity Growth Rates

263. A PGR is the rate at which a company's expected free cash flows are assumed to grow indefinitely after the period for which there are year-by-year forecasts. (Gompers Tr. 742:17–743:4.) In a typical industry, a company is often assumed to have a PGR between the rate of inflation and the rate of nominal GDP growth. (Gompers Tr. 743:15–744:6; de Gennaro Tr. 368:15–369:6.) Where an industry is expected to decline in the future, however, a PGR below the rate of inflation may be appropriate; it is not unusual to see a zero or negative PGR used for companies or industries that are in structural decline, like the tobacco industry. (Gompers Tr. 744:7–23, 746:4–5; Crew Tr. 640:21–641:10; de Gennaro Tr. 204:3–25, 326:6–13, 368:17–369:6; Clark Tr. 1446:1–12.)

264. The Financial Advisors used the following PGR ranges in their DCF analyses: Goldman, negative 0.50% to positive 0.50%, (PX0115.0541); JPMorgan,

0.00% to positive 1.00%, (PX0115.0261; Clark Tr. 1445:1–6); Lazard, negative 0.50% to positive 0.50%, (PX0115.0583; de Gennaro Tr. 227:7–18).

265. In the Financial Advisors' DCF analyses, the vast majority of the total value of RAI was comprised by the terminal value, *i.e.*, the value attributable to the period of time after the explicit year-by-year forecasts, which requires carefully considering the appropriate PGR "because it is the most critical factor in terms of determining the value of RAI." (Gompers Tr. 757:24–758:20; Clark Tr. 1441:22–1442:2; de Gennaro Tr. 227:19–229:14, 311:19–312:22, 349:16–351:3; Zmijewski Tr. 1282:19–1283:20.)

266. The Financial Advisors' PGR ranges were based on research into, and their own experience and knowledge regarding, the tobacco industry and RAI's competitive position within the industry, including their understanding of the threats and potential upsides facing the Company and tobacco companies generally. (de Gennaro Tr. 203:5–12, 204:3–25, 225:8–18; Clark Tr. 1445:7–25; Eckler Dep. Tr. 64:1–24, 65:15–24, 66:20–67:06.)

267. The Advisors also considered (i) growth rates used for other tobacco transactions, including the 2015 Lorillard Transaction, (ii) industry analysts' views regarding appropriate growth rates for a tobacco company, and (iii) the concern that increased prices would not be able to offset increasing volume declines in the longer term. (DX0068.0003; Clark Tr. 1445:7–17; Eckler Dep. Tr. 80:11–81:02; de Gennaro Tr. 224:10–225:7, 300:12–23.) Gompers identified the same factors in his analysis of

the Financial Advisors' PGR ranges as evidence supporting their reasonableness. (Gompers Tr. 746:8–747:2, 879:15–24.)

268. In order to test their perpetuity growth rates, the Financial Advisors checked their analyses using terminal exit multiples, among other things, as a "sanity check." (Clark Tr. 1441:22–1442:2, 1445:18–25, 1448:2–23; de Gennaro Tr. 204:3–25, 227:19–229:14, 300:12–23, 311:19–312:22, 365:5–366:6; Eckler Dep. Tr. 78:22–79:18, 79:19–80:10, 84:11–85:02.) A terminal exit multiple is the portion of the DCF value that resides in the period after the end of the year-by-year projections, *i.e.*, the ratio of earnings in the last year of the projection period to the terminal value. The terminal exit multiple is a measure of the company's growth rate in the terminal period and can be compared to a company's current multiple to check the reasonableness of the terminal period assumptions. (Gompers Tr. 752:1–753:16.) In general, a company's terminal exit multiple should be near but below the company's current multiple because "looking forward, you would expect the growth rate off into the future five years from now will be lower than the growth rate today." (Gompers Tr. 753:12–757:23.)

269. Gompers opined that the Financial Advisors' PGR ranges were reasonable based on his own analysis, which was the same analysis that he would have performed had he conducted his own DCF analysis. (Gompers Tr. 745:5–12.) Just as the Financial Advisors had done, Gompers checked the Financial Advisors' PGR ranges against RAI's implied terminal exit multiple and found that the choice of PGRs was reasonable, in particular because they were lower than RAI's multiple at

the time of BAT's October 20 Offer. (Gompers Tr. 753:12–757:23; PDX0005.0007.) Specifically, he identified RAI's pre-Merger trading multiple as 12.4x, and found that the Financial Advisors' implied terminal exit multiples ranged from 10.5x to 11.5x. (PDX0005.0007; Gompers Tr. 753:19–755:16.) Gompers, as detailed above, also performed a comparable companies analysis and precedent transactions analysis that confirmed the reasonableness of the Financial Advisors' PGRs. (Gompers Tr. 770:7–11, 779:25–780:8.)

270. Lazard used the same PGR range in its work on behalf of RAI in the Lorillard Transaction, even though RAI was the seller in the Merger and had been the purchaser in the Lorillard Transaction. (de Gennaro Tr. 225:8–18.) Dissenters contended that it was inappropriate for Lazard to use the same PGR for both transactions because the Lorillard Transaction was "transformative[,]" (Gilchrist Tr. 494:4–7), and a "fundamental change[,]" (de Gennaro Tr. 305:1–16), that resulted in a "new and improved [RAI,]" (de Gennaro Tr. 365:5–366:6). But as de Gennaro testified, Lazard's work on the Lorillard Transaction included a valuation of the *pro forma* combined "new and improved" RAI—the exact same company that was then sold to BAT—meaning that any "fundamental change" had already been considered in the valuation performed for the Lorillard Transaction. (de Gennaro Tr. 239:20–240:6; DX0393.0147–.0148.)

271. Moreover, de Gennaro explained that a component of the PGR range was trends in the U.S. tobacco landscape, and that there had been no significant changes since Lazard's initial analysis. (PX0115.0583; de Gennaro Tr. 225:8–12.) Lazard's

PGRs were based on a long-term view of the prospects of the Company and the industry rather than the specifics of a few nearer-term years. (de Gennaro Tr. 303:20–307:18.) After performing reasonableness checks on its DCF results, Lazard determined that "there was nothing suggesting that it was an unreasonable set of assumptions[,]" (de Gennaro Tr. 311:19–312:22), and that there was "no reason to be uncomfortable with the perpetual growth rate" because "all the trends were the same in terms of volume declines." (de Gennaro Tr. 307:11–18.)

272. Dissenters also suggested that the Financial Advisors' PGRs were too low because they were applied after five years of projections instead of ten years. (DX0068.0001–.0003; Clark Tr. 1529:15–1530:12; Eckler Dep. Tr. 67:16–20; 67:23–68:5.) In support, Dissenters cite an internal JPMorgan email in which the JPMorgan deal team discusses the appropriateness of different ranges of PGRs. (DX0068.0002–.0003.) The evidence suggests, however, that JPMorgan used a higher PGR than it otherwise would have used if it had begun applying the PGR after ten years of projections. JPMorgan's contemporaneous documents reveal, and Clark consistently testified, that JPMorgan discussed internally changing the range of PGRs to a negative range if given an up-to-date set of ten-year projections:

> Q. And why would you have used lower growth rates if you had ten-year projections than growth rates you had used after the five years of projections?
>
> A. Because our anticipation was that there would be, you know, some growth – continued growth at the company in years six through ten and thus, to account for that, in the context of the five years of projections that we did have, we used a slightly higher range of perpetuity growth rates relative to if we had ten years worth of projections, and then had accounted for that potentially higher growth in years six through ten.

We would have married that with a view that the industry would continue to decline following that point in time at a likely negative rate.

(Clark Tr. 1446:17–1448:1; DX0068.0002–.0003.) As noted above, JPMorgan ultimately determined that a detailed set of ten-year projections was not necessary to perform its valuation work. (Clark Tr. 1432:23–1433:3.)

273. Dissenters have suggested that the PGR ranges used by the Financial Advisors amounted to an assumption that RAI's business would "fall off a cliff after five years of sustained year after year growth[.]" (Sadighi Tr. 28:9–12.) But a growth rate below inflation does not mean that RAI would stop being profitable or soon cease to exist. Rather, because RAI had such high cash free cash flows, it would continue far into the future even with a growth rate below inflation. As Eckler explained,

> So the free cash flow EBITDA would have been $9 billion, so with $9 billion of free cash flow and very little leverage, I can't think of a single instance of a company that's not viable. So the judgment was that $9 billion would continue into perpetuity.

(Eckler Dep. Tr. 81:3–5, 81:7–82:8.)

274. Further, as Gompers testified, Dissenters' view is a "mischaracterization of what a zero percent growth rate means." (Gompers Tr. 747:18–22.) In the Financial Advisors' DCF models, RAI's growth does not necessarily stop cold right after the projection period. (Eckler Dep. Tr. 67:18–68:05; Gompers Tr. 747:18–749:17, 750:14–751:2.) A PGR "averages over the time with maybe some positive and then negative in the future and averages across scenarios some of which may be very large negative events that happen." (Gompers Tr. 749:13–17.) Thus, a company with a 0% growth rate could continue to see positive growth for some time, which would then be balanced out by negative growth and/or by the possibility of a major adverse event.

275. Compared to the PGR ranges used by RAI's Financial Advisors in their DCF analyses, the 2.24% PGR that Zmijewski incorporates into his DCF analysis is substantially higher. Dissenters' PGR was calculated as follows: Flyer first determined that a 1% or 1.25% PGR was appropriate to use after 2026. (Flyer Tr. 1075:14–122.) In support of his 1% PGR conclusion, Flyer pointed to JPMorgan's use of 1.0% as the upper bound of its PGR range and to RAI's use of a 3% PGR in its stock repurchase plan. (Flyer Tr. 1129:1–17.) Flyer was asked by Dissenters' counsel to use a 1% or 1.25% PGR in conjunction with the growth rates extracted from the last five years of the June 2017 LE to calculate a "blended" PGR to be applied starting in 2023.[44] (Flyer Tr. 1078:9–11.) This blended rate is simply a mathematical calculation in which Flyer converted his 1.0% PGR and the growth rates for the years covered by the June 2017 LE into a single flat rate. (Flyer Tr. 1078:23–1079:19.) The result is a blended PGR of 2.24% or 2.42%. (Flyer Tr. 1075:3–1076:6.)

276. In his DCF analysis, Zmijewski chose to use Flyer's 2.24% blended PGR. (Zmijewski Tr. 1244:7–9.) No testimony was offered as to why he chose the lower of Flyer's blended PGRs, and Zmijewski testified that he had not tested what the results of his DCF analysis would have been had he used Flyer's higher 2.42% blended growth rate. (Zmijewski Tr. 1363:1–10.)

---

[44] Flyer ran the calculations for 1% and 1.25% PGR after 2026 but focused the bulk of his trial testimony on explaining the reasonableness of a 1% PGR after 2026. (Flyer Tr. 1079:7–1079:19.)

277. Zmijewski testified that he had "no opinion on growth rates for this company[,]" (Zmijewski Tr. 1379:17–18), and that he did not calculate a PGR to use in his DCF analysis because

> after I was engaged in this matter and I started working on this particular company, I realized this company isn't your standard consumer products company. This is a company that[ ] . . . has a highly concentrated industry, you quickly discover volumes are decreasing, but revenues are going up. So you know prices are increasing at a faster rate than volumes are decreasing. So this is not your standard industry. Somebody with good expertise needs to figure out how all of that pulls together to think about a long-run forecast. You need industry expertise. I don't have that expertise.

(Zmijewski Tr. 1264:1–11.) Instead, Zmijewski relied entirely on the PGR calculated by Flyer, even though the vast majority of Zmijewski's valuation is dependent on the PGR that was used. (Zmijewski Tr. 1362:21–1363:2.) For example, simply changing the PGR from 2.2% to 0%, the midpoint of Goldman and Lazard's PGR ranges, in Zmijewski's DCF analysis decreased his valuation from $92.17 to $58.00 per share. (Zmijewski Tr. 1396:2–9.) Incorporating the range of PGRs used by the Financial Advisors (negative 0.5% to positive 1.0%) into Zmijewski's analysis results in a range of valuations of $53.62 to $69.56. (Zmijewski Tr. 1396:10–1398:13.)

278. In calculating his PGR, Flyer did not incorporate into his analysis the effects or the likelihood of adverse regulation on menthol cigarettes, concluding that he "didn't see any reason why [the June 2017 LE projections] were biased." (Flyer Tr. 1195:18–1196:1.) For reasons stated above, it is not credible for a valuation of RAI to assume that a menthol ban is impossible or that such a ban would have no effect on RAI's future cash flows.

279. Flyer also testified that he "explicitly estimated the 1 percent for combustibles [*i.e.*, cigarettes]" and yet admitted that combustibles "may be 15, 20 percent of the business" in 2026, as compared to approximately 90% at the time of the Merger. (Flyer Tr. 1207:9–23.) Any scenario in which such a set of circumstances would obtain is exceedingly unlikely. If combustibles were to drop that dramatically in the years leading up to 2026, there is no reason to believe they would then grow at 1.0% in perpetuity thereafter.

280. Flyer further testified that it was inappropriate to calculate a PGR of 0% after 2021 (five years), as the Financial Advisors did, when the Company projected robust growth through 2026. (Flyer Tr. 1121:18–23.) Flyer's PGR analysis ignores, however, the substantial evidence showing that these ten-year projections were not intended to create a probability-weighted value of future cash flows, disregarded significant assumptions and sensitivities that could dramatically impact RAI's business, and were largely extrapolations of current industry trends and dynamics without substantial change. And Flyer ignores that a 0% PGR can represent continued but slowing growth for a period followed by a plateau and then negative growth in the future to balance out the positive growth in the earlier years. (Gompers Tr. 749:13–17.)

281. Just as Gompers checked the reasonableness of the PGRs used by RAI's Financial Advisors, he also checked the reasonableness of the PGR used in Zmijewski's DCF valuation by calculating its implied terminal exit multiple. Gompers calculated Zmijewski's implied terminal exit multiple to be 17.7x, which

was significantly higher than the Financial Advisors' terminal exit multiples and also significantly higher than RAI's multiple of 12.4x at the time of BAT's October 20 Offer. (PDX0005.0007; Gompers Tr. 753:23–757:23.) Zmijewski's 17.7x terminal exit multiple means that under his valuation, RAI would be growing at a faster rate five years into the future than at the present time—an unreasonable expectation given that tobacco is an industry in "structural decline." (Crew Tr. 640:21–641:10; Gompers Tr. 756:19–757:23.)

282. Based on its review of the evidence, the Court finds the PGR ranges used by the Financial Advisors to be reasonable and reliable, and the PGRs calculated by Flyer and used by Zmijewski to be unreasonable and unreliable.

ii. Discount Rate/WACC

283. A discount rate is a rate of return used to discount future cash flows back to present value. It is intended to capture the level of risk associated with a stream of cash flows in the context of the market as a whole. (Gompers Tr. 726:10–15.) A lower discount rate will lead to a higher present value of a company. (Clark Tr. 1444:21–25.)

284. Both sides used a WACC for purposes of discounting RAI's future cash flows. A WACC is based primarily on the cost of the company's debt, the cost of its equity, the relative percentages of debt and equity in its capital structure, the volatility of the company's common stock, an appropriate risk premium, and the applicable tax rate. (PX0115.0278; PX0115.0562; PX0115.0627.)

285. There is very little disagreement between the WACC calculations performed by Gompers, Zmijewski, and the Financial Advisors. The Financial Advisors used

the following discount rate ranges: Goldman, 5.00% to 6.50% (PX0115.0541); JPMorgan, 5.75% to 6.75% (PX0115.0261; Clark Tr. 1444:13–17); and Lazard, 5.00% to 6.00% (PX0115.0583; de Gennaro Tr. 226:7–10). Similarly, Gompers calculated the WACC for RAI as of July 25, 2017 at 5.78%, (Gompers Tr. 761:11–762:4), and Zmijewski calculated the WACC for RAI as of July 25, 2017 at 5.7%, (Zmijewski Tr. 1243:18–1244:11, 1267:23–1268:22).

286. Gompers's and Zmijewski's WACC calculations resulted in only a 2% to 3% difference in valuation. (Zmijewski Tr. 1268:7–22; Gompers Tr. 761:22–762:3.) The primary source of disagreement between the two experts concerned whether to use the promised yield or the expected yield when calculating RAI's cost of debt. Gompers's use of promised yield has greater evidentiary support because the cash flows used in the DCF analyses were not risk-adjusted and therefore were not truly expected cash flows, (Gompers Tr. 763:18–764:5), and Zmijewski's use of the expected yield was prone to error because he estimated the expected yield by referring to a portfolio of similarly rated debt rather than by using the actual terms of RAI's debt instruments, (Gompers Tr. 764:6–11).

### iii.     2016 Share Repurchase Program

287. On occasions prior to BAT's October 20 Offer, members of RAI's finance or accounting teams performed DCF calculations of RAI. In the ordinary course of business, RAI would, as an initial matter, use an 8% WACC. (PX0047.0002; Gilchrist Tr. 422:14–424:2.) This 8% WACC was "risk-adjusted" and used for purposes such as evaluating capital expenses. (Gilchrist Tr. 423:15–424:2.) When analyzing riskier potential expenses, RAI would increase the WACC, and for safer investments, it

would decrease the WACC. Gompers opined that this type of WACC calculation was not a market-derived cost of capital and was improper when conducting a valuation. (Gompers Tr. 760:23–763:6; PX0047.0002.)

288. In June 2016, members of RAI's accounting team performed a DCF calculation in connection with identifying the proposed authorization ceiling for the planned share repurchase program. (*See supra* § II(E)(e).) Initially, RAI ran a range of DCFs with a wide variety of discount rates and PGRs, amounting to 30 total scenarios and valuations. In its DCF calculation for the share repurchase program, RAI created a series of scenarios using the first five years of the June 2016 LE, a range of risk-adjusted WACCs from 7% to 9.5%, and a range of perpetuity growth rates from 1% to 4%. The average of the 30 DCF valuations in June 2016 was $51.46 per share. (DX0622, at tab "Sheet1.") RAI management later conducted additional scenarios, adding 60 scenarios using a set of "Constrained" projections and a different tax rate. The average share price resulting from the second set of scenarios was $53.33. (DX0138, at tab "Sheet1.")

289. The June 2016 DCF calculations also identified the "scenario utilized for purposes of [RAI's] goodwill evaluation at most recent year-end[.]" This scenario used an "Assumed WACC" of 9.5% and an "Assumed Terminal Growth Rate" of 3%. Applied to the first five years of the June 2016 LE, the calculation resulted in a total equity value for RAI of $38.94 per share. (DX0622, at tab "Sheet1"; Gilchrist Tr. 424:10–425:16.)

290. Flyer cites as support for his 1.0% PGR beginning in 2026 the PGR ranges of 1.0% to 4.0% appearing in the DCF calculation worksheet prepared by RAI in connection with the share repurchase plan. (Flyer Tr. 1129:1–17, 1233:1–10; DX0138, at tab "Sheet1"; DX0622, at tab "Sheet1.") Flyer's reliance on that worksheet is misplaced. The range of PGRs used by RAI management cannot be considered in isolation from other inputs like the range of discount rates. (Gompers Tr. 760:3–13; de Gennaro Tr. 328:10–329:4, 325:22–327:1.) Further, RAI's DCF calculations used five years of projections and not ten years, and RAI's PGR range was applied in 2022, not 2026. (DX0138, at tab "Sheet1"; DX0622, at tab "Sheet1.")

291. The evidence shows that the WACC and PGR used by RAI for purposes of the share repurchase plan were inextricably linked, such that RAI was concerned more with the valuation produced by the interaction between the two inputs and less on what the precise inputs were. (Gilchrist Tr. 421:12–20; Gompers Tr. 760:3–13.)

292. Accordingly, the Court concludes that the DCF scenarios run for the share repurchase plan provide support for a fair value at or below the $59.64 per share deal price.

#### iv. Lazard's Has-Gets Valuation in the Lorillard Transaction

293. Prior to the Merger, Lazard had experience in large-scale tobacco transactions, including advising RAI in connection with the Lorillard Transaction. (JX0006.0004; DX0151.0015; de Gennaro Tr. 186:21–188:8.) As previously noted, de Gennaro was a lead banker for RAI in that transaction. (DX0151.0006.)

294. Even though Lazard represented RAI as a buyer in the Lorillard Transaction, Lazard's valuation work there was consistent with the work it

performed on behalf of RAI as a seller in the BAT transaction. RAI performed the same valuation analyses and incorporated similar assumptions about industry trends in the tobacco industry into its valuation work. (de Gennaro Tr. 224:10–226:6.)

295. In both the Lorillard Transaction and the Merger, RAI performed a "has-gets" valuation analysis of the *pro forma* entity resulting from each transaction. (de Gennaro Tr. 195:2–9, 235:10–16.) A "has-gets" analysis is essentially a comparison between the projected value of the existing company as a going concern—what a shareholder already "has"—and the projected value of the potential newly created company—what a shareholder "gets." (de Gennaro 200:9–201:7; Wajnert Tr. 133:5–21.)

296. In calculating its *pro forma* DCF valuation for RAI, Lazard used a range of perpetuity growth rates between negative 0.5% and positive 0.5% and a WACC range of 5.0% to 6.0%. (DX0393.0147–.0148; de Gennaro Tr. 194:23–195:16; 239:19–240:9.) The results of Lazard's "has-gets" analysis of the *pro forma* combination of RAI and Lorillard was a valuation range of $60.15 to $93.39 per share. (DX0393.0147.)

297. Dissenters relied on the high-end of this valuation in pre-trial briefing and at trial as evidence supporting the reasonableness of their proposed $92.17 per share valuation. (Wajnert Tr. 131:7–144:19; Defs.' Pretrial Br. 23–24, ECF No. 190.) However, as Wajnert identified during his cross-examination and as de Gennaro later explained, Dissenters failed to account for the fact that, following the close of RAI's acquisition of Lorillard in June 2015, RAI effected a two-for-one stock split in August 2015—doubling the number of outstanding shares of RAI common stock from

700 million to 1.4 billion. (Wajnert Tr. 170:3–7; de Gennaro Tr. 208:8–209:13, 238:20–24; DX0317.0001, .0004; JX0023.0029, .0085.) As a result of the stock split, Lazard's has-gets valuation from the Lorillard deal equates to a range of between $30.08 and $46.70 per share. (de Gennaro Tr. 240:10–22, 241:12–242:5.) Thus, rather than supporting Zmijewski's valuation, this analysis (which Dissenters themselves touted as an appropriate benchmark) strongly undermines it and instead supports the deal price as fair value for RAI's shares.

### c. Fair Value Does Not Include a Control Premium

298. A control premium is the additional value that a buyer ascribes to an asset under the assumption that the buyer will be able to derive more value from that asset. (Gompers Tr. 789:14–17.) In other words, as Gompers explained, "the control premium is essentially what an acquirer is willing to pay because they can better manage that asset, drive additional cash flows from that asset or get synergies." (Gompers Tr. 845:17–20.)

299. The value attributable to a control premium is a subjective value on behalf of the acquirer; that is, it only reflects the value that the acquirer believes it can add. (Gompers Tr. 912:10–17 ("[S]omebody buys the assets because *they believe* that they're going to be better. They're going to be able to, you know, fire lazy managers and the like." (emphasis added)).) Because this value is unique to the particular acquirer—here, BAT—the "control premium represents the value only under the control of the [acquirer]." (Gompers Tr. 912:17–18.)

300. As Yilmaz testified, a company's value is determined from the perspective of "an independent firm that is expected to go on as an independent entity[.]" (Yilmaz

Tr. 1866:24–1867:7.) Yilmaz clarified: "Just to be sure we are all on the same page, this does not have any kind of minority discount or some kind of acquisition premium or control premium attached to it." (Yilmaz Tr. 1867:8–10.) Gompers agreed with Yilmaz: "So if what you're trying to value is the firm, the fair value of the firm, assuming no transaction, you should not gross it up by some control premium." (Gompers Tr. 911:7–9.)

301. Thus, evidence relating to whether certain calculations in the record need to have a control premium added to them to be reflective of RAI's fair value is neither persuasive nor relevant in determining RAI's fair value here. (Wajnert Tr. 165:23–166:4, 167:10–17, 168:4–13; Gilchrist Tr. 551:1–17; Gompers Tr. 846:16–848:9, 854:24–855:3, 858:5–22, 901:19–902:16, 908:10–18; DX0277.0019–.0020; PX0115.0397–.0398; DX0277.0019–0020; PX0115.0397–0398; Constantino Tr. 1829:24–1830:3, 1830:10–24, 1848:16–18.)

  d. <u>Fair Value Determination</u>

302. Based on the admissible evidence of record, the Court concludes that Dissenters' valuation of $92.17 is an extreme outlier. It implies a $50 billion mispricing of RAI's shares, which if accepted would appear to be the largest mispricing ever identified in an appraisal case in North Carolina, Delaware, or elsewhere, by far. Moreover, Dissenters' approach to valuation is unreasonable both as a matter of common sense fact-finding and under North Carolina law, insisting that the only reliable evidence of value is their expert's litigation-generated DCF valuation, which is starkly inconsistent with all other evidence of value including the

market evidence, contemporaneous DCFs, and various sanity checks that Dissenters' experts agree are a typical part of the valuation process.

303. Dissenters' theory that RAI management and the Financial Advisors conspired to sell the Company at a depressed price is not supported by the record, which revealed that diligent and knowledgeable professionals worked in good faith to get the best result they could for RAI's shareholders.

304. Based on the admissible evidence introduced at trial, the Court finds the fair value of RAI as of the date of the Merger was no more than the $59.64 per share that Dissenters have already been paid.

III.

CONCLUSIONS OF LAW

305. This case was properly designated as a mandatory complex business case and assigned to the undersigned. The Court has authority to make its Findings of Fact following the completion of the trial and the submission of all disputed issues for resolution by the Court without a jury. Based on the foregoing Findings of Fact, the Court makes the following Conclusions of Law. Any Findings of Fact that are more appropriately deemed Conclusions of Law are incorporated by reference into the Court's Conclusions of Law.

A.    North Carolina's Appraisal Statute

306. "Appraisal is the exclusive remedy for a shareholder who wishes to exercise a dissenter's rights." *Osher v. Ridinger*, 162 N.C. App. 155, 157, 589 S.E.2d 905, 907 (2004); *see also Cede & Co. v. Technicolor, Inc.*, 542 A.2d 1182, 1186 (Del. 1988) ("An appraisal proceeding is a limited legislative remedy intended to provide shareholders

dissenting from a merger on grounds of inadequacy of the offering price with a judicial determination of the intrinsic worth (fair value) of their shareholdings.").

307. N.C.G.S. § 55-13-30(a) provides that "[i]f a shareholder makes a demand for payment under N.C.G.S. § 55-13-28 which remains unsettled, the corporation shall commence a proceeding . . . by filing a complaint with the Superior Court Division of the General Court of Justice to determine the fair value of the shares and accrued interest." The North Carolina appraisal statute, however, does not create a general right to appraisal for shareholders in a corporation like RAI with stock that is "[t]raded in an organized market and has at least 2,000 shareholders and a market value of at least twenty million dollars[.]" *Id.* § 55-13-02(b)(1). Nevertheless, "appraisal rights shall be available pursuant to subsection (a) of this section for the holders of any class or series of shares where the corporate action is an *interested transaction*." *Id.* § 55-13-02(b)(4) (emphasis added).

308. An "interested transaction" under the appraisal statute is "[a] corporate action described in N.C.G.S. § 55-13-02(a), other than a merger pursuant to N.C.G.S. § 55-11-04 or N.C.G.S. § 55-11-12, involving an *interested person* and in which any of the shares or assets of the corporation are being acquired or converted." *Id.* § 55-13-01(7) (emphasis added).

309. The statute defines an "interested person" as

> [a] person, or an affiliate of a person, who at any time during the one-year period immediately preceding approval by the board of directors of the corporate action met any of the following conditions: 1. Was the beneficial owner of twenty percent (20%) or more of the voting power of the corporation, other than as owner of excluded shares[, or] 2. Had the power, contractually or otherwise, other than as owner of excluded

shares, to cause the appointment or election of twenty-five percent (25%) or more of the directors to the board of directors of the corporation."

*Id.* § 55-13-01(7)(a).

310. The Merger was an "interested transaction" as defined in the appraisal statute because it was a qualifying "corporate action" thereunder and BAT was an "interested person" due to its 42% shareholder stake and right under the Governance Agreement to appoint five out of fourteen directors to the RAI Board. (Corr. Stip'd Facts ¶ 4; JX0020.0006, at § 2.01I(ii); Wajnert Tr. 60:13–21, 61:25–62:8.) Therefore, Dissenters are entitled to appraisal rights.

311. As such, Dissenters are then entitled to a judgment for "the amount, if any, by which the court finds the fair value of the shareholders' shares, plus interest, exceeds the amount paid by the corporation to the shareholder for the shareholder's shares." N.C.G.S. § 55-13-30(e)(i). The trial court shall also assess all court costs of the proceeding "against the corporation, except that the court may assess costs against all or some of the shareholders demanding appraisal, in amounts the court finds equitable, to the extent the court finds such shareholders acted arbitrarily, vexatiously, or not in good faith with respect to the rights provided by this Article." *Id.* § 55-13-31(a).

B.    Goal of the Appraisal Proceeding

312. There is little case law in North Carolina addressing judicial appraisal actions under section 55-13-30. *See* Russell M. Robinson, II, *Robinson on North Carolina Corporation Law* § 27.06[1] (7th ed. 2019) ("There is no reported appellate North Carolina decision determining the fair value of shares in an appraisal

proceeding."). Delaware's courts, in contrast, have developed a substantial body of law determining fair value through judicial appraisal. Although Delaware's appraisal statute, 8 Del. C. § 262, is not identical to section 55-13-30, the two statutes each require a determination of "fair value"[45] and are sufficiently similar that the Court finds decisions of the Delaware courts under section 262, although not binding, to be helpful guidance in interpreting the North Carolina appraisal statute and deciding the fair value of RAI's shares in this action. *See, e.g., Corwin v. British Am. Tobacco PLC*, 251 N.C. App. 45, 53, 796 S.E.2d 324, 331 (2016), ("North Carolina courts often look to Delaware courts for guidance regarding unsettled business law issues."), *overruled on other grounds*, 821 S.E.2d 729 (N.C. 2018); *First Union Corp. v. SunTrust Banks, Inc.*, 2001 NCBC LEXIS 7, at \*31 (N.C. Super. Ct. Aug. 10, 2001) ("North Carolina courts have frequently looked to Delaware for guidance because of the special expertise and body of case law developed in the Delaware Chancery Court and the Delaware Supreme Court.").

313. Under the North Carolina and Delaware appraisal statutes, "[t]he trial court's 'ultimate goal in an appraisal proceeding is to determine the "fair or intrinsic value" of each share on the closing date of the merger.' " *In re Appraisal of Stillwater Mining Co.*, Consol. C.A. No. 2017-0385-JTL, 2019 Del. Ch. LEXIS 320, at \*56–57 (Del. Ch. Aug. 21, 2019) (quoting *Dell, Inc. v. Magnetar Glob. Event Driven Master Fund Ltd.*, 177 A.3d 1, 20 (Del. 2017)). "There may be no perfect methodology for

---

[45] Similar to the North Carolina appraisal statute, the Delaware appraisal statute asks a court to determine "the fair value of the shares exclusive of any element of value arising from the accomplishment or expectation of the merger." 8 Del. C. § 262(h).

arriving at fair value for a given set of facts," but a trial court's conclusions should "follow logically from those facts and [be] grounded in relevant, accepted financial principles." *Dell*, 177 A.3d at 22–23. "The basic concept of value . . . is that the stockholder is entitled to be paid for that which has been taken from him, viz., his proportionate interest in a going concern." *Merion Capital L.P. v. Lender Processing Servs.*, No. 9320-VCL, 2016 Del. Ch. LEXIS 189, at *37 (Del. Ch. Dec. 16, 2016) (quoting *Tri-Cont'l Corp. v. Battye*, 74 A.2d 71, 72 (Del. 1950)).

C.   Burden of Proof

314.  North Carolina's appraisal statute omits a specific reference to burden of proof. Delaware's statute contemplates that "the burden to establish fair value by a preponderance of the evidence rests on *both* the petitioner and the respondent." *Laidler v. Hesco Bastion Envtl., Inc.*, C.A. No. 7561-VCG, 2014 Del. Ch. LEXIS 75, at *20 (Del. Ch. May 12, 2014) (emphasis added). Given that both statutes compel the Court to determine fair value rather than to decide between the parties' competing positions, the Court concludes that Delaware's approach is consistent with the text and intent of North Carolina's appraisal statute and should be applied here.

315.  As a result, the Court concludes that, as in Delaware, "[n]o presumption, favorable or unfavorable, attaches to either side's valuation, and [e]ach party also bears the burden of proving the constituent elements of its valuation position . . . , including the propriety of a particular method, modification, discount, or premium." *In re Panera Bread Co.*, C.A. No. 2017-0593-MTZ, 2020 Del. Ch. LEXIS 42, at *41–42 (Del. Ch. Jan. 31, 2020) (internal quotation marks and footnotes omitted). As the

Delaware Chancery Court has explained, in language this Court concludes should apply equally under section 55-13-30,

> [T]he Court . . . has discretion to select one of the parties' valuation models as its general framework or to fashion its own. The Court may evaluate the valuation opinions submitted by the parties, select the most representative analysis, and then make appropriate adjustments to the resulting valuation. The court also may make its own independent valuation calculation by . . . adapting or blending the factual assumptions of the parties' experts. It is also entirely proper for the Court . . . to adopt any one expert's model, methodology, and mathematical calculations, *in toto*, if that valuation is supported by credible evidence and withstands a critical judicial analysis on the record. When . . . none of the parties establishes a valuation that is persuasive, the Court must make a determination based on its own analysis.

*In re Appraisal of Dell Inc.*, C.A. No. 9322-VCL, 2016 Del. Ch. LEXIS 81, at *59–60 (Del. Ch. May 31, 2016) (internal quotation marks and citations omitted), *aff'd in part, rev'd in part on other grounds sub nom. Dell*, 177 A.3d 1; *see also IQ Holdings, Inc. v. Am. Commercial Lines Inc.*, No. 6369-VCL, 2013 Del. Ch. LEXIS 234, at *2 (Del. Ch. Mar. 18, 2013); *Gholl v. eMachines, Inc.*, C.A. No. 19444-NC, 2004 Del. Ch. LEXIS 171, at *18 (Del. Ch. Nov. 24, 2004).

D.     Fair Value

316.   Under Delaware's appraisal statute, "fair value does not equal best value." *Verition Partners Master Fund Ltd. v. Aruba Networks, Inc.*, C.A. No. 11448-VCL, 2018 Del. Ch. LEXIS 160, at *45 (Del. Ch. May 21, 2018) (internal quotation marks omitted). The Court concludes that the same is true under North Carolina's appraisal statute. Rather, for purposes of section 55-13-30, the Court concludes that, as in Delaware, a "[f]air value for the purposes of appraisal 'means a price that is one that

a reasonable seller, under all of the circumstances, would regard as within a range of fair value; one that such a seller could reasonably accept[.]' " *Id.* at *44 (quoting *DFC Glob. Corp. v. Muirfield Value Partners, L.P.*, 172 A.3d 346, 370 (Del. 2017)).  Nor are dissenting shareholders entitled "to the best price theoretically attainable had market conditions been the most seller-friendly." *In re Appraisal Solera Holdings, Inc.*, CONSOLIDATED C.A. No. 12080-CB, 2018 Del. Ch. LEXIS 256, at *51 (Del. Ch. July 30, 2018); *see also Stillwater*, 2019 Del. Ch. LEXIS 320, at *59 ("As the Delaware Supreme Court recently explained, 'fair value is just that, "fair."  It does not mean the highest possible price that a company might have sold for had Warren Buffet negotiated for it on his best day and the Lenape who sold Manhattan on their worst.' " (quoting *DFC*, 172 A.3d at 370)).

317.  Nevertheless, " '[i]t is not sufficient for . . . directors to achieve the best price that a fiduciary will pay if that price is not a fair price.'  Nor is it sufficient to obtain a fair price if that price is not the best alternative available for the corporation and its stockholders." *In re Dole Food Co. Stockholder Litig.*, CONSOLIDATED C.A. No. 8703-VCL, CONSOLIDATED C.A. No. 9079-VCL , 2015 Del. Ch. LEXIS 223, at *112 (Del. Ch. Aug. 27, 2015) (citation omitted).

318.  To determine the fair value of a corporation's stock,

> the court can consider a wide range of factual evidence, including, but not limited to, the market price, the merger price, other offers for the company or its assets, prices at which knowledgeable insiders sold their shares, internal corporate documents . . . and valuation work prepared for non-litigation purposes.

*Reynolds Am. Inc. v. Third Motion Equities Master Fund, Ltd.*, 2018 NCBC LEXIS 94, at *7–8 (N.C. Super. Ct. Sept. 12, 2018) (quoting *In re Dole Food Co.*, 114 A.3d 541, 550 (Del. Ch. 2014)). "Even where the parties have retained credible experts, the court should consider 'factual evidence relating to valuation as a cross-check, or reality-check, on the litigation-driven figures generated by [those] experts.' " *Id.* at *8 (quoting *Dole Food*, 114 A.3d at 550).

319. In North Carolina, as in Delaware, the court cannot "adopt at the outset an 'either-or' approach, thereby accepting uncritically the valuation of one party, as it is the [c]ourt's duty to determine the core issue of fair value on the appraisal date." *In re Appraisal of Metromedia Int'l Gp., Inc.*, 971 A.2d 893, 899–900 (Del. Ch. 2009). "[T]he court should first envisage the entire pre-merger company as a 'going concern,' as a standalone entity, and assess its value as such. '[T]he corporation must be viewed as an on-going enterprise, occupying a particular market position in the light of future prospects.' " *Dell*, 177 A.3d at 20 (quoting *In re Appraisal of Shell Oil Co.*, 607 A.2d 1213, 1218 (Del. 1992)); *see also Stillwater*, 2019 Del. Ch. LEXIS 320, at *57 ("[T]he trial court must assess 'the value of the company . . . as a going concern, rather than its value to a third party as an acquisition.' " (quoting *M.P.M. Enters., Inc. v. Gilbert*, 731 A.2d 790, 795 (Del. 1999))); *IQ Holdings*, 2013 Del. Ch. LEXIS 234, at *2 ("Fair value is determined by valuing the business as a going concern."). "[T]he appraisal endeavor is 'by design, a flexible process.' " *Dell*, 177 A.3d at 21 (quoting *Golden Telecom Inc. v. Global GT LP*, 11 A.3d 214, 218 (Del. 2010)).

320. The North Carolina appraisal statute provides that fair value must be determined "immediately before the effectuation of the corporate action as to which the shareholder asserts appraisal rights[.]" N.C.G.S. § 55-13-01(5). Thus, the Court must determine fair value as of the Transaction Date rather than when the Merger Agreement was signed in January 2017. *See Stillwater*, 2019 Del. Ch. LEXIS 320, at *57 ("Put differently, the valuation date is the date on which the merger closes."). "If the value of the corporation changes between the signing of the merger agreement and the closing, then the fair value determination must be measured by the 'operative reality' of the corporation at the effective time of the merger." *Id.* at *57–58.

321. North Carolina's statute provides the Court with certain guidelines for performing its valuation. Under N.C.G.S. § 55-13-01(5), fair value is to be assessed (i) "using customary and current valuation concepts and techniques," (ii) "excluding any appreciation or depreciation in anticipation of the corporate action unless exclusion would be inequitable," and (iii) "without discounting for lack of marketability or minority status." The statute does not limit or prescribe the specific "valuation concepts and techniques" that the Court may use, and requires only that they be "customary and current" and "generally employed for similar business in the context of the transaction requiring appraisal." *Id.*

322. In the merger context, courts, economists, and valuation professionals customarily and currently use a wide range of valuation concepts and techniques, including but not limited to assessing market evidence of the value of the shares, assessing whether the transaction process was one in which the resulting deal price

is a reliable indicator of value, reviewing internal valuations performed by the company prior to consideration of the merger, estimating the net present value of the company's expected future cash flows (a DCF analysis), comparing the company's trading multiples to the trading multiples of similar firms, and comparing the multiples paid in the merger to the multiples paid in similar transactions. *See Dole Food*, 114 A.3d at 550; *see also Sieg Co. v. Kelly*, 568 N.W.2d 794, 798 (Iowa 1997) (applying statute that, like North Carolina's, is patterned on the Model Business Corporation Act: "[a]s we have observed on prior occasions, there is no predominant formula for arriving at fair value").

323. "[T]hose knowledgeable about valuation recognize that the field is as much art as science." *Dole Food*, 114 A.3d at 553 n.7. "Fair value is, by now, a jurisprudential concept that draws more from judicial writings than from the appraisal statute itself." *Del. Open MRI Radiology Assocs., P.A. v. Kessler*, 898 A.2d 290, 310 (Del. Ch. 2006). Therefore, it is appropriate to view skeptically the use of any one approach to the exclusion of all others, particularly when that approach purports to identify with precision a value far out of line with all other evidence. *Dole Food*, 114 A.3d at 557 ("Rather than supporting the petitioners' idealized depiction of valuation as a scientific process that should be reserved exclusively for neutral opiners, the martial metaphor suggests the need to consider other evidence as a check on the warring experts' models."). Ultimately, "[w]hat is necessary in any particular appraisal case is for the Court . . . to explain its fair value calculus in a manner that is grounded in the record before it." *In re Appraisal of Jarden Corp.*,

CONSOLIDATED C.A. No. 12456-VCS, 2019 Del. Ch. LEXIS 271, at *3 (Del Ch. Jul. 19, 2019) (quoting *DFC*, 172 A.3d at 388) (internal quotation marks and brackets omitted).

E.    Deal Price as Fair Value

324.   Courts will in appropriate cases "afford[ ] substantial, if not exclusive, weight to deal price in the fair value analysis." *Dell*, 177 A.3d at 30; *see also In re Appraisal of AOL Inc.*, C.A. No. 11204-VCG, 2018 Del. Ch. LEXIS 63, at *2–3 (Del. Ch. Feb. 23, 2018) ("[A] transaction that demonstrates an unhindered, informed, and competitive market value is at least first among equals of valuation methodologies in deciding fair value."). As the notes to the Model Business Corporation Act, on which North Carolina's statute is based, explain, "A court determining fair value under chapter 13 should give great deference to the aggregate consideration accepted or approved by a disinterested board of directors for an appraisal-triggering transaction." Model Bus. Corp. Act § 13.01 cmt. 2 (Am. Bar Ass'n 2016).[46]

325.   Indeed, Delaware courts have recognized that "the price produced by an efficient market is generally a more reliable assessment of fair value than the view of a single analyst, especially an expert witness who caters her valuation to the litigation imperatives of a well-heeled client." *Dell*, 177 A.3d at 24. "The fact that a transaction price was forged in the crucible of objective market reality (as

---

[46] Dissenters contend that an assessment of deal price in determining fair value is not a "customary and current valuation concept and technique" under section 55-13-01(5). Dissenters' contention, however, has no support in North Carolina case law and is squarely refuted by the legislative history reflected in the Model Business Corporation Act commentary set forth above.

distinguished from the unavoidably subjective thought process of a valuation expert) is viewed as strong evidence that the price is fair." *Van de Walle v. Unimation, Inc.*, C.A. No. 7046, 1991 Del. Ch. LEXIS 27, at *50 (Del. Ch. Mar. 6, 1991). As a result, Delaware courts will in appropriate cases "afford[ ] substantial, if not exclusive, weight to deal price in the fair value analysis." *Dell*, 177 A.3d at 30.[47]

326. Nevertheless, "[t]here is no presumption that the deal price reflects fair value." *Stillwater*, 2019 Del. Ch. LEXIS 320, at *60; *see also Dell,* 177 A.3d at 21; *DFC*, 172 A.3d at 366–67. "As a general matter, the persuasiveness of the deal price depends on the reliability of the sale process that generated it." *Stillwater*, 2019 Del. Ch. LEXIS 320, at *61–62. "If the sale process is not open or sufficiently reliable, the deal price should not be regarded as persuasive evidence of fair value." *Panera*, 2020 Del. Ch. LEXIS 42, at *43 (internal quotation marks omitted). In short, "[a] deal price serves as a persuasive indicator of fair value where the sale process bears 'objective indicia of fairness that rendered the deal price a reliable indicator of fair value.'" *Id.* (quoting *Stillwater*, 2019 Del. Ch. LEXIS 320, at *44).

327. Although "[t]here is no checklist or set of minimum characteristics for giving weight to the deal price[,]" *id.*, the Delaware courts have recognized "objective indicia

---

[47] *See also, e.g.*, *Verition Partners Master Fund, Ltd. v. Aruba Networks, Inc.*, 210 A.3d 128, 135 (Del. 2019) (noting the Delaware courts' "long history of giving important weight to market-tested deal prices" and listing cases); *see also generally, e.g.*, *Panera*, 2020 Del. Ch. LEXIS 42; *In re Appraisal of Columbia Pipeline Grp., Inc.*, Cons. C.A. No. 12736-VCL, 2019 Del. Ch. LEXIS 303 (Del. Ch. Aug. 12, 2019); *Solera*, 2018 Del. Ch. LEXIS 256; *In re Appraisal of PetSmart, Inc.*, CONSOLIDATED C.A. No. 10782-VCS, 2017 Del. Ch. LEXIS 89 (Del. Ch. May 26, 2017); *Merion Capital L.P. v. BMC Software, Inc.*, C.A. No. 8900-VCG, 2015 Del. Ch. LEXIS 268 (Del. Ch. Oct. 21, 2015); *LongPath Capital, LLC v. Ramtron Int'l Corp.*, C.A. No. 8094–VCP, 2015 Del. Ch. LEXIS 177 (Del. Ch. June 30, 2015).

of fairness" in a deal process "where (i) information was sufficiently disseminated to potential bidders, so that (ii) an informed sale could take place, (iii) without undue impediments imposed by the deal structure itself[,]" *AOL*, 2018 Del. Ch. LEXIS 63, at \*21. Other "objective indicia" include "negotiations at arm's-length; board deliberations without any conflicts of interest; buyer due diligence and receipt of confidential information about the company's value; and seller extraction of multiple price increases." *Panera*, 2020 Del. Ch. LEXIS 42, at \*44 (internal quotation marks, brackets, and footnotes omitted).

328. As noted by the court in *Panera*, "[t]he Delaware Supreme Court has particularly stressed the absence of post-signing bidders as an objective indicator that the sale process was reliable and probative of fair value." *Id.* at \*44; *see also, e.g.*, *Aruba*, 210 A.3d at 136 ("It cannot be that an open chance for buyers to bid signals a market failure simply because buyers do not believe the asset on sale is sufficiently valuable for them to engage in a bidding contest against each other."); *Dell*, 177 A.3d at 29 ("Fair value entails at minimum a price some buyer is willing to pay—not a price at which no class of buyers in the market would pay."); *id.* at 33 (finding also that absence of a higher bid meant "that the deal market was already robust and that a topping bid involved a serious risk of overpayment," which "suggest[ed] the price [wa]s already at a level that [wa]s fair").

329. Although some Delaware decisions have suggested that, in certain circumstances, unless there is a robust auction involving well-informed and unconstrained bidders, the transaction price is not a reliable indicator of fair value,

*see Global GT LP v. Golden Telecom, Inc.*, 993 A.2d 497, 508 (Del. Ch. 2010) (declining to give any weight to the merger price where controlling shareholders refused to allow an auction), the Delaware Supreme Court has not retreated from its long-held view that when "the directors possess a body of reliable evidence with which to evaluate the fairness of a transaction, they may approve that transaction without conducting an active survey of the market[,]" *Barkan v. Amsted Indus., Inc.*, 567 A.2d 1279, 1287 (Del. 1989); *see also, e.g., LongPath*, 2015 Del. Ch. LEXIS 177, at *70 ("I am not aware of any case holding that a multi-bidder auction of a company is a prerequisite to finding that the merger price is a reliable indicator of fair value."); *Stillwater*, 2019 Del. Ch. LEXIS 320, at *70 (rejecting "a rule that pre-signing outreach is invariably required before the deal price can serve as persuasive evidence of fair value"); *Columbia Pipeline,* 2019 Del. Ch. LEXIS 303, at *116–17 (declining to impose "minimum requirements for other sale processes to meet before the deal price can be considered as a persuasive indicator of fair value").

330.  Indeed, Delaware courts have recognized that "[a]t least for a widely held, publicly traded company, a sale process could [result in an informed sale] through the public announcement of a transaction and a sufficiently open post-signing market check." *Stillwater*, 2019 Del. Ch. LEXIS 320, at *70.  Moreover, "a board may pursue a single transaction partner, so long as the transaction is subject to an effective market check under circumstances in which any bidder interested in paying more has a reasonable opportunity to do so." *Id.* at *75 (internal quotation marks omitted). That said, "if a board fails to employ any traditional value maximization tool, such as

an auction, a broad market check, or a go-shop provision, that board must possess an impeccable knowledge of the company's business for the Court to determine that it acted reasonably." *Panera*, 2020 Del. Ch. LEXIS 42, at *54 (quoting *In re OPENLANE, Inc. S'holders Litig.*, 2011 Del. Ch. LEXIS 156, at *18 (Del. Ch. Sept. 30, 2011)).

331. Even when the deal price is not given controlling weight, it remains a relevant indicator of fair value that should not be ignored, particularly when independent and well-informed directors negotiated with the buyer at arm's length. *See Dole Food*, 114 A.3d at 559; *Jarden*, 2019 Del. Ch. LEXIS 271, at *10 (finding fair value to be consistent with the "less reliable, but still relevant, deal price less synergies value"); *Blueblade Capital Opportunities LLC v. Norcraft Cos.*, C.A. No. 11184-VCS, 2018 Del. Ch. LEXIS 255, at *73–74 (Del. Ch. July 27, 2018) (concluding that even when a merger price is not a reliable indicator of fair value, "[t]hat does not mean, however, that the Merger Price is irrelevant for purposes of the Court's fair value determination. To the contrary, it is appropriate to consider the Merger Price as a 'reality check' on the Court's DCF valuation" (emphasis omitted)).

332. In this case, there are numerous objective indicia of a robust deal process that led to a deal price that reliably reflected RAI's fair value.

333. First, RAI's stock traded in an efficient market. At all relevant times, the Company had a market capitalization of approximately $67 billion, its shares were publicly traded in high volumes and with high liquidity on the NYSE, its stock was widely covered by equity analysts, information concerning the Company was widely

available and readily disseminated, and the market reacted to breaking news and information concerning the Company. (PX0063.0010, .0025; PX0115.0181; JX0017.0003; de Gennaro Tr. 187:18–188:8, 215:15–23); *see, e.g.*, *Dell*, 177 A.3d at 6–7, 27 (noting that "the evidence suggests that the market for Dell's shares was actually efficient and, therefore, likely a possible proxy for fair value" because, among other things, Dell's stock actively traded on the NASDAQ, the company had a $20 billion market cap, the stock was widely covered by equity analysts, and its share price "quickly reflected the market's view on breaking developments"); *Stillwater*, 2019 Del. Ch. LEXIS 320, at *164, *173 (relying on certain "attributes of market efficiency characteristics such as market capitalization, public float, weekly trading volume, bid-ask spread, analyst following, and market reaction to breaking news and information").

334. Second, through the Governance Agreement and its other contractual relationships with BAT, RAI had freedom to make decisions independent of BAT concerning the Merger, (Wajnert Tr. 63:18–64:3; JX0023.0080), providing reliable evidence that the Merger was an arm's-length transaction. Indeed, the Transaction Committee twice rejected BAT's merger offers without countering, strongly suggesting that the Transaction was prepared to recommend RAI's continued independence as an alternative to executing a transaction with BAT unless BAT increased the bid price. (JX0023.0067–.0073.) Moreover, there was ample evidence that RAI seriously considered strategic alternatives to a merger with BAT. (Wajnert Tr. 73:24–74:24; Cameron Dep. Tr. 106:16–107:11; Crew Tr. 665:16–666:15); *see, e.g.*,

*Solera*, 2018 Del. Ch. LEXIS 256, at *52 ("Reliance on the deal price as evidence of fair value is strengthened when independent representatives of a target company actively negotiate with potential buyers and demonstrate a real willingness to reject inadequate bids.").

335. Third, the Transaction Committee and the Board were free of conflicts in negotiating and deliberating upon the Merger. The Transaction Committee was composed of fully independent, sophisticated executives with substantial experience in considering and negotiating complex mergers and acquisition transactions. From management's regular presentations and submissions to the Committee and the Board, including those concerning RAI management's financial projections, the Committee and the Board had impeccable knowledge of the Company's business and its future prospects for growth. The Committee and the Board were able to consider the proposed transaction and any alternatives, including maintaining RAI as an independent entity, fully free of conflicts, and were aware that BAT would not force a deal on an unwilling RAI. (de Gennaro Tr. 214:9–215:14; Wajnert Tr. 63:4–10, 68:8–69:17); *see, e.g., Dell*, 177 A.3d at 28 (citing fact that special committee was "composed of independent, experienced directors and armed with the power to say 'no'" as factor supporting fairness of deal price); *Columbia Pipeline*, 2019 Del. Ch. LEXIS 303, at *64–65 (noting six of seven board members were experienced outside directors in supporting fairness of deal price).

336. Fourth, BAT assessed RAI's value having access to extensive public information about the Company as well as confidential, nonpublic information shared

at regular RAI Board meetings. (Wajnert Tr. 146:15–149:15; Gompers Tr. 844:22–845:2); *see, e.g.*, *Panera*, 2020 Del. Ch. LEXIS 42, at *45–46 (citing buyer's access to public and nonpublic information in supporting fairness of deal price); *see also, e.g.*, *DFC*, 172 A.3d at 349 (similarly noting that deal price was "informed by robust public information[ ] and easy access to deeper, non-public information").

337. Fifth, as a result of the Transaction Committee's efforts, RAI was able to extract four price increases from BAT during the course of the Merger negotiations. These increases—from $56.50 to $59.64 per share—resulted in an additional $4.5 billion for RAI's shareholders. (JX0023.0068–.0076; Wajnert Tr. 80:19–22; Nowell Dep. Tr. 173:25–175:10, 175:17–176:25); *see, e.g.*, *Dell,* 177 A.3d at 28 (holding the deal price supported fair value where "[t]he Committee, composed of independent, experienced directors and armed with the power to say 'no,' persuaded [buyer] to raise its bid six times"); *Panera*, 2020 Del. Ch. LEXIS 42, at *46–47 (finding two price increases supported deal price as fair value); *Columbia Pipeline*, 2019 Del. Ch. LEXIS 303, at *65–66 (holding the deal price supported fair value where committee extracted two price increases from buyer).

338. Finally, although the Transaction Committee did not solicit other buyers or engage in an auction process, no third-party bidders expressed interest or submitted a bid during the Merger negotiations or in the six-month post-agreement signing period despite widespread public awareness of BAT's October 20 Offer soon after it was made. (Wajnert Tr. 90:3–6; Clark Tr. 1429:16–18); *see, e.g.*, *Stillwater*, 2019 Del. Ch. LEXIS 320, at *131 ("The failure of any other party to come forward provides

significant evidence of fairness, because '[f]air value entails at minimum a price some buyer is willing to pay—not a price at which no class of buyers in the market would pay.'" (quoting *Dell*, 177 A.3d at 29)).

339. Dissenters contend that RAI's deal process was wholly unreliable and thus that the deal price in no way reflects fair value. In particular, Dissenters' experts, Yilmaz and Zmijewski, opine that the Transaction Committee's failure to seek out potential buyers other than BAT, (Yilmaz Tr. 1938:1–3), or to push BAT to dilute its shares, subsidize potential bidders' costs, or offer support for an alternative transaction, (Yilmaz Tr. 1941:21–1942:1; Zmijewski Tr. 1311:3–8), render the deal price unreliable, (Yilmaz Tr. 1868:11–14; Zmijewski Tr. 1308:11–1309:13). As proof, Zmijewski asserts that Japan Tobacco was interested in acquiring RAI but did not bid due to BAT's ownership position. (Zmijewski Tr. 1312:20–1313:3.) Dissenters suggest that, given Japan Tobacco's acquisition of six tobacco companies in the past five years, Japan Tobacco would have bid for RAI if BAT had been open to an alternative bid. (DX0272.0001 (email stating "in a different world where BAT did not own its stake [Japan Tobacco] would have made a play for RAI").

340. The Court disagrees. While RAI could have improved the optics of its deal process by actually soliciting bidders and pressing BAT to encourage alternative bidders, there were few (if any) companies in the tobacco industry or adjacent industries that could have made an offer for RAI. Although Japan Tobacco appears to have been the only one of these potential bidders that conceivably might have bid for RAI other than BAT, Japan Tobacco never expressed interest or submitted a bid

despite its almost certain knowledge of BAT's October 20 Offer and the public deal announcement in January 2017. (Wajnert Tr. 171:19–172:12.) No evidence was introduced from Japan Tobacco (or any other potential third-party bidder) to suggest that Japan Tobacco (or any other potential third-party bidder) would have bid had BAT been open to such an offer, and the evidence offered to prove Japan Tobacco's interest—an internal email within Goldman reporting what an unnamed person at Japan Tobacco allegedly said—is hearsay and hardly persuasive. (DX0272.0001.)

341. In addition, while the Merger Agreement included a no-shop provision, BAT's information rights, and a $1 billion termination fee, (JX0023.0061–.0062), no persuasive evidence was introduced to suggest that these provisions undermined the sales process or otherwise discouraged other bidders, including Japan Tobacco, from coming forward. As a result, the Court finds that the Committee's decision not to solicit potential alternative buyers or to push BAT to change its position on alternative bids does not undermine the reliability of the deal price under the circumstances here. *See, e.g.*, *Dell*, 177 A.3d at 28 (where news of a potential sale was public, "interested parties would have approached the Company . . . if serious about pursuing a deal"); *Panera*, 2020 Del. Ch. LEXIS 42, at *49 (finding failure of market participants "to pursue a merger when they had a free chance to do so . . . provides significant evidence of fairness" of the deal price); *Highfields Capital, Ltd. v. AXA Fin., Inc.*, 939 A.2d 34, 60 (Del. Ch. 2007) ("If MONY was truly worth $43 per share" rather than the $31 deal price, "certainly some savvy investor likely would have competed with AXA, as each dollar per share below that level, according to

Highfields's theory, would have resulted in the purchaser realizing approximately $50 million in value."); *see also, e.g., Aruba*, 210 A.3d at 136.

342. The additional testimony Dissenters presented to dispute the reliability of the deal price, in particular that from Yilmaz, was also unpersuasive. Yilmaz conceded that he did not consider the specifics of the Merger in forming his opinions and instead opined as a "theorist." (Yilmaz Tr. 1968:24–1969:7.) He also acknowledged that it was possible that a board of directors could obtain fair value even where the sole bidder was a large blockholder, (Yilmaz Tr. 1974:7–1975:18), explaining further that

> if the board was all well meaning and [the] board knew everything that was relevant and they don't give in to any pressure and they were able to do the best thing for their shareholders, it is possible that they can get fair value,

(Yilmaz Tr. 2009:12–2010:2).

343. In addition, while he opined that it was "highly likely" that BAT's ownership stake adversely affected the deal price, (Yilmaz Tr. 1949:23–1950:9), Yilmaz did not attempt to measure any supposed effects deriving therefrom. He also did not analyze the possibility of RAI's suffering from agency problems due to BAT's ownership stake or review the deposition testimony of the Transaction Committee members who engaged with BAT in the negotiations. (Yilmaz Tr. 1976:4–1977:6, 1978:14–1980:6, 1981:23–1982:6.) In fact, in giving his opinion on the reliability of the deal price, Yilmaz did not consider or assess whether the Transaction Committee actually resisted BAT in the negotiations. (Yilmaz Tr. 1977:7–1979:15.) Yilmaz's theoretical

opinions are insufficient to undermine the compelling evidence indicating that the deal process led to a price reflecting the fair value of RAI.

344. Further, the "golden parachute" compensation paid to certain members of RAI management and the contingent fee nature of the compensation paid to the Financial Advisors does not undermine the reliability of the deal price as fair value. There was no evidence that any member of RAI's management placed his or her personal interests above the best interests of the Company, and the same is true for each of the Financial Advisors. Indeed, Delaware courts have noted that "[c]ontingency clauses are standard in financial advisor agreements and seldom create a conflict of interest." *Panera*, 2020 Del. Ch. LEXIS 42, at *74. There was no evidence of such a conflict here. *See id.* at *76 (finding that a financial advisor's contingency fee did not undermine the reliability of the deal price and concluding that "[i]n any event, [the advisor's] fairness opinion would not have precluded a board determination that it was better for [the seller] to remain a standalone company").

345. Similarly, Dissenters' challenges to the reliability of the information RAI provided to the Financial Advisors, including their use of five-year rather than ten-year projections, does not undermine the deal price's reliability. To the contrary, it is clear these projections, increased by the management overlays, were the most accurate and up-to-date projections RAI had available. *Cf. Dole Food*, 2015 Del. Ch. LEXIS 223, at *102 (criticizing management for "[w]ithholding the company's latest projections" from the special committee and advisors (internal quotation mark omitted)).

346. Nor does the Financial Advisors' choice of inputs for their DCF analyses, including their choice of perpetuity growth rate and their decision to apply that rate in year six of their DCF calculations, undermine the deal price's reliability. *See, e.g.*, *Merion Capital*, 2016 Del. Ch. LEXIS 189, at \*55 (finding financial advisors' DCF-based valuation ranges consistent with market indicators and thus supportive of deal price as fair value).

347. Accordingly, based on the evidence presented, the Court finds that the Merger was negotiated at arm's length by independent, fully informed, and deeply knowledgeable directors with the assistance of independent and experienced advisors, all of whom had extensive experience in the tobacco industry and a deep and impeccable knowledge of RAI and its potential opportunities, challenges, and future prospects. The Committee and the Board acted with full transparency and in relentless pursuit of value, rejected two BAT offers outright, indicating their seriousness in continuing as an independent entity, and extracted four price increases from BAT resulting in an additional $4.5 billion for RAI's shareholders. The non-BAT shareholders voted overwhelmingly (99% of shares voted) in favor of the Merger, a transaction that had received widespread favorable reaction from industry observers and analysts. As in *Dell*, and particularly given the fact that RAI's size and industry position meant that there were few, if any, likely bidders other than BAT, "[n]othing in the record suggests that increased competition would have produced a better result." 177 A.3d at 28. The Court thus concludes that, under the

circumstances present here, even without more aggressive outreach and a competitive auction, the resulting deal price is reliable evidence of RAI's fair value.

348. Consideration of the Delaware Supreme Court's decision in *Golden Telecom*, a case heavily relied upon by Dissenters, does not change this result. Although the case has numerous similarities with the case at bar, including the presence of large, 40%-plus shareholders who were unsupportive of an alternative transaction, RAI had certain rights and leverage through the Governance Agreement that were not present in *Golden Telecom*. While the target board in *Golden Telecom* treated the deal like "a merger proposal by a controlling stockholder," 993 A.2d at 508, here, as the Supreme Court of North Carolina has concluded, the Governance Agreement prevented BAT from having effective control of RAI. *See Corwin,* 371 N.C. at 625, 821 S.E.2d at 743. Further, the contemporaneous market reaction to the deal in *Golden Telecom*, where the "weight of the evidence suggest[ed] that the market believed that [the buyer] was getting a bargain[,]" *id.* at 509, was far different than here, where the market believed the Transaction Committee succeeded in negotiating a fair price, (Gompers Tr. 802:25–803:8; Yilmaz Tr. 2003:4–22).

F.    Alternative Methods of Valuation

349. In Delaware, the appraisal statute expressly commands a court in appraisal actions to "take into account all relevant factors" and not to ignore any indicia of fair value. 8 Del. C. § 262(h). This Court has previously held that "[e]ven where the parties have retained credible experts, the court should consider 'factual evidence relating to valuation as a cross-check, or reality-check, on the litigation-driven figures

generated by [those] experts.'" *Reynolds*, 2018 NCBC LEXIS 93, at *12 (quoting *Dole Food*, 114 A.3d at 550).) Accordingly, the Court considers alternative methods of valuation to test the reliability of the deal price as fair value.

a.  Unaffected Market Price

350.  One common valuation concept is to consider the price an asset fetches in the market. As this Court has previously observed in an appraisal action,

> [P]ublicly traded companies operate in an environment where there is a market mechanism which provides a strong, if not determinative, indicator of the value of minority shares. There are federal and state statutory protections built into transactions involving publicly held companies. Information from which shareholders can evaluate transactions is readily available from public companies because of disclosure and filing requirements of the federal securities laws.

*Beam v. Worldway Corp.*, 1997 NCBC LEXIS 8, at *14 (N.C. Super. Ct. Oct. 23, 1997).[48]

351.  Delaware precedent is in accord, holding that "the price a stock trades at in an efficient market is an important indicator of its economic value that should be given weight[.]" *Aruba*, 210 A.3d at 138; *Jarden*, 2019 Del. Ch. LEXIS 271, at *58 n.322 (noting that courts may "look to stock price to corroborate a fair value conclusion"). "Indeed, '[w]here there is an established market for a corporation's stock, market value must be considered in appraising the value of the corporation's shares.'" *Dole Food*, 114 A.3d at 559 (quoting *Cooper v. Pabst Brewing Co.*, Civil

---

[48] Dissenters contend that a consideration of unaffected market price in assessing fair value is not a "customary and current valuation concept and technique" under section 55-13-01(5). (Defs.' Opening Post-Trial Br. 26–27.) The Court disagrees. Not only does this Court's *Beam* decision, cited above, conclude otherwise, but Dissenters' reading of the statutory text is unduly restrictive in this context.

Action No. 7244, 1993 Del. Ch. LEXIS 91, at *22 (Del. Ch. June 8, 1993)). "[T]he efficient market hypothesis . . . teaches that the price produced by an efficient market is generally a more reliable assessment of fair value than the view of a single analyst, especially an expert witness who caters her valuation to the litigation imperatives of a well-heeled client." *Dell*, 177 A.3d at 24.

352. For this reason, courts have used a company's unaffected market price as a barometer for fair value as "[m]arket prices are typically viewed superior to other valuation techniques because, unlike, e.g., a single person's discounted cash flow model, the market price should distill the collective judgment of the many based on all the publicly available information." *DFC*, 172 A.3d at 369–70; *see also Jarden*, 2019 Del. Ch. LEXIS 271, at *58 ("When the market is efficient, the trading price of a company's stock can be a proxy for fair value.").

353. The Delaware Supreme Court has noted the importance of market price in determining the fair value of highly regulated industries like tobacco:

> Publicly traded companies in industries like tobacco, energy, pharmaceuticals, and certain commercial products are subject to close regulation, the development of which can affect their future cash flows. Precisely because of that reality, the market's assessment of the future cash flows necessarily takes regulatory risk into account as it does with all the other reasonable uncertain factors that affect a company's future.

*DFC*, 172 A.3d at 372.

354. Dissenters' arguments attacking the use of RAI's market price are unavailing. In particular, the Court rejects Dissenters' contention that a stock's trading price can never show fair value because it implicitly contains a minority discount. (Defs.' Opening Post-Trial Br. 26–27, 49.) While Dissenters' argument may

have some currency in closely-held corporations, it has no application here in the public company setting. (Gompers Tr. 787:1–9); *see, e.g.*, Lawrence A. Hamermesh & Michael L. Wachter, *The Short and Puzzling Life of the "Implicit Minority Discount" in Delaware Appraisal Law*, 156 U. Pa. L. Rev. 1, 5–6 (2007) (stating that "not a single piece of financial or empirical scholarship affirms the core premise of the [implicit minority discount] - that public company shares systematically trade at a substantial discount to the net present value of the corporation").

355. Based on the evidence presented and the Court's findings of fact concerning RAI's Unaffected Stock Price and its Adjusted Unaffected Stock Price, the Court concludes that each support the reliability of the deal price of $59.64 per share as the fair value of RAI's shares as of the Transaction Date.

### b. Discounted Cash Flow Analyses

356. Courts may also consider more theoretical "valuation concepts and techniques," such as analyses of comparable companies, comparable precedent transactions, and DCF analyses.

357. A DCF analysis is an accepted valuation methodology. *See, e.g.*, *Columbia Pipeline*, 2019 Del. Ch. LEXIS 303, at *137 ("The DCF method is a technique that is generally accepted in the financial community."). "A DCF analysis, although complex in practice, is rooted around a simple principle: the value of the company at the time of the merger is simply the sum of its future cash flows discounted back to present value." *AOL*, 2018 Del. Ch. LEXIS 63, at *26 (internal quotation marks omitted). Yet, "a DCF analysis is only as reliable as the inputs relied upon and the assumptions

underlying those inputs. . . . [T]he use of math should not obscure the necessarily more subjective exercise in judgment that a valuation exercise requires." *Id.* at *26–27 (internal quotation marks omitted). Importantly, "[i]nputs in a discounted cash flow are predictions which are necessarily speculative in nature." *Harris v. Rapid-Am. Corp.*, Civil Action No. 6462, 1990 Del. Ch. LEXIS 166, at *18 (Del. Ch. Oct. 2, 1990), *aff'd in part, rev'd in part*, 603 A.2d 796 (Del. 1992).

358. The weight and utility of DCF analysis and other methodologies will depend on the specific circumstances of the case. They are generally given less weight in cases like this one where there was an active public market for the stock and a robust deal process. *See, e.g.*, *DFC*, 172 A.3d at 370 ("[A] singular discounted cash flow model is often most helpful when there isn't an observable market price."); *Union Ill. 1995 Inv. L.P. v. Union Fin. Grp., Ltd.*, 847 A.2d 340, 359 (Del. Ch. 2003) ("In view of the market's opportunity to price UFG directly as an entity, the use of alternative valuation techniques like a DCF analysis is necessarily a second-best method to derive value.").

359. The DCF calculations in this case aptly illustrate the Delaware Supreme Court's observation that, despite their widespread acceptance, "DCF valuations involve many inputs—all subject to disagreement by well-compensated and highly credentialed experts—and even slight differences in these inputs can produce large

valuation gaps." *Dell*, 177 A.3d at 38.[49]  The Delaware Court of Chancery has explained,

> The DCF model typically can generate a wide range of estimates.  In the world of real transactions (capital budgeting decisions for example) the hypothetical, future-oriented, nature of the model is not thought fatal to the DCF technique because those employing it typically have an intense personal interest in having the best estimates and assumptions used as inputs.  In the litigation context use of the model does not have that built-in protection.

*Cede & Co. v. Technicolor, Inc.*, Civil Action No. 7129, 1990 Del. Ch. LEXIS 259, at *26 n.17 (Del. Ch. Oct. 19, 1990).

360.  The wide variability and susceptibility to manipulation attendant to DCF analysis in appraisal litigation has increasingly caused Delaware courts to question its reliability.  *See, e.g., Highfields*, 939 A.2d at 52–53 (stating that the DCF methodology "has much less utility in cases where the transaction giving rise to appraisal was an arm's-length merger"); *In re Appraisal of Jarden Corp.*, CONSOLIDATED C.A. No. 12456-VCS, 2019 Del. Ch. LEXIS 994, at *3 n.4 (Del. Ch. Sept. 16, 2019) ("I am more convinced than ever that the experts' inability to agree on inputs is evidence that DCF is not reliable here, particularly given the presence of a reliable 'market-based metric.' " (quoting *Stillwater*, 2019 Del. Ch. LEXIS 320, at *174); *Columbia Pipeline*, 2019 Del. Ch. LEXIS 303, at *140, *142 ("*Dell* and *DFC* teach that a trial court should have greater confidence in market indicators and less

---

[49] For example, as discussed above, a change in PGR from 2.2% to 0% drops Zmijewski's DCF valuation from $92.17 to $58.00 per share, an over $50 billion reduction in share value. (Zmijewski Tr. 1396:2–9.)

confidence in a divergent expert determination. . . . The wide swings in output that result from legitimate debate over reasonable inputs undermine the reliability of [petitioners' expert's] DCF model.").

361. This is particularly so for post-merger DCFs prepared by experts for purposes of litigation. *See, e.g., Doft & Co. v. Travelocity.com Inc.*, C.A. No. 19734, 2004 Del. Ch. LEXIS 75, at *28 (Del. Ch. May 21, 2004) ("[T]his court is inherently suspicious of post-merger, litigation-driven forecasts because 'the possibility of hindsight bias and other cognitive distortions seems untenably high.' " (quoting *Agranoff v. Miller,* 791 A.2d 880, 892 (Del. Ch. 2001))).

362. When a DCF analysis is used, Delaware courts have increasingly cautioned that "it is only reliable when it can be verified by alternative methods to DCF or by real world valuations." *S. Muoio & Co. v. Hallmark Entm't Invs. Co.*, Civil Action No. 4729-CC, 2011 Del. Ch. LEXIS 43, at *75 (Del. Ch. Mar. 9, 2011), *aff'd*, 35 A.3d 419 (Del. 2011). Indeed, courts in Delaware have consistently rejected DCF-based valuations that differ dramatically from other evidence of value. *See, e.g., Stillwater*, 2019 Del. Ch. LEXIS 320, at *3 ("The experts disagreed over too many inputs, and the resulting valuation swings were too great, for this decision to rely on a [DCF] model when a market-tested indicator is available."); *Columbia Pipeline*, 2019 Del. Ch. LEXIS 303, at *139 ("[The expert's] valuation of $32.47 per share stands in contrast with contemporaneous market evidence."); *Cede & Co. v. Technicolor, Inc.*, Civil Action No. 7129, 2003 Del. Ch. LEXIS 146, at *13–14 (Del. Ch. Dec. 31, 2003), *aff'd in part, rev'd in part on other grounds*, 884 A.2d 26 (Del. 2005) ("Easton's

projections are supported by several independent indicia of value, while Torkelsen does not even attempt to perform reasonableness checks upon his valuation."); *Gray v. Cytokine Pharmascis., Inc.*, C.A. No. 17451, 2002 Del. Ch. LEXIS 48, at *23 (Del. Ch. Apr. 25, 2002) ("In sum, when compared to other indications of value, Davis's valuation is such an outlier that it casts doubt on its reliability, quite apart from its exact assumptions and methodologies.").

363. Applying these principles here, and for the reasons discussed at length above, (*see supra* § II(F)(b)), the Court concludes that the DCF analyses performed by the Financial Advisors were reliable and constitute persuasive evidence that the fair value of RAI's shares as of the Transaction Date was at or below the deal price of $59.64 per share.

364. The Court further concludes that Zmijewski's DCF analysis and his valuation of RAI at $92.17 per share is unreliable. Indeed, Zmijewski's valuation of RAI's shares for this litigation is an extreme outlier when compared to all other indicia of value in the record and is based on projections unsuited for valuation analysis and a blended PGR that is unsupported by credible and persuasive evidence, undermining its reliability either as a basis to challenge the deal price as fair value or as support for Dissenters' requested $92.17 per share valuation.

c. Comparable Companies/Comparable Transactions Analyses

365. It is common practice to cross-check the output of a DCF analysis against comparable companies analyses. *See DFC*, 172 A.3d at 386–88 (finding it reasonable for the Chancery Court to consider comparable companies in fair value

determination). "The idea is that if the market expects comparable companies to grow at a certain rate, then one can infer the growth of the subject company by applying a multiple drawn from the comparables to a relevant metric, such as EBITDA or revenues." *In re Appraisal of the Orchard Enters.*, C.A. No. 5713-CS, 2012 Del. Ch. LEXIS 165, at *29 (Del. Ch. July 18, 2012).

366. As the court in *Panera* recently explained,

> Before a comparable companies multiples analysis can be undertaken with any measure of reliability, it is necessary to establish a suitable peer group through appropriate empirical analysis. If, and only if, a proper peer set can be selected, the next step in the comparable companies analysis is to select an appropriate multiple and then determine where on the distribution of peers the target company falls. Where the experts' identified companies are too divergent from the company in terms of size, public status, and products, to form meaningful analogs for valuation purposes, this Court will disregard this valuation metric.

*Panera*, 2020 Del. Ch. LEXIS 42, at *100 (internal quotation marks and footnotes omitted).

367. Like a comparable companies analysis, "[a] comparable transactions analysis is an accepted valuation tool in . . . appraisal cases. The analysis involves identifying similar transactions, quantifying those transactions through financial metrics, and then applying the metrics to the company at issue to ascertain a value." *Highfields*, 939 A.2d at 54. "The utility of the comparable transactions methodology is directly linked to the 'similarity between the company the court is valuing and the companies used for comparison.'" *Id.* (quoting *Lane v. Cancer Treatment Ctrs. of Am.*, C.A. No. 12207-NC, 2004 Del. Ch. LEXIS 108, at *126 (Del. Ch. July 30, 2004)).

368. Based on the evidence presented and as discussed above, the Court concludes that the comparable companies and comparable transactions analyses performed by the Financial Advisors each serve as a useful market or "sanity" check showing that Zmijewski's valuation is clearly excessive. (*See supra* § F(a)(iii).) The analyses are less useful as support for the deal price as fair value. The Court gives no weight to the comparable companies analysis for this purpose, *see, e.g.*, *Lane*, 2004 Del. Ch. LEXIS 108, at *126 ("At some point, the differences become so large that the use of the comparable company method becomes meaningless for valuation purposes." (quoting *In re Radiology Assocs., Inc. Litig.*, 611 A.2d 485, 490 (Del. Ch. 1991))), but finds that the Lorillard Transaction provides support that the deal price is a reliable indicator of the fair value of RAI's shares as of the Transaction Date.

d.    <u>Contemporaneous Market Reaction</u>

369. Delaware courts often consider analyst commentary concerning proposed transaction prices in assessing the valuation of a company in appraisal actions. *See, e.g.*, *DFC*, 172 A.3d at 353, 373. Contemporaneous analyst reaction to BAT's October 20 Offer was decidedly positive, generally supporting the reliability of the deal price as fair value for RAI's shares. This is in marked contrast to the two cases on which Dissenters principally rely where the opening bid in each was criticized as unfair to shareholders: *Golden Telecom*, 993 A.2d at 509, and the RJR Nabisco transaction from the 1980s, (Yilmaz Tr. 1997:22–1998:2, 2000:17–21).

370. Moreover, the vast majority of RAI's public shareholders, including the Company's officers and directors, approved the deal price negotiated by the

Transaction Committee even though the majority-of-the-minority condition gave them the power to vote it down. (Corr. Stip'd Facts ¶ 18; DX0277.0011; DX0324.0002; JX0023.0044; Crew Tr. 671:23–672:10.) Such strong non-BAT officer, director, and shareholder approval provides powerful, contemporaneous evidence that the deal price constituted fair value for RAI's shares. *See, e.g.*, *Technicolor*, 1990 Del. Ch. LEXIS 259, at *105 ("Yet knowledgeable officers and directors all sold their stock for $23 per share. This fact while itself not conclusive is relevant in concluding that as of January 24, 1983, sophisticated, knowledgeable persons would not have concluded that Technicolor stock had an inherent value of $62.75[.]").

371. The Court finds unpersuasive Yilmaz's contention that the shareholder vote should be disregarded because the shareholders did not have the June 2017 ten-year projections. (Yilmaz Tr. 1903:20–1904:22.) The Court finds little relevance in RAI's year six through ten projections for valuation purposes, and no persuasive evidence was presented that disclosure of those projections would have changed the shareholder vote. Moreover, the October 2016 Projections disclosed in the Proxy were more optimistic than the first five years of the June 2017 projections, (Zmijewski Tr. 1370:17–1372:7), providing no basis to conclude that shareholders would have voted against the transaction had the June 2017 projections been disclosed.

372. Further, Mason Capital's own contemporaneous view of RAI's value on a standalone basis shortly after the October 20 Offer suggests that the deal price was for fair value. (*See supra* § II(F)(a)(vi).) That valuation of $54.44 per share—derived before litigation commenced and Mason received in discovery RAI's ten-year

projections on which so much of Dissenters' case rests—serves as a useful market check to the $59.64 per share deal price and undermines the reliability of both Mason's litigation valuation of $88.16 per share and Zmijewski's $92.17 per share valuation as reasonable determinations of fair value.

G.   Exclusion of Value in Anticipation of the Corporate Action

373.   The Court must value RAI as a standalone business as of the closing date on July 25, 2017, as though the Merger were not planned and did not happen.  *See* N.C.G.S. § 55-13-01(5) (requiring court to "exclud[e] any appreciation or depreciation in anticipation of the [merger]").[50]  That means the Court must exclude any value arising from synergies that were expected from the Merger.  *See Boettcher v. IMC Mortg. Co.*, 871 So. 2d 1047, 1053 (Fla. Dist. Ct. App. 2004) (determining fair value under an appraisal statute patterned on the Model Business Corporation Act "required the exclusion of any appreciation or depreciation in IMC's shares based upon anticipation of the consummation of the proposed asset sale"); *see also Jarden*, 2019 Del. Ch. LEXIS 271, at *6–7 (noting that Delaware law requires "back[ing] out" synergies (citing *ACP Master, Ltd. v. Sprint Corp.*, Nos. 8508-VCL, 9042-VCL, 2017 Del. Ch. LEXIS 125, at *79 (Del Ch. July 21, 2017))).

374.  Here, the deal price includes the portion of the $400 million (or approximately $0.28 per share) in anticipated synergies that was paid to the RAI

---

[50] The Delaware appraisal statute is similar:  "Through such proceeding the Court shall determine the fair value of the shares *exclusive of any element of value arising from the accomplishment or expectation of the merger or consolidation*, together with interest, if any, to be paid upon the amount determined to be the fair value."  8 Del. C. § 262(h) (emphasis added).

shareholders. (JX0021.0007; JX0023.0068.) Dissenters are not entitled to the value of those synergies, so those amounts must be deducted from the deal price to arrive at fair value under the statute. *See, e.g., Union Ill.*, 847 A.2d at 356 (instructing courts to exclude "any value that the selling company's shareholders would receive because a buyer intends to operate the subject company, not as a stand-alone going concern, but as a part of a larger enterprise, from which synergistic gains can be extracted"); *Stillwater*, 2019 Del. Ch. LEXIS 320, at *138 ("In an arm's-length, synergistic transaction, the deal price generally will exceed fair value because target fiduciaries bargain for a premium that includes . . . a share of the anticipated synergies[.]" (quoting *Olson v. ev3*, 2011 Del. Ch. LEXIS 34, at *10 (Del Ch. Feb. 21, 2011))).

375. Likewise, the Court should not adjust its valuation of RAI to incorporate a control premium because a control premium is not part of the company as a standalone enterprise. As Gompers testified, a "control premium is the value to somebody else who [thinks he/she] can derive more value from [the existing] assets" than current management can, which is "not the value of that company under the existing management – assuming that no transaction occurred." (Gompers Tr. 789:14–17.) Thus, a control premium does not inhere in the standalone company but instead "represents the value only under the control of the [acquirer.]" (Gompers Tr. 912:17–18.) As such, a control premium is value arising "in anticipation of" the merger, N.C.G.S. § 55-13-01(5), and, accordingly, must be excluded from the appraisal value of the pre-merger company, (Yilmaz Tr. 1867:8–10; Gompers Tr. 911:7–9).

H.    No Discount for Lack of Marketability or Minority Status

376.   North Carolina's appraisal statute also provides that the valuation should not be discounted "for lack of marketability or minority status."   N.C.G.S. § 55-13-01(5).   Neither lack of marketability nor minority status are at issue in this case.

377.   First, there is no lack of marketability of RAI shares because of RAI's highly liquid and transparent market on the NYSE.   (JX0017.0003.)   Second, Dissenters did not have "minority status" because RAI did not have a majority or controlling shareholder.   (JX0023.0080; Wajnert Tr. 63:18–64:18.)   As the Supreme Court of North Carolina has already held, BAT was not a controlling shareholder because the Governance Agreement placed "contractual handcuffs" on BAT that prevented it from oppressing RAI's remaining shareholders or otherwise exercising control.   *Corwin,* 371 N.C. at 619, 821 S.E.2d at 739.   To the extent Dissenters suggested at trial that the existence of a large blockholder can affect the value of a company's shares, (Yilmaz Tr. 1969:8–1971:2), Dissenters offered no specific evidence in support of that theory in this case.

I.    Interest, Attorneys' Fees, and Costs

378.   Section 55-13-30(e) provides, in relevant part, that "each shareholder made a party to the proceeding is entitled to judgment either (i) for the amount, if any, by which the court finds the fair value of the shareholder's shares, plus interest, exceeds the amount paid by the corporation to the shareholder for the shareholder's shares[.]" Under N.C.G.S. § 55-13-01(6), "interest" is calculated by applying the statutory rate "from the effective date of the corporate action until the date of payment."   Thus,

under the statute, interest stops running on an amount when that amount is paid. As a result, because RAI's payment obligations to Dissenters ceased when it paid each Dissenter $59.64 per share plus interest in 2017, no further interest is due to Dissenters under the statute. Other states with similar statutes have interpreted their statutes similarly.[51]

379. Dissenters' arguments to the contrary are without merit. They argue that section 55-13-30 requires judgment to be calculated by starting with the adjudged fair value of RAI's shares, add interest at the legal rate through the date of judgment, and then subtract the amounts already paid. (Defs.' Opening Post-Trial Br. 61–63.) Given the large sums involved here, such an interpretation would result in an interest award to Dissenters in this action of over $100 million even though the Court has concluded that RAI paid them fair value for their shares. The Court concludes that this is a nonsensical result, one supported neither by the text of the statute nor the intent of the legislature.

380. N.C.G.S. § 55-13-31(b)(1) also provides that

> [t]he Court in an appraisal proceeding may also assess the expenses for the respective parties, in amounts the court finds equitable . . . [a]gainst the corporation and in favor of any or all shareholders demanding appraisal . . . if the court finds the corporation did not substantially comply with the requirements of G.S. 55-13-20, 55-13-22, 55-13-25, or 55-13-27.

---

[51] *See, e.g.*, *Pueblo Bancorporation v. Lindoe, Inc.*, 63 P.3d 353, 357 (Colo. 2003); *Ely, Inc. v. Wiley*, No. LA-22998, Slip Op. at 9 (Iowa Dist. Ct. Aug. 31, 1994), *rev'd on other grounds*, 546 N.W.2d 218 (Iowa Ct. App. 1996); *First W. Bank Wall v. Olsen*, 621 N.W.2d 611, 615 (S.D. 2001); *Utah Res. Int'l, Inc. v. Mark Techs. Corp.*, 342 P.3d 761, 768 (Utah 2014); *HMO-W Inc. v. SSM Health Care Sys.*, 667 N.W.2d 733, 735-36 (Wis. Ct. App. 2003); *Brown v. Arp & Hammond Hardware Co.*, 141 P.3d 673, 677 (Wyo. 2006).

Although Dissenters have sought their expenses here, the Court finds that RAI substantially complied with each of the cited statutes and therefore that an award of attorneys' fees and expenses against RAI is not justified.

381. Finally, N.C.G.S. § 55-13-30(a) provides,

> The court shall assess the costs against the corporation, except that the court may assess costs against all or some of the shareholders demanding appraisal, in amounts the court finds equitable, to the extent the court finds such shareholders acted arbitrarily, vexatiously, or not in good faith with respect to the rights provided by this Article.

RAI does not seek, nor does the Court find grounds, to assess costs against Defendants. Accordingly, the Court concludes that costs should be assessed against RAI as provided under section 55-13-30(a).

IV.

CONCLUSION

382. The evidence at trial of all "valuation concepts and techniques," "excluding any appreciation or depreciation in anticipation of the" merger and "without discounting for lack of marketability or minority status," establishes the fair value of RAI's shares as of the Transaction Date to be no more than $59.64 per share.

383. An imperfect, but nonetheless robust, deal process conducted by independent and sophisticated directors and financial advisors with deep and impeccable knowledge of RAI's business and growth prospects considered all reasonable and likely alternatives, extracted multiple price increases from BAT, and negotiated a final deal price of $59.64. The market valued RAI stock at well under $59.64 prior to BAT's first offer and likely would have continued to do so through the Transaction Date if the Merger had not occurred. Properly conducted DCF analyses,

including three separate analyses conducted by RAI's highly regarded, independent, and conflict-free financial advisors, support a fair value of $59.64 or less. The acquisition multiples in precedent transactions, while of less value, suggest a fair value below $59.64, and when considered together with the trading multiples for comparable companies, at a minimum and with all other evidence of value introduced at trial, provide a useful market or sanity check undermining the extraordinary $92.17 per share valuation reached by Zmijewski, which, if accepted, would suggest an enormous, implausible mispricing of more than $50 billion.

384. For these and all the reasons set forth above, the Court concludes that the fair value of RAI stock as of the Transaction Date was no more than the deal price of $59.64 per share.

385. **WHEREFORE**, the Court hereby **ENTERS JUDGMENT** ordering that:

a. No further sums are due from RAI to Defendants for payment of Defendants' shares;

b. RAI shall not be liable for Defendants' attorneys' fees and expenses incurred in connection with this action; and

c. RAI shall pay Defendants' court costs as provided in N.C.G.S. 55-13-31(a) no later than forty-five (45) days after the entry of this Judgment.

This the 27th day of April, 2020.

/s/ Louis A. Bledsoe, III
Louis A. Bledsoe, III
Chief Business Court Judge

## APPENDIX A

## DISSENTERS' SHAREHOLDINGS AND PAYMENTS RECEIVED

| Dissenter | Shares[52] | Payments Received[53] |
|---|---|---|
| **Magnetar Defendants** | | |
| Third Motion Equities Master Fund Ltd. | 1,652,198 | |
| Magnetar Capital Master Fund, Ltd. | 116,572 | |
| Spectrum Opportunities Master Fund Ltd | 93,294 | |
| Magnetar Fundamental Strategies Master Fund Ltd. | 51,590 | |
| Magnetar MSW Master Fund Ltd. | 40,576 | |
| **Total** | **1,954,230** | **$117,648,722.64** |
| | | |
| **Canyon, Mason, and BlueMountain Defendants** | | |
| The Canyon Value Realization Master Fund, L.P. | 1,661,466 | |
| Canyon Value Realization Fund, L.P. | 1,008,856 | |
| Canyon Blue Credit Investment Fund L.P. | 164,000 | |
| Canyon-SL Value Fund, L.P. | 139,888 | |
| Permal Canyon IO Ltd. | 68,180 | |
| Canyon Value Realization MAC 18 Ltd. | 45,672 | |
| Amundi Absolute Return Canyon Fund P.L.C. | 27,733 | |
| Mason Capital Master Fund, L.P. | 3,484,886 | |
| Blue Mountain Credit Alternatives Master Fund L.P. | 337,000 | |

---

[52] (Compl. Judicial Appraisal ¶¶ 3–25.)

[53] (Corr. Stip'd Facts ¶¶ 20–25.)  The exact amount of payments made to each individual Defendant was not included in evidence.

| | | |
|---|---|---|
| BlueMountain Summit Trading L.P. | 202,681 | |
| BlueMountain Montenvers Master Fund SCA SICAV-SIF | 114,360 | |
| BlueMountain Foinaven Master Fund L.P. | 67,379 | |
| BlueMountain Guadalupe Peak Fund L.P. | 43,580 | |
| Anton S. Kawalsky, trustee for the benefit of Anton S. Kawalsky Trust UA 9/17/2015 | 2,000 | |
| **Total** | **7,367,681** | **$444,223,930.40** |
| | | |
| **Defendant Barry Blank Trust** | | |
| Barry W. Blank Trust | 320,000 | |
| **Total** | **320,000** | **$19,314,863.34** |

**APPENDIX B**

**RULINGS ON REMAINING EVIDENTIARY OBJECTIONS**[54]

1. As noted in the Judgment to which this Appendix B is attached, the parties lodged numerous objections to proffered exhibits and testimony during the trial. The Court ruled on many of these objections at the time they were made. As to others, however, the Court received the proffered exhibits and testimony subject to objection and permitted post-trial briefing and argument on the objections. The Court's rulings on the parties' remaining evidentiary objections are set forth below in this Appendix B and are incorporated into the body of the Judgment as if set forth in full therein.

2. "The trial court has wide discretion in making [a determination of the admissibility of evidence] and will not be reversed absent an abuse of discretion." *Hamilton v. Thomasville Med. Assocs., Inc.*, 187 N.C. App. 789, 792, 654 S.E.2d 708, 710 (2007) (quoting *Heatherly v. Indus. Health Council*, 130 N.C. App. 616, 619, 504 S.E.2d 102, 105 (1998)).

A. RAI's Objections to Zmijewski's and Yilmaz's Opinions

3. RAI objects to the Court's consideration of select testimony and demonstrative exhibits offered by two of Dissenters' expert witnesses, Zmijewski, (Zmijewski Tr. 1266:4–16, 1267:5–21, 1286:1–1287:7, 1324:10–18, 1325:21–1328:8, 1329:5–1332:1, 1341:10–1347:18, 1348:4–1351:7, 1358:23–1361:17, 1362:18–20;

---

[54] The Court does not redefine in this Appendix B terms that have been defined in the Judgment, and such terms shall have the same meaning in this Appendix B as they have been defined in the Judgment.

Zmijewski's demonstrative slides,[55] at Slide 26, Slide 58), and Yilmaz, (Yilmaz Tr. 1914:21–1920:3), because Dissenters failed to timely disclose the opinions reflected in this evidence, (Reynolds American Inc.'s Post-Trial Evid. Br. 1–9 [hereinafter "RAI's Evid. Br."], ECF No. 216). Although the Court is sympathetic to RAI's concerns that Zmijewski and Yilmaz offered expert opinions at trial that neither expert had previously disclosed, the Court nevertheless, in the exercise of its discretion, hereby overrules RAI's objections in the circumstances here. The Court notes, however, that the challenged testimony and demonstrative slides lack persuasive force, and the Court thus affords them little weight in its determination of RAI's fair value.

B.      RAI's Objections to Constantino's Testimony

4.      RAI objects to portions of Constantino's testimony, (Constantino Tr. 1798:19–1800:6, 1801:15–1802:4), that it believes constitutes hearsay regarding the risk of heightened menthol regulation and certain messaging by RAI and Lorillard management regarding the risk of a menthol ban, (RAI's Evid. Br. 9–12). The Court, in the exercise of its discretion, hereby overrules RAI's objections but finds the challenged testimony lacking in evidentiary value and gives it little weight in the Court's determination of RAI's fair value.

---

[55] These demonstrative slides were not marked with an exhibit number, but redacted versions of the slides in question were attached to RAI's Post-Trial Evidentiary Brief. (*See* ECF No. 217.4.)

C. Dissenters' Objections to Deposition Testimony of Holland, Nowell, Eckler, and Peters

5. Dissenters contend that certain designated deposition testimony should be excluded, (Defs.' Opening Post-Trial Evid. Br. 14–17 [hereinafter "Defs.' Evid. Br."], ECF No. 214), including all of RAI's affirmative designations of Holland's Rule 30(b)(6) testimony, (Holland 30(b)(6) Dep. Tr.), certain designated testimony of Nowell, (Nowell Dep. Tr. 94:6–24, 168:11–24, 171:20–172:5, 172:13–16, 175:11–16, 182:6–24), and Eckler, (Eckler Dep. Tr. 79:19–80:23, 108:23–109:16, 113:3–114:9, 137:8–138:16), and certain counter-designations of the deposition testimony of Peters, (Peters Dep. Tr. 75:14–22, 110:14–21, 160:22–162:4, 162:15–164:2, 164:25–166:25). The Court, in the exercise of its discretion, hereby overrules Dissenters' objections. The Court notes, however, that it has not relied on most of this testimony in reaching its determination of fair value, and where it has, as noted by specific reference in the Judgment, the testimony is cumulative to other evidence establishing the facts or conclusions for which this testimony is cited.

D. Dissenters' Objections to Gompers's Expert Testimony

6. Dissenters seek to exclude the testimony of RAI's expert, Gompers, on grounds that Gompers improperly: (i) vouched for the Financial Advisors' DCF analyses, (Defs.' Evid. Br. 10), (ii) attempted to summarize the factual record and characterize lay witness testimony, (Defs.' Evid. Br. 11), (iii) testified to the efficiency of the market for RAI stock based on a non-testifying expert's prior deposition testimony, (Defs.' Evid. Br. 12), and (iv) parroted hearsay analyst reports without conducting any independent analysis, (Defs.' Evid. Br. 13).

7.     The Court, in the exercise of its discretion and for the reasons set forth below, overrules Dissenters' objections and considers Gompers' testimony in determining the fair value of RAI's shares in this action.

8.     Vouching occurs when an expert merely "parrots" or "rubber stamps" an opinion from another witness.  *See In re Wagner*, No. 06-cv-01026, 2007 U.S. Dist. LEXIS 22769, at *10 (E.D. Pa. Mar. 29, 2007);[56] *Loeffel Steel Prods., Inc. v. Delta Brands, Inc.*, 387 F. Supp. 2d 794, 808–09, 824 (N.D. Ill. 2005).  Experts cannot merely vouch for the opinions of others.  *See, e.g., State v. Bullock*, No. COA10-320, 2010 N.C. App. LEXIS 2058, at *7 (N.C. Ct. App. Nov. 2, 2010) ("[E]xpert testimony is not admissible to vouch for a witness's credibility."); *see also, e.g., Louis Vuitton Malletier v. Dooney & Bourke, Inc.*, 525 F. Supp. 2d 558, 664 (S.D.N.Y. 2007) ("[T]he expert witness must in the end be giving his *own* opinion."); *FrontFour Capital Grp. LLC, v. Taube*, C.A. No. 2019-0100-KSJM, 2019 Del. Ch. LEXIS 97, at *50 (Del. Ch. Mar. 11, 2019) ("[The expert] opined that the process used by various investment banks was reasonable, but an expert cannot simply vouch for the work of someone else.").

9.     Gompers's work in this case was not mere vouching; he did not simply "rubber stamp" the Financial Advisors' opinions or claim their work as his own.  To the contrary, Gompers performed his own detailed, independent analyses using

---

[56] North Carolina courts may look to decisions interpreting the relevant Federal Rules of Evidence in construing the North Carolina Rules of Evidence.  *See, e.g., State v. McGrady*, 368 N.C. 880, 887–88, 787 S.E.2d 1, 7 (2016); N. C. R. Evid. 102, cmt. ("A substantial body of law construing [the Federal Rules of Evidence] exists and should be looked to by the courts for enlightenment and guidance in ascertaining the intent of the General Assembly in adopting these rules.").

customary valuation techniques and relying on his training and expertise as a financial economist, to test the validity and reasonableness of the Financial Advisors' inputs, analyses, and valuations. (Gompers Tr. 745:2–20, 752:1–757:23; PDX0005.) As such, Dissenters' challenge on this basis is overruled. *See, e.g., Iconics, Inc. v. Massaro*, 266 F. Supp. 3d 461, 469 (D. Mass. 2017) ("Nor may an expert 'parrot' the conclusions of other witnesses, although an expert may rely on other witness's testimony or other expert conclusions to form an opinion."); *Cholakyan v. Mercedes-Benz USA, LLC*, 281 F.R.D. 534, 544 (C.D. Cal. 2012) ("[A]n expert can appropriately rely on the opinions of others if other evidence supports his opinion and the record demonstrates that the expert conducted an independent evaluation of that evidence."); *Therasense, Inc. v. Becton, Dickinson & Co.*, No. C 04-02123 WHA, 2008 U.S. Dist. LEXIS 124780, at *18 (N.D. Cal. May 22, 2008) ("[T]he expert might scrutinize a . . . test, its protocol, and its participants so carefully that it would be reasonable to rely on it after the fact.").

10.     Gompers also did not improperly provide a summary of the factual record. An expert is not permitted to "rehash[ ] otherwise admissible evidence" or testify "solely for the purpose of constructing a factual narrative based upon record evidence." *Highland Capital Mgmt., L.P. v. Schneider*, 379 F. Supp. 2d 461, 468–69 (S.D.N.Y. 2005) (citations omitted); *see also, e.g., Factory Mut. Ins. Co. v. Alon USA L.P.*, 705 F.3d 518, 524 (5th Cir. 2013) ("Rule 703 was not intended to abolish the hearsay rule and to allow a witness, under the guise of giving expert testimony, to in effect become the mouthpiece of the witnesses on whose statements or opinions the

expert purports to base his opinion." (internal quotation marks omitted)). Gompers has done neither here. Rather, as noted above, Gompers performed extensive independent work to test the Financial Advisors' DCF-based valuations of RAI, (Gompers Tr. 745:2–20, 752:1–753:18, 770:7–771:6, 779:25–780:25), to adjust RAI's unaffected stock price to account for changes between the October 20 Offer and the Transaction Date, (Gompers Tr. 789:21–792:25), and to explain why Zmijewski's valuation of RAI was an outlier when compared to all other evidence of value in the case, (Gompers Tr. 799:16–801:23, 802:12–803:8). *See Sharkey v. J.P. Morgan Chase & Co.*, 978 F. Supp. 2d 250, 254 (S.D.N.Y. 2013) ("[I]nformation and testimony [that] is not accessible to a lay person . . . is admissible as expert testimony."). Dissenters' challenge on this basis is therefore overruled.

11.    Neither was Gompers's testimony concerning the market efficiency of RAI stock improper, nor did he improperly rely upon an expert whose conclusions are not part of the record. First, there is no legal or evidentiary rule in North Carolina requiring a court's determination of market efficiency to reflect a consideration of expert testimony. Indeed, courts in Delaware and elsewhere have identified numerous factual criteria to be considered in assessing whether the market for a particular security is efficient. *See, e.g., In re Appraisal of Jarden Corp.*, C.A. No. 12456-VCS, 2019 Del. Ch. LEXIS 271, at *57–60 (Del. Ch. July 19, 2019); *In re Appraisal Solera Holdings, Inc.*, C.A. No. 12080-CB, 2018 Del. Ch. LEXIS 256, at *60–62 (Del. Ch. July 30, 2018); *Cammer v. Bloom*, 711 F. Supp. 1264, 1285–87 (D.N.J. 1989). While expert testimony no doubt can be helpful in this determination,

there is no reason why, in the appropriate case, a trial court cannot make this determination solely from the factual record. And here, as discussed in the body of the Judgment, ample evidence was introduced at trial to permit a finding of market efficiency for the trading of RAI's stock.

12. In addition, Gompers did not present any testimony regarding market efficiency that relied on another expert. *See, e.g.*, *J.B. Hunt Transp., Inc. v. Gen. Motors Corp.*, 243 F.3d 441, 444–45 (8th Cir. 2001) (affirming exclusion of testifying expert's testimony that was "inextricably linked" to excluded expert's testimony); *Beck's Office Furniture & Supplies, Inc. v. Haworth, Inc.*, No. 95-4018, No. 95-4029, 1996 U.S. App. LEXIS 20608, at *21 (10th Cir. Aug. 16, 1996) ("Experts . . . may not merely parrot the opinions of other experts whose conclusions are not themselves in the record."). Instead, both he and Yilmaz testified that they had not seen any evidence contradicting market efficiency. (Gompers Tr. 785:3–11, 785:20–786:8; Yilmaz Tr. 1967:4–13.) Dissenters' challenge on these grounds are therefore overruled.

13. Finally, Gompers did not act as a conduit for otherwise inadmissible hearsay. *See, e.g.*, *Laugelle v. Bell Helicopter Textron, Inc.*, 2014 Del. Super. LEXIS 508, at *48 (Del. Super. Ct. Oct. 6, 2014) ("[E]xperts are not to serve as a 'conduit' for otherwise inadmissible hearsay statements."); *see also, e.g.*, *United States v. Baca*, No. CR 16-1613 JB, 2018 U.S. Dist. LEXIS 211943, at *52 (D.N.M. Dec. 17, 2018) ("[T]he expert must form his own opinions by 'applying his extensive experience and a reliable methodology' to the inadmissible materials."); *Gannett Co., Inc. v. Kanaga*,

750 A.2d 1174, 1187 (Del. 2000) ("The danger exists, however, that Rule 703 can be used as a 'back door' hearsay exception – a crafty litigant could give hearsay to its expert for the purpose of having the expert refer to it as a basis for the expert's opinion." (citation omitted)); *Towerview LLC v. Cox Radio, Inc.*, C.A. No. 4809-VCP, 2013 Del. Ch. LEXIS 159, at *6–7 (Del. Ch. June 28, 2013) ("[The expert] did not refer to the document in his expert report or testify about it at trial or in his deposition. Hence, there is no basis for treating the document as admissible as nonhearsay to support [his] expert opinion under Rule 703."); *In re J.C.*, No. COA08-1339, 2009 N.C. App. LEXIS 344, at *7 (N.C. Ct. App. Apr. 7, 2009) (The "admissibility [of evidence under Rule 703] does not depend on an exception to the hearsay rule, but on the limited purpose for which it is offered." (quoting *State v. Wood*, 306 N.C. 510, 516–17, 294 S.E.2d 310, 313 (1982))).

14. Although Dissenters correctly argue that the analyst reports on which Gompers relied are hearsay, the Financial Advisors and both sides' experts agreed that analyst reports are frequently relied upon by valuation experts in appraisal actions, (Gompers Tr. 745:2–20, 802:12–24; Zmijewski Tr. 1380:17–1381:2; de Gennaro Tr. 187:18–188:8, 199:2–19; Clark Tr. 1445:1–17; Constantino Tr. 1790:17–1791:11, 1793:25–1794:9; Eckler Dep. Tr. 58:18–59:4), and experts are allowed to rely on hearsay if it is reasonable to do so, as it is here*, see* N.C. R. Evid. 703 ("If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence."); *see also, e.g.*, *Towerview LLC*, 2013 Del. Ch. LEXIS 159, at *5 ("A document may be

considered nonhearsay if it is admitted as basis evidence to help the factfinder understand the expert's thought process and determine what weight to give to the expert's opinion." (internal quotation marks omitted)); *id.* at *9 ("Petitioner tacitly has accepted the fact that analyst reports are proper evidence for the experts to consider[.]"); *Hammel v. USF Dugan, Inc.*, 178 N.C. App. 344, 349, 631 S.E.2d 174, 178 (2006) ("When an expert witness testifies to the facts that are the basis for his or her opinion, 'such testimony is not hearsay [because it is used] to show the basis of the opinion.'" (quoting *State v. Robinson*, 330 N.C. 1, 25, 409 S.E.2d 288, 302 (1991))); *In re Lint*, No. COA02-1109, 2003 N.C. App. LEXIS 1156, at *6 (N.C. Ct. App. June 17, 2003) (Rule 703 "permits an expert witness to rely on an out-of-court communication as a basis for an opinion and to relate the content of that communication to the [fact-finder].").

15. Here, Gompers examined each individual analyst report and explained how the reports supported his conclusions; he did not simply adopt them as his own or read them into the record. (Gompers Tr. 729:24–730:9, 745:21–747:2, 785:24–786:8.) As such, this testimony is properly admitted, and Dissenters' objection is overruled. *State v. Brewington*, 367 N.C. 29, 45, 743 S.E.2d 626, 635 (2013) ("[T]he expert opinion was 'independent' and . . . the report was not used for the truth of the matter asserted because it was only used to support this 'independent opinion' of a qualified expert.").

E.     Adverse Inference Concerning Shivdasani/Missing Witness Rule

16. Dissenters seek to invoke the "missing witness rule" to obtain an inference that the expert testimony of Dr. Anil Shivdasani ("Shivdasani") concerning market

efficiency, an expert retained by RAI, would have been adverse to RAI because RAI decided not to call him as a witness at trial. (Defs.' Evid. Br. 5–9.) Dissenters suggest RAI elected not to call Shivdasani because he found that the market for RAI's stock was inefficient and, because of a recent adverse court ruling, would be seen as lacking credibility. (Defs.' Evid. Br. 6.)

17. North Carolina courts have applied the "missing witness rule" to fact witnesses with unique information that was unavailable from another source. *See, e.g.*, *Sunbelt Rentals, Inc. v. Head & Engquist Equip., L.L.C.*, 2003 NCBC LEXIS 6, at \*135–36 (N.C. Super. Ct. May 2, 2003). The rule has been characterized as "similar" to "the well-established principle of 'spoliation of evidence[.]' " *McLain v. Taco Bell Corp.*, 137 N.C. App. 179, 183, 527 S.E.2d 712, 715–16 (N.C. Ct. App. 2000) (citing *Yarborough v. Hughes*, 139 N.C. 199, 209, 51 S.E. 904, 908 (N.C. 1905)). As one court has noted,

> What is called the "missing witness rule" is not a rule; it is simply a "permissible inference that a factfinder may draw from the absence of a potential witness who might have knowledge of facts at issue in the case," when the witness is "peculiarly available" to the party not calling the witness.

*Rockwell v. State*, No. 150, 2019 Md. App. LEXIS 651, at \*7 (Md. App. Aug. 2, 2019) (quoting *Harris v. State*, 182 A.3d 821, 832 (Md. 2018)). "Notably, an adverse inference cannot be drawn when the witness is not available, or where his testimony is unimportant or cumulative, or where he is *equally available to both sides*." *Dansbury v. State*, 1 A.3d 507, 521 (Md. Ct. Spec. App. 2010) (emphasis added) (internal quotation marks omitted). "[T]he doctrine applies only if the missing

witness is particularly under the control of the defendant rather than being equally available to both parties." *State v. Montgomery*, 183 P.3d 267, 278 (Wash. 2008).

18.     The Court, in the exercise of its discretion, denies Dissenters' request for an adverse inference arising from Shivdasani's failure to testify.   First, Dissenters deposed Shivdasani and could have introduced his videotaped deposition testimony at trial under N.C. R. Civ. P. 32(a)(4), which provides that "The deposition of a witness, whether or not a party, may be used by any party for any purpose if the court finds: . . . the witness is an expert witness whose testimony has been procured by videotape as provided for under Rule 30(b)(4)."  Because Shivdasani's testimony was available to both sides, there is no basis for the adverse inference permitted by the rule.

19.     Moreover, North Carolina courts have never suggested that the missing witness rule should apply to expert witnesses.  Indeed, there are sound reasons why it should not, including that there may be "many explanations for a party's decision not to call a particular expert that may have nothing to do with a party's fear that the expert will reveal prejudicial information[,]" including cost, redundancy, resolution of claims, dismissal of parties, and witness availability.  *Washington v. Perez*, 98 A.3d 1140, 1153–54 (N.J. 2014) (noting additional reasons to reject application of the rule to experts include that (i) "the content of an expert witness's testimony is unlikely to be a mystery to the parties and their counsel when a case proceeds to trial"; (ii) "an expert is unlikely to be in exclusive possession of factual evidence that would justify an adverse inference charge"; and (iii) "court rules do not

compel a litigant who has disclosed the name and opinion of a particular expert to call that expert to testify at trial"); *see also In re Care & Treatment of Gonzalez*, 763 S.E.2d 210, 215 (S.C. 2014) (holding that an "unfavorable inference may be drawn only from a party's failure to call an available, material witness where under all the circumstances, the failure to produce such witness creates suspicion of a willful attempt to withhold competent evidence").

F.      Post-Merger Evidence

20.     Dissenters objected at trial to RAI's effort to introduce evidence relating to the period after the Transaction Date[57] as irrelevant to the determination of fair value. (Defs.' Evid. Br. 1–5.) RAI also lodged a conditional objection, contending that should the Court sustain Dissenters' objection, Dissenters' post-merger evidence, which Dissenters offered solely as rebuttal to RAI's, should likewise be excluded. (RAI's Evid. Br. 24–29.)

21.     North Carolina offers little guidance concerning a court's consideration of post-merger evidence in determining fair value under the appraisal statute, section 55-13-30. The North Carolina appraisal statute itself is silent, simply instructing the court to determine "[t]he value of the corporation's shares . . . immediately before the effectuation of the corporate action as to which the shareholder asserts appraisal rights[.]" N.C.G.S. § 55-13-01(5). North Carolina case law does not adequately fill

---

[57] The challenged evidence is as follows: Gompers Tr. 793:16–797:25, 800:14–801:20, 918:14–923:3; Flyer Tr. 1080:17–1082:20, 1083:3–1084:16, 1115:5–15, 1192:18–1196:1, 1197:3–1199:2, 1203:14–1204:9; Fragnito Tr. 1671:6–10, 1686:24–1687:9, 1692:20–21, 1707:18–1709:7; Constantino Tr. 1794:10–1795:10, 1795:14–19.

the gap. *See, e.g.*, *IRA for Benefit of Oppenheimer v. Brenner Cos.*, 107 N.C. App. 16, 25, 419 S.E.2d 354, 360 (1992) ("The post-merger financial information does not affect Interstate's findings made prior to the merger.").

22. The Court thus turns to Delaware for guidance. Delaware courts in appraisal litigation will "permit consideration of post-merger evidence that could have been discerned at the time of the merger, but [do not permit] consideration of post-merger evidence that was not capable of being known on the date of the merger." *In re Cinerama Inc.*, C.A. No. 7129, 1999 Del. Ch. LEXIS 32, at *11 (Del. Ch. Feb. 25, 1999) (emphasis omitted); *see also Cavalier Oil Corp. v. Harnett*, Civil Action Nos. 7959, 7960, 7967, 7968, 1988 Del. Ch. LEXIS 28, at *47 (Del. Ch. Feb. 22, 1988) ("Post-merger data may be considered only if it is 'known or susceptible of proof as of the date of the merger and not the product of speculation.'" (quoting *Weinberger v. UOP, Inc.*, 457 A.2d 701, 713 (Del. 1983))), *aff'd*, 564 A.2d 1137 (Del. 1989).

23. Courts have on occasion considered competent evidence of events post-dating the relevant corporate action when those events are relevant to the reasonableness of a company's pre-closing views of its future business prospects. *See, e.g.*, *Cede & Co. v. Technicolor, Inc.*, 758 A.2d 485, 499 (Del. 2000) ("[T]his Court held that post-merger evidence is admissible 'to show that plans in effect at the time of the merger have born fruition.'" (quoting *Gonsalves v. Straight Arrow Publishers, Inc.*, 701 A.2d 357, 362 (Del. 1997))); *In re Appraisal of PetSmart, Inc.*, No. 10782-VCS, 2017 Del. Ch. LEXIS 89, at *44 n.268 (Del. Ch. May 26, 2017) (finding that "post-closing performance is probative of the reliability of . . . management projections");

*Gearreald v. Just Care, Inc.*, C.A. No. 5233-VCP, 2012 Del. Ch. LEXIS 91, at *10 (Del. Ch. Apr. 30, 2012) (noting "[t]he Court . . . should take into account all relevant factors known or ascertainable as of the merger date that illuminate the future prospects of the company").

24. RAI argues that its post-merger evidence here addresses RAI's proper consideration of regulatory risks, the dynamic quality of the vapor industry, and the lack of support for Dissenters' claim that the market mispriced RAI. (RAI's Evid. Br. 25–26.) Such evidence, however, reaches beyond the reasonableness of RAI's pre-closing views of its future business prospects and is therefore not properly considered in this proceeding. In the exercise of the Court's discretion, Dissenters' objection is therefore sustained. *See, e.g.*, *Kahn v. Household Acquisition Corp.*, 591 A.2d 166, 175 (Del. 1991) (excluding evidence of post-merger offers "as valid indications of merger-date fair value because they were not 'known or susceptible of proof as of the date of the merger' " (quoting *Weinberger*, 457 A.2d at 713)). Consistent with RAI's conditional objection, the Court, in the exercise of its discretion, will likewise disregard the post-merger evidence offered by Dissenters.

**SO ORDERED**, in the exercise of the Court's discretion and effective contemporaneously with the filing of the Judgment to which these rulings are attached as Appendix B and incorporated therein.